Alan D. Halperin (AH-8432)
Robert D. Raicht (RR-2370)
Walter Benzija (WB-0909)
**HALPERIN BATTAGLIA RAICHT, LLP**
Proposed Counsel to the
  Debtor and Debtor-in-Possession
555 Madison Avenue - 9th Floor
New York, New York 10022
(212) 765-9100

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re:

                                              Chapter 11

SALANDER-O'REILLY GALLERIES, LLC,             Case No.  07-30005 (CGM)

                 Debtor.

--------------------------------------------------------x

## MOTION FOR AN ORDER (I) AUTHORIZING SECURED AND SUPERPRIORITY POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364, (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND (IV) SCHEDULING A HEARING ON DEBTOR'S MOTION FOR A FINAL ORDER AUTHORIZING FINANCING PURSUANT TO 11 U.S.C. § 364 PENDING THE FINAL HEARING

TO THE HONORABLE CECELIA G. MORRIS,
UNITED STATES BANKRUPTCY JUDGE:

Salander-O'Reilly Galleries, LLC, the debtor and debtor-in-possession herein (the

"Debtor"), respectfully represents:

### Preliminary Statement

1.      The Debtor makes this motion (the "Motion") for an order, pursuant to

sections 105(a), 361, 363, 364(c) and (d) of Title 11 of the United States Code (the "Bankruptcy

Code") and Fed.R.Bankr.P. 2002, 4001 and 9014, and General Order No. M-274 of this Court (the

"Guidelines") on an interim and final basis, to:

{00054670.5 / 0607-001}

a.      Obtain advances from First Republic Bank (the "<u>Lender</u>") up to an aggregate principal amount of $1,500,000 (the "<u>DIP Facility</u>") in accordance with the Term Sheet annexed as Exhibit "A" (the "<u>Term Sheet</u>") hereto which is subject to definitive documentation to be filed prior to the hearing on final approval of the proposed secured financing and use of cash collateral (together with the Term Sheet, the "<u>DIP Agreement</u>"), with advances to be made in accordance with the DIP Agreement, and the Debtor's use of proceeds to be in accordance with the weekly cash budget annexed as appendix A to the Term Sheet, and the monthly cash budget annexed as appendix B to the Term Sheet (together, the "<u>Budget</u>" and together with the DIP Agreement, collectively, the "<u>DIP Loan Documents</u>");

b.      Approve the terms and conditions of the DIP Loan Documents and authorize the Debtor to execute and deliver the DIP Loan Documents to the Lender;

c.      Authorize the Debtor under sections 364(c) and (d) of the Bankruptcy Code to obtain from the Lender post-petition financing and incur secured post-petition indebtedness under the DIP Loan Documents, and on account of such indebtedness grant the Lender (i) pursuant to section 364(c)(1) of the Bankruptcy Code, a claim having priority over any and all expenses and claims of the kind specified in, *inter alia*, sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726 and 1114 of the Bankruptcy Code (the "<u>Superpriority Claim</u>"); (ii) pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a valid, fully perfected first priority lien and security interest in all of the Debtor's now owned or hereafter acquired assets, whether or not encumbered by a valid lien or other encumbrance on the Petition Date (as defined herein) (the "<u>DIP Post-Petition Lien</u>"); and (iii) pursuant to section 364(d) of the Bankruptcy Code be secured by a valid, fully perfected first priority priming lien in all of the DIP Facility Collateral (as defined herein) (the "<u>DIP Priming Lien</u>" together with the DIP Post-Petition Lien, the "<u>DIP</u>

Lien"); it being understood that all claims and liens arising pursuant to clauses (i), (ii) and (iii) above are subject and subordinate only to the Carve-Out (as defined herein);

d.    Authorizing the Debtor to use Cash Collateral (as that term is defined in section 363(a) of the Bankruptcy Code) on an interim and final basis in the manner specified in the Term Sheet and the Budget;

e.    Pursuant to section 361(2) of the Bankruptcy Code, granting the Lender: (i) as the pre-petition lender under the Existing Credit Agreement, adequate protection of the pre-petition liens on, and security interests in, the Pre-Petition Collateral (as defined herein) in the form of a post-petition lien subject and subordinate only to the DIP Lien and the Carve-Out (the "Adequate Protection Liens"); and (ii) pursuant to Bankruptcy Code section 507(b) of the Bankruptcy Code, if and to the extent the Adequate Protection Liens are insufficient to protect the Lender's interests in the Pre-Petition Collateral from a diminution in value for any reason, an allowed administrative expense claim to the extent of such insufficiency, with priority over all other allowed administrative expense claims, except for the Superpriority Claim and the Carve-Out (the "Adequate Protection Claim");

f.    Modification of the automatic stay to the extent required to effectuate the terms of the DIP Agreement;

g.    Pursuant to Fed.R.Bankr.P. 4001, scheduling interim and final hearings on this Motion; and

h.    Granting the Debtor such other and further relief as the Court may deem just and proper.

## Background

2.      On November 1, 2007 (the "Petition Date"), an involuntary petition under

Chapter 7 of the Bankruptcy Court was filed against the Debtor.  On November 6, 2007, the

Debtor consented to the entry of an order for relief and exercised its right to convert the case to

Chapter 11 of the Bankruptcy Court.  The Debtor has continued in the management and

operation of its business and property as a debtor-in-possession pursuant to §§1107 and 1108 of

the Bankruptcy Code.

3.      No committee or trustee has been appointed in the case.

4.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §1334.

This is a core proceeding pursuant to 28 U.S.C. §157(b).  Venue of this proceeding and this

Motion is proper pursuant to 28 U.S.C. §§1408 and 1409.  The statutory predicates for the relief

requested herein are sections 105(a), 361, 363(a), 364(c) and (d) of the Bankruptcy Code and

Fed.R.Bankr.P. 2002, 4001 and 9014.

5.      The Debtor currently operates its business from leased premises located at

22 East 71st Street, New York, New York 10021.

6.      The Debtor is the owner and operator of an art gallery in New York City.

The gallery exhibits and manages fine art from Renaissance to contemporary and represents

living artists and artists' estates.  In the ordinary course of its business, the Debtor buys and sells

art works for its portfolios.  The Debtor also sells works of art on consignment from other

owners or, in the case of contemporary art, often from the artists.  The paintings that the Debtor

deals in are museum quality works of art and many are valued in the hundreds of thousands or

millions of dollars.  The Debtor purchases art for resale at auction and in private transactions

with individuals or other galleries.  It sells artworks through private transactions and art shows,

to walk-in customers at the gallery and, on occasion, at auction.  Its customers include individuals, institutional purchasers, including wealthy private collectors and well-known museums throughout the world.

7.      The Debtor's bankruptcy filing was precipitated by the continuing and mounting pressures of the various lawsuits facing the Debtor and in particular the deleterious effect of the preliminary injunction entered in one such action which forced the shutdown of the Debtor's operations.  These disputes have interfered with the Debtor's efforts to operate its business and have damaged its reputation in the marketplace.  The Debtor seeks the protection of the Bankruptcy Court to resolve these disputes, restore its stature in the industry and maximize its asset values.

8.      The Debtor plans to use the breathing space afforded to it by the bankruptcy filing to accomplish a number of goals that will ultimately inure to the benefit of its estate and all of its creditors.  The Debtor has already taken steps to gain the trust of its creditors in this process.  The Debtor has retained, subject to the Bankruptcy Court's approval, the turnaround firm of Triax Capital Advisors LLC and has named its managing director, Joseph E. Sarachek, as its Chief Restructuring Officer (the "CRO").  Mr. Sarachek is an independent third party with substantial experience with companies in the art industry.  Mr. Sarachek has assumed complete control of all aspects of the Debtor's business and financial affairs, including unfettered authority to make all managerial and operational decisions on behalf of the Debtor.

9.      Among the first orders of business, the CRO shall undertake a comprehensive and detailed inventory of the Debtor's assets including artwork wherever located. The CRO will also undertake any and all actions necessary to assemble the Debtor's books and records to enable the Debtor to once again conduct its business.  Among the issues raised in a

number of the litigations concerns the nature and extent of ownership rights asserted in various pieces of artwork.  Absent a resolution of these competing interests to the Debtor's primary and most valuable assets, its ability to continue to operate will be severely hampered.  Thus, it is the CRO's intention to implement procedures necessary to efficiently address and resolve the competing ownership interests in the various pieces of artwork.  Such procedures contemplate notice to the potential claimants, the establishment of deadlines for the assertion of competing claims, and the initiation of a claims resolution process before this Court.

    10.    The Debtor believes that the fundamentals of its business remain sound. The Debtor intends to use the Chapter 11 process to (a) resolve its litigation disputes, (b) resolve any financing issues, (c) conduct a review of its business, and (d) negotiate and confirm a plan that maximizes asset values for the benefit of the Debtor's estate and its creditors.

### Debtor's Pre-Petition Financing

    11.    The Debtor financed its operations through a Credit Agreement between it and the Lender, dated January 12, 2005, as modified by modifications dated February 3, 2006 and March 31, 2006 (the "Original Credit Agreement").  The Original Credit Agreement was superseded by that certain Amended and Restated Credit Agreement between the Lender and the Debtor, dated April 2006 as amended by amendments dated July 19, 2006, August 25, 2006, October 10, 2006, December 29, 2006 and February 16, 2007 ("Amended Credit Agreement", together with the Original Credit Agreement, the "Existing Credit Agreement").  The Existing Credit Agreement provided the Debtor with financing via (a) a revolver of $26,000,000; (b) a term loan of $1,500,000, dated January 12, 2005, and (c) a second term loan of $14,000,000, dated April 2006.  The obligations are secured by, among other things, a perfected security interest in all personal property of the Debtor (the "Pre-Petition Collateral").

12.    The Debtor asserts and acknowledges that the Lender is owed approximately $25,342,000.00 under the Existing Credit Agreement as of the Petition Date.  The Lender is also the pre-petition lender.

13.    The Debtor is in default under the terms of the Existing Credit Agreement, which events of default have not been cured or waived.  As a result of such defaults, the obligations under the Existing Credit Agreement have been accelerated and demanded by the Lender and are currently due and payable in full.

### The Debtor Requires Debtor-in-Possession Financing And Use of Cash Collateral to Continue Operating

14.    The Debtor has no unencumbered funds or credit available to fund its business operations.  Because the Debtor's books and records have been impounded and it and its agents are barred from access to its records by court order, the Debtor has determined that seeking alternative financing would be impossible.  The Lender is the most familiar with the Debtor's collateral to the extent it can be identified and is therefore capable of making an assessment of its value; it would be difficult if not impossible for a lender unfamiliar with the Debtor to ascertain such value on an expedited basis.  No reputable lender would be willing to extend credit without access to such basic financial information about the Debtor.  Thus, given the emergent circumstances facing the Debtor, the Debtor has determined in its business judgment that the funding offered by its Lender is the only viable course and is in the best interest of the estate.  Indeed, without the funding from the Lender under the DIP Agreement, the Debtor's operations will cease and the value of its assets will be lost.  Therefore, it is imperative that the Debtor be authorized to obtain advances under the DIP Agreement in order to preserve and maximize the value of its assets.

15.     The Debtor seeks authority to draw on an interim basis $630,000 pursuant
to the Term Sheet and a total of $1,500,000 (inclusive of the interim funding amount) through
the duration of the DIP Agreement.

## The DIP Agreement

### A.     General Terms

16.     Subject to the terms and conditions of the DIP Agreement, and Court
approval thereof, the Lender has agreed to advance funds to the Debtor for the payment of the
expenses in accordance with the Budget.  The terms and conditions of the DIP Agreement, as
currently reflected in the Term Sheet, including the protections and rights granted to the Lender,
are summarized herein.

17.     Pursuant to the DIP Agreement, upon final approval by this Court, the
Lender shall make loans and advances to the Debtor in an aggregate amount not to exceed
$1,500,000.  Advances under the DIP Agreement shall be made in accordance with the Budget
and pursuant to the specific terms of the DIP Agreement.  The DIP Agreement provides that
interest will accrue on all advances at the prime rate plus 5.00%, payable monthly in arrears.
The Default Rate (as defined in the DIP Agreement) is the prime rate plus 9.00% payable
immediately.  In addition, the Lender is due a commitment fee of $100,000 payable upon the
maturity of the DIP Agreement.  The DIP Agreement is renewable upon the consent of the
Lender.  No additional facility fee will be charged by the Lender upon any such renewal.

18.     The maturity date of the DIP Agreement is defined as the earliest of (a) 30
days after the date on which the Bankruptcy Court entered the Interim DIP Order, if within such
time the Final DIP Order has not been entered, (b) 180 days after the Petition Date; (c) the
effective date of a chapter 11 plan; (d) upon entry of an order dismissing or converting the case

to Chapter 7 of the Bankruptcy Code; (e) upon entry of an order appointing a trustee; or (f) upon

an uncured material breach of a representation, warranty or covenant.  The DIP Agreement may

be extended, subject to the sole discretion of the Lender, for an additional 180-day period.

## B.   DIP Lien

19.   For all Obligations (as defined in the Interim DIP Financing Order)

incurred by the Debtor, the DIP Agreement grants Lender the Superpriority Claim.  As security

for all Obligations, the DIP Agreement authorizes the Debtor to obtain post-petition financing

from the Lender secured by the DIP Lien on the following  property of the Debtor and its estate,

wherever located, whether now owned or hereinafter acquired or arising, and all proceeds and

products thereof:

(a)   all personal and fixture property of every kind and nature including without limitation all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including healthcare insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter of credit rights (whether or not evidenced by a writing), securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles;

(b)   the Debtor's interest in Renaissance Art Investors, LLC ("RAI");

(c)   the Debtor's leasehold interest and any other estate it may have in the real property located at 22 East 71st Street, New York, New York;

(d)   assignment of life insurance on the life of Lawrence Salander having a face amount of not less than $5,000,000;

(e)   any right of the Debtor or its bankruptcy estate to avoid any transfer of the Lender's prepetition collateral or incurrence of debt to a third party  that is senior to or pari passu in any respect to the Lender's Existing Credit Agreement;

(f)   all commercial tort claims (without the necessity for a more particular description); and

(g)    Non-Estate Assets (defined below) solely to the amount of the Non-Asset Asset Costs (defined below).

(collectively, the "DIP Facility Collateral"); it being understood that the Superpriority Claim and the

DIP Lien to be granted under the proposed interim and final orders are subject and subordinate only

to the Carve-Out.  The DIP Lien shall not be subordinated to or made *pari passu* with any other lien

or security interest, however arising, other than with respect to the Carve-Out.

### C.    Limited DIP Lien on Non-Estate Assets and Conditional Replevin

20.    Given the unsettled nature of the Debtor's books and the nature of the

Debtor's pre-petition business, the Debtor may be in possession of certain properties which are

asserted to be held on consignment or in trust for third parties or in to which the Debtors holds

legal title within the meaning of section 541(d) of the Bankruptcy Code (collectively, "Non-

Estate Assets").  At this time, the Debtor respectfully submits that it would be impractical for the

Court to address on an interim basis competing ownership claims to such Non-Estate Assets until

such time as an orderly claims resolution process can be implemented as contemplated by the

Debtor and required under the Term Sheet.  During the period prior to a final determination of

such potential competing claims, the Debtor (and the Lender) seek authorization to expend, cash

collateral and other assets to preserve and maintain such Non-Estate Assets (collectively, "Non-

Estate Asset Costs").

21.    To address the unique issue of the Non-Estate Assets and the Non-Estate

Asset Costs, the Debtor and the Lender have agreed to the following procedures, subject to

Bankruptcy Court approval.  To the extent any Notice Party asserts an interest in particular

property that the Notice Party asserts to be a Non-Estate Asset, such Notice Party shall be

deemed to consent to a DIP Lien in such property solely to the extent of the Non-Estate Asset

Costs directly attributable to the property at issue as determined by the Bankruptcy Court upon

notice and hearing except and only to the extent that such Notice Party may, in lieu of consenting

to such DIP Lien, within ten (10) business days of entry of this Order (a) submit to the

Bankruptcy Court an affidavit setting forth in detail the nature and extent of its claim to the

property in question, (b) remove such property from the Debtor's Premises at its own cost and

(c) provide for the benefit of the Lender and the Debtor's estate an undertaking (i) in the amount

of the full insurable value of the property (as agreed to by the parties or determined by the

Bankruptcy Court) or (ii) twice the claimed value of the property, all in a form reasonably

acceptable to the Lender and the Debtor.  Such undertaking shall be payable in full in the event

that the Bankruptcy Court later enters an order determining that such property is "property of the

estate" within the meaning of Section 541 of the Bankruptcy Code.  Such undertaking shall be

expressly in lieu of any right of the Notice Party to return any such asset to the Debtor upon

entry of such order, and the Lender or the Debtor shall be permitted to retain the full amount of

the undertaking even in the event that the actual fair market value of the property is less than the

amount of the undertaking.  In the event that a final order is entered determining that such

removed property is, in fact, a Non-Estate Asset, the removing party shall be entitled to cancel

the undertaking, or, to the extent that the undertaking has previously been called upon, cash in

the full amount of the undertaking.

      22.    The Debtor respectfully submits that the foregoing procedure is

reasonable, fair and designed to protect the interests of all parties in interest.

**D.    Carveout**

      23.    The DIP Agreement provides a carve-out (the "Carve-Out") from the liens

and claims granted to the Lender thereunder, which liens and claims shall be subject to: (a) fees

payable to the United States Trustee pursuant to 28 U.S.C. §1930(a)(6) and any fees payable to

the Clerk of the Bankruptcy Court; (b) the carve-out in favor of the professionals retained by the

Debtor in the amount of $300,000, which shall be reduced dollar for dollar by amounts drawn by

Borrower for the payment of such fees and expenses pursuant to the Monthly Cash Budget until

the amount of such Carve Out is reduced to $100,000.00; (c) fees and expenses of any

professionals retained by any creditors' committee in this Chapter 11 case in the amount of

$20,000; (d) reasonable fees and expenses of any Chapter 7 trustee, allowable pursuant to section

726(b) of the Bankruptcy Code in an amount not to exceed $15,000, provided, however that the

Carve-Out for any Chapter 7 trustee and the liens and claims granted to the Lender will not be

subject or subordinate to any expenses or fees of any party incurred in connection with any

action, among other things, (i) challenging the pre-petition and/or post-petition liens and claims

of the Lender and/or (ii) hindering or delaying the Lender's rights in the Pre-Petition Collateral

and the DIP Facility Collateral.

E.     **Payment Procedures and Debtor's Waiver**

24.     The Debtor seeks authorization to implement certain reasonable payment

procedures in consultation with any official committee of unsecured creditors appointed in this

case and the United States Trustee.  The proceeds of the sale of any collateral and any other

amounts received on account of such collateral is to be applied to repay or prepay, as the case

may be the following:  (a) first, accrued interest and fees outstanding under the DIP Agreement,

if any; (b) second, principal amounts outstanding under the DIP Agreement, if any; (c) third,

accrued interest and fees outstanding under the Existing Credit Agreement, except to the extent

the Bankruptcy Court determines that the lender is under-secured, in which case the Debtor shall

pay the obligation set forth in section (d) hereof; (d) fourth, the principal amounts outstanding

under the Existing Credit Agreement.

25.    Without the prior written consent of the Lender, the Debtor has also waived its ability to (a) create, incur, assume or suffer to exist any lien or security interest upon or with respect to any property or assets (real or personal, tangible or intangible) of the Debtor in favor of any party other than the Lender, or sell any such property or assets subject to an understanding or agreement, contingent or otherwise, to repurchase such property or assets (including sales of accounts receivable with recourse to the Debtor), or assign any right to receive income or permit the filing of any financing statement under the UCC or any other similar notice of lien under any similar recording or notice statute; or (b) obtain credit or incur indebtedness that is entitled to superpriority administrative expense status equal or superior to that granted to the Lender pursuant to this Interim DIP Financing Order.  The Debtor further waives any right to seek relief under the Bankruptcy Code, including, without limitation, under section 105(a) of the Bankruptcy Code, to restrict or impair the rights and remedies of Lender set forth in this Interim DIP Financing Order or under the DIP Agreement.

**F.    Funding for Fees and Expenses of Debtor's Counsel**

26.    The proposed interim funding of $630,000 includes $300,000, which was funded by the Lender on the date the Debtor filed its voluntary chapter 11 petition and placed into an escrow account maintained by the Lender for the benefit of Debtor's proposed bankruptcy counsel (the "Funded Escrow"), Halperin Battaglia Raicht, LLP ("HBR"), on account of fees and expenses incurred by the firm from the commencement of the involuntary period through the date of the Debtor's voluntary chapter 11 petition and throughout the chapter 11 case.  Payments from the Funded Escrow shall be made in accordance with further orders of the Bankruptcy Court authorizing the payment of fees and the reimbursement of expenses under

the applicable sections of the Bankruptcy or pursuant to monthly compensation procedures proposed to be established in this case.

27.     Prior to the filing of the involuntary petition, HBR was to have received a pre-petition retainer of $300,000 for services performed in preparation of the chapter 11 filing and post-filing services.  Among other things, the pre-petition retainer amount could not be funded due to the filing of the involuntary bankruptcy petition against the Debtor and the injunction issued in the Lennox Action.  In order to ensure that the Debtor is represented by counsel of its choice, the creation of the Funded Escrow was necessary and appropriate.

## Use of Cash Collateral

28.     In consideration of the use of Cash Collateral and diminution in value thereof arising from the priming liens granted to the Lender to secure the obligations under the DIP Agreement in accordance with sections 364(c)(2), 363(e) and 361 of the Bankruptcy Code, the proposed interim and final orders propose to grant any holder of a valid, perfected and non-avoidable lien against the Pre-Petition Collateral: (a) the Adequate Protection Liens, and (b) to the extent the Adequate Protection Liens are insufficient to adequately protect the holder's interest in the Pre-Petition Collateral, an Adequate Protection Claim.

## Validity of Pre-Petition Obligations

29.     The Debtor acknowledges the validity, enforceability and the priority of the Obligations.  Nevertheless, parties in interest, including but not limited to any statutory committee appointed in this case, have until the earlier of (a) 60 days after the appointment of any statutory committee, and (b) January 10, 2008 to commence an adversary proceeding challenging the validity, enforceability of the Obligations.  In the event no such adversary

proceeding is commenced within the timeframe specified, the Obligations under the Existing

Credit Agreement shall constitute allowed claims for all purposes.

## Extraordinary Provisions Pursuant to the Financing Guidelines

### A.    Liens on Avoidance Actions

30.    The DIP Agreement provides as a condition thereto that the Superpriority

Claim, the DIP Lien, and the Adequate Protection Liens shall extend to any causes of action

arising under sections 542, 544, 545, 546, 547, 548, 549, 550, 551 and 553(b) of the Bankruptcy

Code or any of the proceeds thereof (the "Avoidance Action Collateral").  The Debtor believes in

its business judgment that the extension of such liens to the Avoidance Action Collateral is

necessary and proper and does not prejudice the estate in that: (a) the lien is limited to the extent

of the borrowing or diminution in value of collateral, if any; and (b) absent such liens, the estate

would have no ability to borrow new funds or use needed Cash Collateral to operate its business.

Moreover, given that the Lender has been denied effective access to the Pre-Petition Collateral

because of the state court injunction, it does not have certainty as to what Pre-Petition Collateral

currently exists.  Due to the uncertainty of the extent of the current collateral, the Lender, in

consideration of the sums being loaned, is entitled to further protection by a lien on the

Avoidance Action Collateral.

## Grounds for Approval of the DIP Agreement

31.    The Debtor respectfully submits that the DIP Agreement is in the best

interest of the estate and its creditors and should be approved.  Obtaining credit by the Debtor is

governed by section 364 of the Bankruptcy Code, which provides in relevant part:

(c)    If the trustee is unable to obtain unsecured credit allowable under section
503(b)(1) of this title as an administrative expense, the court, after notice and a
hearing, may authorize the obtaining of credit or the incurring of debt –

(1) with a priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate is subject to a lien.

(d)      (1) the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate this is subject to a lien only if –

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

(e)      The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of the grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

32.      It is respectfully submitted that the Debtor meets the statutory criteria to obtain the relief requested.  In the first instance, the Debtor is unable to obtain financing from any other source other than its current Lender.  As discussed above, the Debtor's books and records have been impounded and it has been barred from accessing its assets by court order.  No reputable lender could lend without the basic financial information the Debtor is currently unable to provide.  Thus, any effort to obtain alternative financing would be futile.

33.      In addition, the Lender has a first lien on all Pre-Petition Collateral.  Any other post-petition lender would require a first lien on such collateral, thus requiring the Lender

to be subjected to being primed.  Absent its consent to adequate protection in an agreed fashion,

the new post-petition lender would presumably have to lend an amount sufficient to provide

adequate protection equal to the value of the Pre-Petition Collateral to prime the Lender, plus an

additional amount equal to the operating requirements of the Debtor.  Since such a loan would be

for more than 100% of the value of the Pre-Petition Collateral, it is respectfully submitted that

such a loan would be impossible to obtain upon any reasonable commercial terms.

34.     Consequently, the requirements of section 364(c)(1) and (d)(1)(A) of the

Bankruptcy Code are met and the Lender may be granted a superpriority and a priming lien.  The

requirement of adequate protection under section 364(d)(1)(B) of the Bankruptcy Code is met,

since the Lender is the pre-petition lender, and consents to receive adequate protection in the

form of the Adequate Protection Liens.

35.     With regard to the terms and conditions of the DIP Agreement, it is

respectfully submitted that such terms and conditions are typical of debtor-in-possession loans.

36.     Finally, the DIP Agreement was negotiated at arms-length and in good

faith.  The terms and conditions of the DIP Agreement have been the subject of considerable

negotiations between the parties and are reasonable under the circumstances, particularly given

the Debtor's financial condition and the extreme time pressures under which it has been

operating.  In addition, this Motion provides appropriate notice to creditors and other parties in

interest and an opportunity for such parties to object to the relief requested herein.  The DIP

Agreement was entered into using the Debtor's best business judgment and the Debtor submits it

is in the best interests of the estate for it to be approved.  Accordingly, it is submitted that the

Lender is entitled to the protections set forth in section 364(e) of the Bankruptcy Code.

## Grounds For Approval of the Use Of Cash Collateral

37.     The Debtor submits that it should be authorized to use Cash Collateral in accordance with the terms of the Interim Order.  Section 363 of the Bankruptcy Code governs a debtor's ability to use, sell or lease property of the estate. Section 363(c)(2) of the Bankruptcy Code restricts a debtor's ability to use cash collateral. That section provides, in pertinent part:

> The trustee [or debtor in possession] may not use, sell or lease cash collateral under paragraph (1) of this subsection unless –
>
> (A) Each entity has an interest in such cash collateral consents; or
>
> (B) The court, after notice and a hearing, authorized such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

38.     Section 363(a) of the Bankruptcy Code defines "cash collateral" as including cash and cash equivalents "whenever acquired," in which the estate and any entity other than the estate have an interest, and the "proceeds, products, offspring, rents or profits of property subject to a security interest as provided in Section 552(b) of this title whether existing before or after the commencement of a case under this title" 11 U.S.C. § 363(a).

39.     Bankruptcy Code section 363(e) provides that, upon request of an entity that has an interest in property to be used by a debtor, the Court shall "prohibit or condition such use… as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  What constitutes adequate protection is determined on a case-by-case basis. *See In re Swedeland Development Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987).  Adequate protection can be provided in a number of ways under section 361 of the Bankruptcy Code, with the focus being to protect a secured creditor from any diminution in the value of its interest in the collateral during the period during of its use

postpetition. *See Swedeland*, 16 F.2d at 564-565; *In re Gallegos Research Group, Corp.,* 193 B.R. 577, 584 (Bankr. D. Colo. 1995). *See also, In re Cann & Saul Steel Co.* 76 B.R. 479 (Bankr. E. D. Pa. 1987); *In re Dunes Casino Hotel*, 69 B.R. 784, 793 (Bankr. D. N.J. 1986) ("Adequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy.").  Regardless of the form of adequate protection given, "the entitlement to and measure of adequate protection is always determined by the extent of the anticipated or actual decrease in the value of the secured creditor's collateral during the bankruptcy case." *Swedeland*, 16 F.2d at 564. "Adequate protection" is not defined in the Bankruptcy Code, although Section 361 of the Bankruptcy Code sets forth three non-exclusive methods of how an interest in property may be adequately protected. *Id.*; *In re Shriver*, 33 B.R. 176, 181 (Bankr. N.D. Ohio 1983).

40.     Pursuant to section 361 of the Bankruptcy Code, a debtor may provide adequate protection by making a cash or periodic payment to the creditor or providing it with the replacement lien.  The creditor is only entitled to protection to the value of its collateral supporting its secured claim; it is not entitled to adequate protection for lost opportunity costs. *In re Gallegos Research Group, Corp.*, 193 B.R. at 584-85 (citing *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365 (1988)); *Cann & Saul Steel*, 76 B.R. at 483.

41.     As set forth herein, the Debtor proposes to provide the Lender with adequate protection in the form of (i) the Adequate Protection Liens and (ii) the Adequate Protection Claim solely for the use of Cash Collateral.  The preservation of the Debtor's operations on a going-concern basis will maintain the value of any equity cushion associated with the Pre-Petition Collateral while avoiding disruption of the Debtors' operations. *See In re*

*Aqua Associates*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.").  The Debtor respectfully submits that the protections set forth herein are appropriate to adequately protect the Lender's security interests.  Accordingly, the Court should authorize the Debtor's use of Cash Collateral in accordance with the Budget.

### The Debtor Requires Interim Financing and Use of Cash Collateral

42.    Pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure, the final hearing on this Motion may be commenced no earlier than fifteen (15) days after service thereof.  The Debtor requires immediate access to funds in order to pay essential expense items.  Consequently, the Debtor seeks interim relief prior to the fifteenth day following the service of this Motion.  The Debtor will seek approval of the DIP Agreement at the final hearing.

43.    The Debtor submits that creditors will not be prejudiced by interim relief because such relief is necessary to protect and preserve the assets for the benefit of the estate and its creditors and prevent irreparable harm to the going concern value of the Debtor's business.  The Debtor hereby requests that the Court schedule an interim hearing on this Motion, until a final hearing on the Motion may be scheduled.

### Notice

44.    The Debtor proposes providing notice of this Motion to (a) counsel for the Lender, (b) the twenty (20) largest unsecured creditors (based on the best available information at the current time), (c) the United States Attorney's Office for the Southern District of New York, (d) the Internal Revenue Service; (e) the New York State Department of Taxation and

Finance; (f) the Office of the Corporation Counsel of the City of New York; (g) the New York County District Attorney's Office, (h) all parties whose identity is currently known to the Debtor with a security interest in or lien on the Debtor's assets; (i) parties having filed a notice of appearance in this case; (j) all parties entitled to notice in *In re Salander*, Case No. 07-36735 (cgm); and (k) the Office of the United States Trustee (individually, the "Notice Party" and collectively, the "Notice Parties").  The Debtor submits that such notice is sufficient under Rule 4001(b)(1) of the Federal Rules of Bankruptcy Procedure, and that no further notice need be given.

### Waiver of Memorandum of Law

45.    Pursuant to Local Bankruptcy Rule 9013-1(b), because there are no novel issues of law presented herein, the Debtor respectfully requests that the Court waive the requirement that a memorandum of law accompany this Motion.

### No Previous Request

46.    No previous application for the relief sought herein has been made by the Debtor to this or any other court.

*Continued on Next Page*

**WHEREFORE**, the Debtor respectfully prays for entry of orders (a) scheduling

a final hearing on this Motion; (b) granting the Debtor authority to borrow from the Lender and

use Cash Collateral on (i) an interim basis in accordance with the Interim DIP Order, in the form

annexed as Exhibit "B" hereto, and (ii) a final basis substantially in the form of the Interim DIP

Order; (c) approving the terms of the DIP Agreement pending the final hearing; (d) at the final

hearing, granting approval of the DIP Agreement and use of Cash Collateral on a final basis; and

(d) granting the Debtor such other and further relief as is just.

Dated:  New York, New York
        November 9, 2007

                                        **SALANDER-O'REILLY GALLERIES, LLC**
                                        Debtor and Debtor-in-Possession

                                        By:     /s/ Joseph E. Sarachek
                                                Its: Chief Restructuring Officer

**HALPERIN BATTAGLIA RAICHT, LLP**
Proposed Attorneys for Debtor
and Debtor-in-Possession


By:       /s/ Alan D. Halperin
          Alan D. Halperin (AH-8432)
          Robert D. Raicht (RR-2370)
          Walter Benzija (WB-0909)
          555 Madison Avenue – 9th Floor
          New York, New York 10022
          212-765-9100