**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re: | Chapter 11 Case |
| SALANDER-O'REILLY GALLERIES, LLC, | Case No. 07-30005 (CGM) |
| Debtor. | |

---

**DISCLOSURE STATEMENT WITH RESPECT TO ~~SECOND~~THIRD AMENDED**
**PLAN OF LIQUIDATION FOR SALANDER-O'REILLY GALLERIES, LLC**

| | |
|---|---|
| HALPERIN BATTAGLIA RAICHT, LLP | PACHULSKI STANG ZIEHL & JONES LLP |
| Alan D. Halperin, Esq. | Robert J. Feinstein, Esq. |
| Robert D. Raicht, Esq. | Ilan D. Scharf, Esq. |
| Walter Benzija, Esq. | 780 Third Avenue, 36th Floor |
| 555 Madison Avenue, 9th Floor | New York, New York 10017 |
| New York, New York 10022 | (212) 561-7700 |
| (212) 765-9100 | |
| | |
| Counsel for Salander-O'Reilly | Counsel for the Official Committee of |
| Galleries, LLC | Unsecured Creditors |

WHITE & CASE LLP
Alan Gover, Esq.
J. Christopher Shore, Esq.
Avi Goldenberg, Esq.
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200

Counsel for First Republic Bank, a division
of Bank of America, N.A.

Dated: New York, New York
November ~~11,~~18, 2009

**DISCLAIMER**

> **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.**
> **ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY**
> **COURT HAS APPROVED THIS DISCLOSURE STATEMENT. THIS DISCLOSURE**
> **STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN**
> **APPROVED BY THE COURT.**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................................... 1

II. NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS ...................... 2

III. EXPLANATION OF CHAPTER 11 ...................................................................... 3
    A.    Overview of Chapter 11 ................................................................................. 3
    B.    Chapter 11 Plan ............................................................................................. 4
    C.    Confirmation of a Chapter 11 Plan ............................................................... 4

IV. OVERVIEW OF THE PLAN ................................................................................. 6
    D.    Summary of the Terms of the Plan ............................................................... 6
    E.    Summary of Distributions Under the Plan ..................................................... 7

V. Questions and Answers Regarding this Disclosure Statement and the Plan ........... 8

VI. HISTORY OF THE DEBTOR AND COMMENCEMENT OF THE CHAPTER 11
    CASE ............................................................................................................... 11
    A.    Description and History of the Debtor's Business ......................................... 11
        1.    History and Operations .......................................................................... 11
        2.    The Gallery's Business ........................................................................... ~~11~~12
        3.    The Gallery's Assets .............................................................................. 12
        4.    The Gallery's Prepetition Financing ...................................................... 12
    B.    Events Leading to the Commencement of the Chapter 11 Case ..................... 12
    C.    Tax Issues ..................................................................................................... 13

VII. THE CHAPTER 11 CASE ................................................................................... 14
    A.    Commencement of the Chapter 11 Case ....................................................... 14
    B.    Continuation of Business and Significant Events after the Petition Date ....... 14
        1.    Debtor in Possession Financing and Use of Cash Collateral ................... 15
        2.    Retention and Compensation of Professionals ....................................... 16
        3.    Appointment of the Official Committee of Unsecured Creditors ............ 17
        4.    Asset Recovery ...................................................................................... 17
        5.    Asset Sales ............................................................................................. 18
        6.    The Landlord Stipulation ....................................................................... 20
        7.    Schedules and Establishment of Bar Dates ............................................ 21
        8.    Motions for Relief from the Automatic Stay .......................................... 23
        9.    Settlement with RAI .............................................................................. 24
        10.    Litigation .............................................................................................. 30

VIII. THE CHAPTER 11 PLAN .................................................................................. 34
    A.    Classification and Treatment of Claims and Equity Interests ........................ 34
        1.    Unclassified Claims (Administrative Claims, Priority Tax Claims, and
            Professional Fee Claims) ....................................................................... ~~34~~35
        2.    Classification and Treatment of FRB Secured Claim (Class 1) ............... 36

i

|  |  |  |  |  |
|---|---|---|---|---|
| | 3. | Classification and Treatment of Other Secured Claims (Class 2) | | 37 |
| | 4. | Classification and Treatment of Other Priority Claims (Class 3) | | 37 38 |
| | 5. | Classification of General Unsecured Claims (Class 4) | | 38 39 |
| | 6. | Classification and Treatment of Interests (Class 5) | | 38 40 |
| B. | | Means for Implementation of the Plan. | | 38 40 |
| | 1. | The SOG Liquidation Trust. | | 38 40 |
| | 2. | Termination of the CRO. | | 43 44 |
| | 3. | Liquidation Trustee. | | 43 44 |
| | 4. | The Source of Distributions. | | 50 51 |
| | 5. | Provision for Treatment of Disputed Claims. | | 50 51 |
| | 6. | Distribution of Property Under the Plan. | | 50 52 |
| C. | | Litigation | | 52 53 |
| | 1. | Preservation of Causes of Action. | | 52 53 |
| D. | | Exculpation and Release. | | 54 55 |
| | 1. | Limitation of Liability in Connection with the Chapter 11 Case, the Plan, Disclosure Statement and Related Documents. | | 54 55 |
| | 2. | Release of Claims Against the Bank, the Creditors' Committee and Members of the Committee. | | 54 56 |
| | 2. | Releases and Injunction Pursuant to the RAI Settlement Agreement | | 57 58 |
| E. | | Other Plan Provisions. | | 58 60 |
| | 1. | The Effective Date. | | 58 60 |
| | 2. | Termination of Committee. | | 59 61 |
| | 3. | Executory Contracts and Unexpired Leases. | | 59 61 |
| | 4. | Entry of a Final Decree. | | 60 62 |
| | 5. | United States Trustee Fees and Reports. | | 60 62 |
| | 6. | Post-Effective Date Effect of Evidences of Claims. | | 60 62 |
| | 7. | Cancellation of Interests. | | 60 62 |
| | 8. | Nondischarge of the Debtor. | | 60 62 |
| | 9. | No Recourse. | | 61 62 |
| | 10. | No Admissions. | | 61 63 |
| | 11. | Modification. | | 61 63 |
| | 12. | Revocation of the Plan. | | 61 63 |
| | 13. | Severability of Plan Provisions. | | 61 63 |
| | 14. | Governing Law. | | 61 63 |
| | 15. | Retention of Jurisdiction. | | 62 64 |
| | 16. | Successors and Assigns. | | 63 64 |
| | 17. | Saturday, Sunday, or Legal Holiday. | | 63 65 |
| IX. CONFIRMATION AND CONSUMMATION PROCEDURES | | | | 63 65 |
| A. | | Overview. | | 63 65 |
| B. | | Confirmation of the Plan. | | 65 66 |
| | 1. | Elements of Section 1129 of the Bankruptcy Code. | | 65 66 |
| | 2. | Acceptance. | | 66 68 |
| | 3. | Best Interests Test. | | 66 68 |
| | 4. | Feasibility. | | 68 70 |
| C. | | Cramdown. | | 68 70 |
| | 1. | No Unfair Discrimination. | | 68 70 |

    2.     Fair and Equitable Test......................................................................6870

D.     Effect of Confirmation.............................................................................6971

X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.......7071

E.     Liquidation Under Chapter 7 of the Bankruptcy Code.............................7072

F.     Alternative Chapter 11 Plans.................................................................7072

XI. CONCLUSION...............................................................................................7173

**EXHIBITS**

**A.**     **Plan**
**B.**     **Order Approving the Disclosure Statement**
**C.**     **Certain Preserved Causes of Action**
**D.**     **Liquidation Analysis**

## I.

## INTRODUCTION

Salander-O'Reilly Galleries, LLC (the "Gallery" or the "Debtor"), as debtor and debtor in possession, the Official Committee of Unsecured Creditors (the "Committee") appointed in the Debtor's chapter 11 case (the "Chapter 11 Case") pending before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and First Republic Bank, a division of Bank of America, N.A. (the "Bank," and collectively with the Debtor and the Committee, the "Plan Proponents"), hereby collectively and jointly submit this disclosure statement, dated as of November ~~11~~,18, 2009 (the "Disclosure Statement"), pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") with respect to the ~~Second~~Third Amended Chapter 11 Plan of Liquidation for Salander-O'Reilly Galleries LLC, proposed by the Debtor, the Committee and the Bank, dated as of November ~~11~~,18, 2009 (the "Plan"). This Disclosure Statement is to be used in connection with the solicitation of votes on the Plan by the Plan Proponents. A copy of the Plan (with all Exhibits thereto) is attached hereto as **Exhibit A.**

BY ORDER DATED NOVEMBER [_], 2009 (THE "DISCLOSURE STATEMENT ORDER"), THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT, WHICH INCLUDES AND DESCRIBES THE PLAN. A COPY OF THE DISCLOSURE STATEMENT ORDER IS ATTACHED HERETO AS **EXHIBIT B**. OTHER THAN HOLDERS OF MEMBERSHIP INTERESTS IN THE DEBTOR, WHICH ARE DEEMED TO HAVE REJECTED THE PLAN, ALL CLASSES ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. ACCORDINGLY, EXCEPT FOR THE DEEMED IMPAIRED MEMBERSHIP INTERESTS, THE PLAN PROPONENTS ARE SOLICITING ACCEPTANCES OF THE PLAN FROM ALL OTHER HOLDERS OF CLAIMS AGAINST THE DEBTOR.

THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALL CLAIMS AGAINST THE DEBTOR. ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN.

VOTING INSTRUCTIONS ARE CONTAINED IN THE ATTACHED DISCLOSURE STATEMENT ORDER. IN ADDITION, THE SOLICITATION PACKAGE ACCOMPANYING EACH OF THE BALLOTS CONTAINS APPLICABLE VOTING INSTRUCTIONS. **TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND ACTUALLY RECEIVED BY COUNSEL TO THE COMMITTEE BY 4:00 P.M. (PREVAILING EASTERN TIME), ON [DECEMBER _], 2009 (THE "VOTING DEADLINE").**

**All capitalized terms used in the Disclosure Statement and not defined herein shall have the meanings ascribed thereto in the Plan. Unless otherwise stated, all references**

herein to "Schedules" and "Exhibits" are references to schedules and exhibits to this Disclosure Statement, respectively.

## II.

## NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan. *See* "Confirmation and Consummation Procedures," below.

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.**

**PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST,**

3

**OR EQUITY INTERESTS IN, THE DEBTOR AND DEBTOR IN POSSESSION IN THIS CASE.**

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting.  No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  Except for the Plan Proponents (in their capacity as such) and certain of the professionals each has retained, no person has been authorized to use or promulgate any information concerning the Debtor, its business, or the Plan other than the information contained in this Disclosure Statement and if given or made, such information may not be relied upon as having been authorized by the Plan Proponents.  You should not rely on any information relating to the Debtor, its business or the Plan other than that contained in this Disclosure Statement and the Exhibits hereto.

After carefully reviewing this Disclosure Statement, including the attached Schedules and Exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot and return the same to the address set forth on the ballot, in the enclosed, postage prepaid, return envelope so that it is actually received by Committee Counsel, no later than the Voting Deadline.  All votes to accept or reject the Plan must be cast by using the appropriate ballot.  Votes which are cast in any other manner will not be counted.  **All ballots must be actually received by Committee Counsel no later than [December __], 2009 at 4:00 p.m., Prevailing Eastern Time.  For detailed voting instructions and the name, address and phone number of the person you may contact if you have questions regarding the voting procedures, see the Disclosure Statement Order.**

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

You will be bound by the Plan if it is confirmed by the Bankruptcy Court, even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.  See "Confirmation and Consummation Procedures," below.

**EACH OF THE DEBTOR, THE COMMITTEE AND THE BANK URGES ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN.**

**III.**

**EXPLANATION OF CHAPTER 11**

**A.    Overview of Chapter 11.**

Chapter 11 is the principal chapter of the Bankruptcy Code pursuant to which a debtor in possession may reorganize its business or liquidate it in an orderly fashion for the benefit of its creditors, stockholders, and other parties in interest.

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor in possession as of the date the petition is filed.  Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the

bankruptcy court orders the appointment of a trustee. In the Debtor's Chapter 11 Case, the Debtor remains in possession of its property and continues to operate its businesses as a debtor in possession. <u>See</u> "The Chapter 11 Case – Continuation of Business after the Petition Date," below.

The filing of a petition under the Bankruptcy Code triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts by creditors or other third parties to collect on prepetition claims against the debtor or otherwise interfere with its property or business. Exempted from the automatic stay are governmental authorities seeking to exercise regulatory or policing powers. Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed chapter 11 plan. In the Chapter 11 Case, no creditor or party in interest has obtained relief from the automatic stay, except for the DCFS Trust and General Motors Acceptance Corporation ("GMAC"), which were granted modified relief to take possession of certain vehicles with the Debtor's consent. <u>See</u> "The Chapter 11 Case – The Automatic Stay."

**B.    <u>Chapter 11 Plan.</u>**

The formulation of a chapter 11 plan is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying the holders of claims against and interests in the debtor's estate. A chapter 11 plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the debtor's assets. In either event, upon confirmation of the plan, it becomes binding on the debtor and all of its creditors and equity holders, and the prior obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan. The Plan incorporates a compromise reached among the Debtor, the Committee and the Bank, which the Plan Proponents believe provides a fair and equitable allocation of the Debtor's Assets that will be distributed to creditors through the SOG Liquidating Trust. For a description of key components of the Plan, see "Overview of the Plan," below.

After a chapter 11 plan has been filed, the holders of impaired claims against and equity interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the Plan Proponents to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of Claims against the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Plan Proponents' solicitation of votes on the Plan.**

**C.    <u>Confirmation of a Chapter 11 Plan.</u>**

If all classes of claims and equity interests accept a plan of reorganization, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. <u>See</u> "Confirmation and Consummation Procedures – Confirmation of the Plan," below. **The Plan Proponents**

3

**believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code.**

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a chapter 11 plan for the bankruptcy court to determine that the class has accepted the plan.  See "Confirmation and Consummation Procedures," below.  Rather, a class of claims will be determined to have accepted the plan if the court determines that the plan has been accepted by more than a majority in number and at least two-thirds in amount of those claims actually voting in such class.  **Only the holders of Claims who actually vote will be counted as either accepting or rejecting the Plan**.

In addition, classes of claims or equity interests that are not "impaired" under a chapter 11 plan are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan.    See "Confirmation and Consummation Procedures," below. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class.  **All classes of Claims are impaired under the Plan and entitled to vote on the Plan.  In addition, the class of Membership Interests is deemed impaired under the Plan and is deemed to reject the Plan.**

In general, a bankruptcy court also may confirm a chapter 11 plan even though fewer than all the classes of impaired claims against and equity interests in a debtor accept such plan. For a chapter 11 plan to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan. See "Confirmation and Consummation Procedures – Cramdown," below.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if, among other things, the plan provides:  (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, in an amount equal to the allowed amount of such claim or such other treatment as accepted by the holder of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive on account of such junior claim or equity interest any property at all unless the senior class is paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims or equity interests if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims or equity interests, and (b) no senior class of claims or equity interests is to receive more than 100% of the amount of the claims or equity interests in such class.  **The Plan Proponents believe that the Plan will satisfy the foregoing requirements as to any rejecting class of Claims or Equity Interests, and can therefore be confirmed despite any such a rejection by any Class.**

5

# IV.

## OVERVIEW OF THE PLAN

The Plan provides for the treatment of Claims against and Membership Interests in the Debtor.

### D.    Summary of the Terms of the Plan.

The Plan provides for the establishment on the Effective Date of the Plan of the SOG Liquidation Trust, which will be formed for the purpose of (a) administering and monetizing the Assets of the Estate, including by the sale of the Debtor's interest in Artwork and pursuit of Causes of Action, (b) resolving all Claims, and (c) making all Distributions provided for under the Plan.  The SOG Liquidation Trust shall be under the direction and control of the Liquidation Trustee, as trustee of the SOG Liquidation Trust.  The Liquidation Trustee shall be subject to the oversight of the Oversight Committee.  On the Effective Date, all of the Estate's Assets, which are principally the Debtor's interest in Artwork and the Causes of Action, shall vest in the SOG Liquidation Trust.  The Plan contemplates the monetization of these Assets and the periodic distribution of the net proceeds thereof to creditors in the following order of priority in satisfaction of the Debtor's obligations:

a.    First, to Holders of Allowed Priority Tax Claims and Allowed Other Priority Claims;

b.    Second, to a fund allocated to Holders of Allowed Consenting General Unsecured Claims, their pro rata portion of $2.5 million less the amount of Allowed Priority Tax Claims and Other Priority Claims;

c.    b. Second Third, on a pro rata basis to the following two tranches of obligations, until both tranches are paid in full:

    i.    To Holders of Allowed Administrative Claims, an amount equal to their unpaid Administrative Claims (other than the DIP Facility Claim) as of the effective date of the Plan (which in respect of unpaid professional fees shall be the aggregate amount of each Professional's Allowed Professional Fee Claim less ten percent (10%) and one hundred percent (100%) of the Allowed and unpaid fees and expenses of the Art Representative (as defined in the Protocol)); and

    ii.    To the Bank in respect of its DIP Facility Claim (including (a) all preservation costs and (b) fees and expenses of the Bank's counsel up to $2 million related thereto);

c.    Third, to the Bank, the sum of $3.0 million;

d.    Fourth, to the Bank and Holders of Allowed Consenting General Unsecured Claims, their proportionate share of Cash available to fund the Bank Residual Fund (in an amount up to $3.0 million) and the Unsecured Creditors Residual

3

Fund (in an amount equal to payments made on account of Allowed Priority Tax Claims and Other Priority Claims) until the Bank Residual Fund and the Unsecured Creditors Residual Fund have each been fully funded :

e. d. FourthFifth, (i) to the Bank, sixty percent (60%) of the net proceeds of the Assets of the Estate received by or allocable to the SOG Liquidation Trust after payment of expenses of the SOG Liquidation Trust, up to the amount of the Bank's allowed prepetition claim and such other legal fees, costs and expenses reimbursable to the Bank under the DIP Facility incurred through the Effective Date of the Plan, and (ii) to holders of Allowed Consenting General Unsecured Creditors on a pro rata basis, forty percent (40%) of the net proceeds of the Assets of the Estate received by or allocable to the Trust after payment of expenses of the SOG Liquidation Trust, up to the amount of such Allowed Consenting General Unsecured Creditors' General Unsecured Claims;

e. Fifth, except to the extent that a holder of an Allowed Priority Claim agrees to less favorable treatment, each holder of an Allowed Priority Claim will receive payment of its Allowed Priority Claim in full; and

f. Sixth, after repayment in full of all Allowed Consenting General Unsecured Claims, to each holder of an allowed General Unsecured Claim up to the amount of such General Unsecured Claim.

On the Effective Date of the Plan, except for artworkArtwork that is Bucket 1 Art pursuant to the RAI Settlement Agreement (each as defined in Section VII.B.9 below), all Artwork that remains subject to unresolved or competing Art Claims filed pursuant to the Art Claims Protocol (as defined below) shall remain subject to the Art Claims Protocol and be resolved pursuant thereto, and such Artwork shall notno such Artwork (i) subject to unresolved or competing Art Claims or (ii) subject to claims or interests asserted by the Sotheby's Entities (as defined below) shall be sold without (a) the consent of every Art Claimant who has filed an Art Claim with respect to such Artwork orand/or the Sotheby's Entities, as applicable, or (b) further order of a court of competent jurisdiction. All Pursuant to the RAI Settlement Agreement, the Debtor will, among other things, abandon any interest it has in Bucket 1 Art, and Bucket 1 Art will be transferred to RAI. RAI will take such Bucket 1 Art pursuant to the terms of the RAI Settlement Agreement and subject to third parties' Art Claimsclaims and interests. RAI will have the sole responsibility of resolving Art Claims againstwith respect to third party claims to Bucket 1 Art.

**The RAI Settlement Agreement remains subject to Court approval.**

**E.        Summary of Distributions Under the Plan.**

The following is a summary of the distributions under the Plan. It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as **Exhibit A**. In addition, for a more detailed description of the terms and provisions of the Plan, see "The Chapter 11 Plan," below.

3

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims, as described in Article IV of the Plan, have not been classified and thus are excluded from the Classes that follow.  The following table summarizes the classification of the Classes of Claims and Interests under the Plan and whether you are entitled to vote on the Plan.

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|-------|-------------|----------------------|---------------|
| Class 1 | FRB Secured Claim | Impaired | Voting |
| Class 2 | Other Secured Claims | Impaired | Voting |
| Class 3 | Other Priority Unsecured Claims | Impaired | Voting |
| Class 4 | General Unsecured Claims | Impaired | Voting |
| Class 5 | Membership Interests | Impaired | Deemed to Reject |

## V.

### Questions and Answers Regarding this Disclosure Statement and the Plan

**Why are the Debtors sending me this Disclosure Statement?**

The Plan Proponents are seeking to obtain Bankruptcy Court approval of the Plan. Prior to soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the preparation and approval of a Disclosure Statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with such requirements.

**What happens to my recovery if the Plan is not confirmed, or does not go effective?**

In the event that the Plan is not confirmed, each of the Debtor, the Committee and the Bank believe it is unlikely that the Debtor will be able to be reorganized or commence an orderly liquidation of its assets under chapter 11.  If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated thereby could be implemented and what Holders of Claims would ultimately receive in respect of their Claims. It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan. Moreover, non-confirmation of the Plan will likely result in either the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or dismissal of the Chapter 11 Case in its entirety. For a more detailed description of the consequences of this or of a liquidation scenario, see "Confirmation of the Plan — Best Interests of Creditors/Liquidation Analysis,"

3

which begins on page ~~65~~68 hereof, and the Liquidation Analysis attached as **Exhibit D** to this Disclosure Statement.

**If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "consummation?"**

"Confirmation" of the Plan refers to the approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and become effective. References to the "Effective Date" mean the date that all conditions to the Plan have been satisfied or waived and the Plan has been fully consummated. Distributions will only be made on the Effective Date or as soon as practicable thereafter, based on the waterfall described in Section IV of this Disclosure Statement.

**Where is the cash required to fund the Plan coming from?**

The cash required to fund the Plan will come from (i) sales of the Estate's Assets, which are collateral of the Bank subject to the terms of the Plan and various stipulations between the Bank, the Committee and the Debtor described in Section V.B.9 below, and (ii) the prosecution and settlement of lawsuits which are property of the Estate.

**Will Art Claimants' ownership interests in Artwork be affected by the Plan?**

Art Claimants' ownership interests in Artwork will not be affected by the Plan. The Plan contemplates that, except for Bucket 1 Art, all disputes regarding ownership of Artwork will be resolved pursuant to the terms of the Art Claims Protocol. The transfer of the Estate's Assets to the SOG Liquidation Trust will not affect any unresolved Art Claims for Artwork, because only the Estate's interest in Artwork will be transferred to the SOG Liquidation Trust.

In addition, the Debtor's abandonment of any interest in Bucket 1 Art will not affect the legal rights of Art Claimants asserting Art Claims against such Bucket 1 Art (any such Art Claimant, other than RAI, a "Bucket 1 Competing Claimant") ~~because RAI will take such Bucket 1 Art pursuant to the terms of the RAI Settlement Agreement and subject to third parties' Art Claims~~. The claims of Bucket 1 Competing Claimants shall be preserved following the Debtor's abandonment of any interest in Bucket 1 Art.

**Will Artwork subject to competing claims be sold under the Plan?**

Artwork that is subject to (a) an Art Claim that has not been allowed by the Working Group (as defined in the Art Claims Protocol) ~~or,~~ (b) competing, unresolved Art Claims or (c) Claims or interests asserted by the Sotheby's Entities, will not be sold or transferred without the consent of the appropriate Art Claimant or the Sotheby's Entities, where applicable, or pursuant to further order of a court of competent jurisdiction; provided, however, that pursuant to the RAI Settlement Agreement, the Debtor will abandon ~~its~~any interest in Bucket 1 Art and ~~RAI will take~~

9

~~such Bucket 1 Art pursuant to the terms of the RAI Settlement Agreement and subject to third parties' Art Claims~~ claims of Bucket 1 Competing Claimants will be preserved.

**Will there be releases granted to parties in interest as part of the Plan?**

Yes, see "Releases," which begins on page ~~53.~~55.

**How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the holders of Claims entitled to vote on the Plan. If you are a holder of Claims in Classes 1, 2, 3 and 4 (collectively, the "Voting Classes"), you may vote for or against the Plan by completing the ballot and returning it in the envelope provided.

**What is the deadline to vote on the Plan?**

All ballots must be actually sent to Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 36th Floor, New York, New York  10017; Attention: Ilan D. Scharf, Esq. so as to be received on or before 5:00 p.m. (prevailing Eastern Time) on **[December  _]**, **2009** (the "Voting Deadline").

**Why is the Bankruptcy Court holding a confirmation hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

**When is the confirmation hearing set to occur?**

The Bankruptcy Court has scheduled the confirmation hearing for [  ], 2009 to take place at [  ] (prevailing Eastern Time) before the Honorable Judge Cecelia G. Morris, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, located at 355 Main Street, Poughkeepsie, New York 12601. The confirmation hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the confirmation hearing or any adjournment thereof. Objections to Confirmation of the Plan must be filed and served on the Plan Proponents and certain other parties, by no later than December [  ], 2009 at 5:00 p.m. (prevailing Eastern Time) in accordance with the notice of the confirmation hearing that accompanies this Disclosure Statement. Unless objections to Confirmation of the Plan are timely served and filed in compliance with the disclosure statement order, which is attached to this Disclosure Statement as **Exhibit B**, they might not be considered by the Bankruptcy Court.  The Debtors have published notice of, among other things, the disclosure statement hearing and the confirmation hearing in the national edition of *The New York Times* to provide notification to those persons who may not receive notice by mail.  Subsequent to such publication, the Plan Proponents have announced adjournments of the Disclosure Statement Hearing in open Court and on the Court's Docket.

**What is the purpose of the confirmation hearing?**

3

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case. The confirmation of a plan of reorganization by the Bankruptcy Court binds the debtor, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.

**What role does the Bankruptcy Court play after the confirmation hearing?**

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan, including disputes over any Claims or Interests arising under the Chapter 11 Case, implementation and enforcement of the Releases, and the Art Claims Protocol. In addition, the Bankruptcy Court will have exclusive jurisdiction to ensure that distributions to holders of Claims are accomplished pursuant to the Plan.

**Does the Debtor recommend voting in favor of the Plan?  Does the Committee?**

Yes. In the opinion of the Debtor and the Committee, the Plan is preferable to liquidation under Chapter 7 of the Bankruptcy Code, as described in this Disclosure Statement and the Liquidation Analysis attached as **Exhibit D** hereto, and any other reasonably available alternative because the Debtor and the Committee believe the Plan provides for a larger distribution to the Debtor's unsecured creditors than would otherwise result from a liquidation or any other reasonably available alternative. In the event of a liquidation, recoveries for Holders of Allowed Claims would be significantly reduced, if not eliminated, and no recovery would be expected for Holders of General Unsecured Claims. Accordingly, the Debtor and the Committee recommend that holders of Claims in Voting Classes support Confirmation of the Plan and vote to accept the Plan.

## VI.

## HISTORY OF THE DEBTOR AND COMMENCEMENT OF THE CHAPTER 11 CASE

A.      **Description and History of the Debtor's Business.**

1.      **History and Operations.**

The Gallery is a privately held limited liability company organized and existing under the laws of the State of New York, which was managed as an art gallery in New York City by Lawrence B. Salander. Mr. Salander's involvement with the Gallery began in 1974, when he partnered with William O'Reilly to form the Gallery, which focused on 19th century European art, American Modernism, and contemporary works.

In 1991, Mr. Salander agreed to buy Mr. O'Reilly's interests in the Gallery, and in February 1995, Curtis Squire, Inc. ("Curtis Squire"), a Minnesota-based firm controlled by Myron Kunin, obtained a 50% interest in the Gallery as a passive investor, which entitled Curtis Squire to half of the Gallery's profits, and named Mr. Salander the sole manager of the partnership.  Curtis Squire maintained its 50% membership interest in the Gallery until April

3

2007 when Curtis Squire terminated its membership interest by letter effective as of or about October 2007.  The Gallery did not have publicly traded securities.

In 2005, the Gallery moved from 20 East 79th Street to a 25,000 square foot town house located at 22 East 71st Street, New York, New York 10021 (the "Premises").  The Gallery leased the Premises from its landlord, 20 East 71st Owner LLC (the "Landlord"), through RFR Realty LLC as agent, pursuant to a ten-year lease (the "Lease").

### 2.     The Gallery's Business.

The Gallery exhibited and managed fine art from the Renaissance through the contemporary periods and represented living artists and artists' estates.  Many of the paintings and sculptures in which the Gallery dealt were museum quality works of arts, some valued in the hundreds of thousands or millions of dollars.  The Gallery also hosted approximately 580 art shows and had been entrusted with museum pieces, often displaying works at exhibitions to promote artists and the art industry.

In the ordinary course of its business, the Gallery sold works of art to individual and institutional clients, including wealthy private collectors and well-known museums throughout the world.  In addition, the Gallery purchased works of art for its portfolios at auction and in private transactions with individuals or other galleries.  The Gallery also took works of art for sale on consignment.  Art was also sold through private transactions and art shows, to walk-in customers at the Gallery's showroom and at auction.

### 3.     The Gallery's Assets.

The Gallery's Assets consist of its interest in Artwork, a 46% interest in an investment fund known as Renaissance Art Investors, LLC ("RAI") and Causes of Action.  RAI was an investment partnership formed by Mr. Salander and an investment group led by Donald Schupak to purchase and invest in certain works of art from the Renaissance and Old Masters periods. The Gallery's business model was premised, in part, on the belief that there was an undervalued market for Renaissance and Old Masters artwork due to lack of recognition of the inherent value and importance of art from those periods.  Over the several years prior to the Petition Date, the Gallery acquired hundreds of works from the Renaissance and Old Masters periods.

### 4.     The Gallery's Prepetition Financing.

Since 2002, the Bank extended financing to the Gallery in a series of loans and other financial accommodations.  As of the Petition Date, the aggregate outstanding principal balance of loans owed by the Gallery to the Bank was $25,317,000.00, plus interest, fees and other expenses claimed by the Bank under its loan documents with the Gallery.

### B.     Events Leading to the Commencement of the Chapter 11 Case.

In the months leading up to the commencement of the Chapter 11 Case, the Gallery and Mr. Salander were sued in multiple lawsuits commenced by artists and owners of artwork who asserted, among other things, rights to artwork consigned to or held by the Gallery, fraud, and unpaid debts.  The Landlord also sued to have the Gallery evicted and to reclaim $1.7 million in

3

unpaid rent. Litigants obtained various restraining orders and judgments against the Gallery, such that the Gallery was no longer able to conduct business. For example, in one of the lawsuits pending in New York Supreme Court in the County of New York encaptioned <u>Lennox v. Salander O'Reilly Galleries</u>, Index No., 602917/2007 before the Honorable Richard B. Lowe III (the "Lennox Action"), a preliminary injunction was issued which, among other things, enjoined the disposition of any artwork at the Premises and prohibited the Gallery and its agents from access to the Premises except upon order of the state court. As a result of the relief granted in the Lennox Action and other actions, the Gallery was forced to close on or about October 19, 2007. In addition, on or about October 30, 2007, a search warrant was issued to the Office of the District Attorney for the County of New York (the "DA"), and substantially all of the Gallery's books and records were seized by the DA. After the Petition Date, the DA provided electronic copies of books and records to the Debtors' estate.

The Chapter 11 Case was precipitated by the continuing and mounting pressures of the various lawsuits facing the Gallery and in particular, the effect of the preliminary injunctions which forced the shutdown of the Gallery's operations and the impoundment of the Gallery's books and records.

On or about April 9, 2009, Steven Harvey, a former employee of the Gallery pled guilty to falsifying business records. On or about March 26, 2009, the Gallery and Mr. Salander were indicted by the DA on multiple counts of grand larceny, falsifying business records, scheming to defraud investors, forgery, and perjury. On or about July 14, 2009, the Gallery and Mr. Salander were charged with additional counts of grand larceny and falsifying business records, and Leigh Morse, a former employee of the Gallery, was charged with counts of grand larceny and fraud.

**C.    Tax Issues**

The Internal Revenue Service ("IRS") filed a proof of claim alleging that the Debtor is obligated for $215,156.57 of payroll taxes for the quarterly and/or annual periods ending September 30, 2007 and December 31, 2007. The Debtor has not filed federal payroll tax forms (IRS Forms 940 and 941) since September 30, 2007. The CRO, on behalf of the Debtor, will file (a) an IRS Form 941 for the fourth quarter of 2007 and for the first, second, third and fourth quarters of 2008 and (b) an IRS Form 940 for the annual tax periods ending December 31, 2007 and December 31, 2008 by September 25, 2009. The IRS has informed the Plan Proponents that the IRS reserves its right to amend the amount of its claim after the Debtor files its tax returns. The Plan Proponents reserve their rights to object to any such amendment.

During the pendency of the Chapter 11 Case, the Debtor retained a number of the Debtor's former employees to work for the Debtor. The Debtor alleges that these employees were retained as independent contractors, and that the Debtor was not obligated to pay payroll taxes for such employees after the Petition Date. The IRS has asserted that such employees were not independent contractors and thus the Debtor is obligated to pay payroll taxes for such employees after the Petition Dates. The IRS has assessed the Debtor's tax liability for post-petition payroll taxes through the period ending December 31, 2008 at $30,598.51. The IRS has informed the Plan Proponents that it intends to file an administrative claim for post-petition

13

payroll tax in an amount to be determined after the Debtor files its returns.  The Plan Proponents reserve their rights to object to any such claim.

The IRS and the State of New York have indicated they may object to the Plan based on its treatment of Priority Tax Claims.

## VII.

## THE CHAPTER 11 CASE

### A.     Commencement of the Chapter 11 Case.

On November 1, 2007, creditors Carol F. Cohen, Giorgio Cavallon Family Limited Partnership, and Richard Ellenberg filed an involuntary chapter 7 petition (the "Petition") against the Gallery pursuant to section 303 of the Bankruptcy Code.  The case was commenced in the Manhattan Division of the United States Bankruptcy Court for the Southern District of New York, and was assigned to the Honorable Burton R. Lifland, United States Bankruptcy Judge.

The next day, Mr. Salander, together with his wife, Julie, as individual joint debtors, filed a voluntary chapter 11 petition with the Bankruptcy Court in the Poughkeepsie Division of the United States Bankruptcy Court for the Southern District of New York, and their case was assigned to the Honorable Cecelia G. Morris.[1]   Judge Lifland then transferred the Gallery's Chapter 11 Case to the Poughkeepsie Division, where it was assigned to Judge Morris as well.

On November 2, 2007, Mr. Salander transferred all managerial control of the Gallery to Joseph E. Sarachek to act as a chief restructuring officer and also approved of the Gallery filing a voluntary chapter 11 petition.  Mr. Sarachek's condition to accepting the position was that he would have unfettered authority and control of the management and operation of the Gallery and that Mr. Salander would no longer have any decision-making capacity in respect of the Gallery. With those conditions having been met under the resolutions signed by Mr. Salander, Mr. Sarachek accepted the engagement, and his retention was subsequently approved on an interim and then final basis by the Bankruptcy Court in the Chapter 11 Case.

On November 9, 2007, at the Debtor's request, the Bankruptcy Court converted the Debtor's chapter 7 case to a case under chapter 11 of the Bankruptcy Code.

On March 31, 2009, the Debtor sought to convert its Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.  Upon entry of the Disclosure Statement Order, the Debtor has agreed to withdraw the application to convert the Chapter 11 Case without prejudice.

### B.     Continuation of Business and Significant Events after the Petition Date.

Since the Petition Date, the Debtor has continued to operate its businesses and manage its property as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Debtor has sought Bankruptcy Court approval for all transactions that were outside the

---

[1] On April 17, 2008, after a contested hearing, the Salanders' chapter 11 case was converted to a case under chapter 7 of the Bankruptcy Code and Thomas Genova was appointed trustee (the "Chapter 7 Trustee").

ordinary course of its business. As discussed in this section, since the Petition Date, the Debtor has sought and obtained authority from the Bankruptcy Court with respect to a number of matters deemed by the Debtor to be essential to the orderly administration of the chapter 11 estate.

On November 29, 2007, the United States Trustee for Region 2 (the "U.S. Trustee") sought appointment of a chapter 11 trustee, which motion was subsequently joined by several parties, including the Committee. The motion remains pending before the Bankruptcy Court. As of the date of this Disclosure Statement, no trustee or examiner has been appointed in this case.

1.    **Debtor in Possession Financing and Use of Cash Collateral.**

By motion dated November 9, 2007, the Debtor sought approval of a $1.5 million debtor in possession financing facility (as amended, the "DIP Facility") extended by the Bank, and authority to use the Bank's cash collateral in order to permit, among other things, the continued maintenance of the Debtor's business and assets, to make payroll, to employ bankruptcy, accounting, management and art appraisal professionals, and to satisfy other working capital and operational needs, all in accordance with weekly and monthly cash budgets. As lender under the DIP Facility, the Bank asserts a first priority, senior and perfected priming lien on and security interest in substantially all of the Debtor's assets (the "DIP Lien"). As adequate protection for the use of any cash collateral and the diminution in value thereof arising from the DIP Lien, the Bank asserts a second, senior and perfected priming security interest in and lien on substantially all of the Debtor's assets (the "Adequate Protection Lien").

Given the nature of the Debtor's prepetition business, the Debtor is in possession of certain properties which are asserted to be held on consignment, in trust or otherwise for third parties, or purchased with the proceeds of property held in trust, or in or to which the Debtor holds legal title within the meaning of section 541(d) of the Bankruptcy Code (collectively, "Non-Estate Assets"). The Debtor has remained in possession of such properties pending further orders of the Bankruptcy Court. Throughout the bankruptcy, the Debtor (and the Bank) have been authorized to expend, and have expended, cash collateral and other assets to preserve and maintain such Non-Estate Assets (collectively, "Non-Estate Asset Costs"). Full funding under the DIP Facility was conditioned on, among other things, the establishment of the Art Claims Protocol (as defined below) to determine the extent of any interest of any person or entity asserting an interest in an alleged Non-Estate Asset.

On November 16, 2007, the Bankruptcy Court entered an order authorizing the Debtor, on an interim basis, to obtain advances, on a secured basis, from the Bank in an amount not to exceed $630,000 (the "Interim DIP Order"). On November 16, 2007, the Bank made a $630,000 advance under the Interim DIP Order.

Multiple parties in interest, including the Committee, moved for reconsideration of the Interim DIP Order, which matter was negotiated and settled in agreement with the Debtor and the Bank. On January 3, 2008, the Bankruptcy Court entered an order approving the DIP Facility, as modified, on a final basis (the "Final DIP Order"), authorizing the Debtor to obtain advances, on a secured basis, from the Bank in an amount not to exceed $1,500,000 in the aggregate (or an additional $870,000 after deducting the advances made under the Interim DIP

15

Order) in accordance with an emergency budget, pending the satisfaction of certain conditions set forth in the Final DIP Order.  On January 4, 2008 and March 14, 2008, the Bank made advances of $350,000 and $520,000, respectively, under the Final DIP Order.

By stipulations and orders entered on April 2, 2008 and April 24, 2008, the Bank was authorized to make additional collateral preservation advances of up to $155,000 and $38,200, respectively, in connection with moving artwork which may constitute the Bank's collateral securing the DIP Facility from the Premises to a bonded warehouse, as authorized by the Bankruptcy Court, when the Debtor vacated the Premises, as described in more detail below.

On June 12, 2008, the Bankruptcy Court entered an order amending the DIP Facility (the "Amended DIP Order") to authorize an additional $665,000 in borrowing.  On June 12, 2008 and June 26, 2008, the Bank made advances of $550,000 and $100,000, respectively under the Amended DIP Order.

On October 3, 2008, the Bankruptcy Court entered a second order amending the Final DIP Order to authorize an additional $1,415,000, thereby amending the total authorized borrowing under the DIP Facility to up to $3,580,000, subject to limitations on the use of the proceeds and compliance with an approved budget.

On June 19, 2009, the Debtor filed a motion for an order (the "Third DIP Order") seeking to amend the Final DIP Order to authorize an additional $1,000,000 of borrowings from the proceeds of assets asserted to be owned by Salander Decorative Arts, LLC ("SDA"), thereby increasing the total authorized borrowing under the DIP Facility to up to $4,580,000, subject to limitations on the use of the proceeds and compliance with an approved budget.  On July 1, 2009, the Court entered the Third DIP Order.

Subject to entry of the Third DIP Order, the maturity date of the DIP Facility will be extended by consent of the Bank until the earlier of the Effective Date, December 31, 2009, or dismissal or conversion of the Chapter 11 Case.

## 2.    Retention and Compensation of Professionals.

During the Bankruptcy Case, the Bankruptcy Court approved the Debtor's retention of Halperin Battaglia Raicht, LLP as counsel for the Debtor; Triax Capital Advisors LLC as an independent contractor to provide certain management services to the Debtor; Stair Galleries & Restoration, Inc. ("Stair Galleries") as the Debtor's auctioneers for a sale of decorative art; Tepper Galleries, Inc. ("Tepper Galleries") also as the Debtor's auctioneers for a sale of rugs; and Gurr Johns, Inc. ("Gurr Johns") as the Debtor's art sales coordinator.[2]  Upon joint application by the Debtor, the Committee, and the Bank, the Bankruptcy Court also approved the retention of Joseph M. Vann as the art representative (the "Art Representative") pursuant to the terms of the Art Claims Protocol.

---

[2] Before retaining Gurr Johns in this capacity, the Debtor, through the CRO, in consultation with the Committee and the Bank, engaged the services of Gurr Johns in its role as fine arts appraiser, to perform a desktop evaluation of approximately 1,300 specified objects of art located at the Premises in order to comply with the conditions for continued fine art insurance coverage.

16

3

As part of the Debtor's retention of Triax, Joseph E. Sarachek (the "CRO") was authorized to serve as chief restructuring officer of the Debtor.  Mr. Sarachek has assumed complete control of all aspects of the Debtor's business and financial affairs, including unfettered authority to make all managerial and operational decisions on behalf of the Debtor. By further order, the Bankruptcy Court authorized the Debtor, acting through the CRO, to hire, as it deems necessary and appropriate, and compensate certain personnel to assist him in discharging his duties and responsibilities under a management agreement dated as of November 2, 2007.

In an effort to enable all parties to monitor the costs of administration, enable the maintenance of a more level cash flow availability and implement efficient cash management, the Debtor and the Committee developed procedures for interim compensation and reimbursement of expenses of the Professionals.  The Bankruptcy Court entered an order implementing and supplementing section B(2) of General Order M-150, which is the Administrative Order re: Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases dated April 19, 1995, with which all Professional Persons would be required to comply in seeking compensation and reimbursement. In addition, a procedure for Debtor reporting of monthly fees and expenses was established.

### 3.    Appointment of the Official Committee of Unsecured Creditors.

On November 20, 2007, the U.S. Trustee appointed the Committee.  The Committee is comprised of Earl Davis, Nella Longari S.R.L., John Crawford, Lawrence Sunden, Inc., Donald Schupak, Frelinghuysen Morris Foundation, and Thomson Works of Art Limited.    The Bankruptcy Court approved the Committee's retention of Pachulski Stang Ziehl & Jones LLP as its counsel and Bridge Associates, LLC as its financial advisor.

### 4.    Asset Recovery.

Upon the Debtor's retention of Triax, the CRO took steps to identify, protect and preserve the Debtor's assets.  Since his appointment, the CRO has undertaken a comprehensive inventory of the Debtor's artwork at various locations.  To date, the CRO has identified, catalogued and photographed approximately 4,000 pieces of artwork at various locations including those in the Debtor's custody, possession or control, or in the custody, possession or control of the Chapter 7 Trustee.

### a.    Books and Records

On November 15, 2007, the Bankruptcy Court entered an order (the "W&S Turnover Order") directing the Debtor's former counsel, the law firm of Winston & Strawn, LLP ("Winston & Strawn"), to turn over to the CRO possession or control of the Debtor's books and records and means to accessing the Premises notwithstanding any requirement (and any liability associated therewith) to comply with Orders of all other courts.  On November 28, 2007, the Bankruptcy Court entered an order authorizing the Debtor to seek turnover of books and records from additional third parties, including the DA which was in possession of several of the Debtor's books and records impounded as an outgrowth of the Lennox Action.  The CRO believed that the search warrant inventory provided by the DA indicated that the records in the

17

3

DA's possession contained information and documents necessary to enable the Debtor to administer the Chapter 11 Case, including to complete its schedules of assets and liabilities and statement of financial affairs; comply with the operating guidelines promulgated by the Office of the U.S. Trustee; and understand (a) the nature and extent of certain art sale transactions, (b) the value of artwork, and (c) competing claims to artwork expected to be asserted by various parties in interest.  By Order of the New York Criminal Court (Ferrara, J.), dated November 29, 2007, the DA was authorized to make the seized records available to the Debtor.  The DA provided electronic copies of seized records to the Debtor after entry of such order.

### b.      Artwork and Other Property

The CRO sought the turnover of certain Artwork (the "Offsite Artwork") from the Salanders' bankruptcy estate located in their two residences.  With the Salanders' consent, on January 17, 2008, the Bankruptcy Court entered a stipulation and order authorizing the transport of all Offsite Artworks which were identified by Gallery tags from the Salanders' residence to the Premises and/or a bonded warehouse at the Debtor's sole cost and expense but with the Salanders' consent, without prejudice to a subsequent determination on ownership in such Offsite Artworks.

Pursuant to the Landlord Stipulation (as defined below) the Debtor agreed, among other things, to vacate the Premises.  Accordingly, the CRO identified and inventoried thousands of pieces of artwork at the Premises, which, along with numerous rugs, furniture, files, books and records, and other items which had to be moved from the Premises prior to the April 30, 2008 deadline to vacate the Premises under the Landlord Stipulation (discussed below).  On March 25, 2008, the Bankruptcy Court entered an order authorizing the Debtor to remove artwork from the Premises to a bonded warehouse.  The Bankruptcy Court further authorized the Debtor to engage the moving and storage services of Transcon International, Inc. ("Transcon").

As of May 30, 2008, all of the contents of the Premises, and all art displayed at the Salanders' residences but labeled with Gallery tags, were moved to a secured bonded storage facility managed by Transcon (the "Transcon Facility").  The CRO identified and inventoried approximately 1,000 additional pieces of artwork and other valuable property located at the Sofia Brothers, Inc. and Day & Meyer, Murray & Young Corp. warehouses utilized by the Debtor that have also been consolidated into the Transcon facility.

On July 22, 2009 and August 13, 2009, the CRO, with the consent of the Chapter 7 Trustee and the Bank, moved substantially all remaining Artwork (other than Artwork personally created by Lawrence Salander) from the Salanders' residences to the Transcon Facility.

### 5.      Asset Sales.

Section 363 of the Bankruptcy Code grants the Debtor the power, subject to approval of the Bankruptcy Court, to use, sell, or lease property of the Debtor's Estate outside of the ordinary course of business.  To date, there have been three categories of assets that were sold.

3

###### a.    Book Collection

Pursuant to the Landlord Stipulation (discussed below), the Debtor was required to vacate the Premises by no later than April 30, 2008.  Thus, in addition to obtaining liquidity for the estate, the CRO also considered how to minimize the costs of the move from the Premises.  After review and evaluation, the CRO determined, in consultation with the Bank and the Committee, that it was in the best interests of the estate and its creditors to sell the Debtor's collection of approximately 20,000 rare and first edition books and other reference materials concerning Renaissance, contemporary art and music (the "Book Collection").[3]  In marketing the Book Collection, the CRO met and conferred with a half dozen individuals, public and private institutions (such as libraries, universities and museums) and firms located in the United States and abroad with expertise in the area of rare and first edition books and experience in the sale and marketing of these types of collections.  An auction was held on April 14, 2008, and on April 15, 2008, the Bankruptcy Court entered an order authorizing the sale pursuant to an asset purchase agreement which provided for a sale of the Book Collection, on an "as is/where is" basis, to Ursus Rare Books Ltd. for a total purchase price of $350,000, free and clear of all liens, claims and encumbrances, provided, however, that any and all encumbrances held by the Bank would attach to the proceeds of the sale.

RAI asserted an ownership interest in three pieces that were sold by Stair Galleries (the "RAI Disputed Property").  The net proceeds of the sale of the RAI Disputed Property were in the amount of $29,000, which is being held in escrow pending further resolution.  The net proceeds from the sale of the RAI Disputed Property will be distributed pursuant to the terms of the RAI Settlement Agreement.

###### b.    Furniture, Frames and Miscellany

By the order (the "Stair Order") authorizing the Debtor to retain Stair Galleries as its auctioneers, the Bankruptcy Court also authorized Stair Galleries to liquidate the furniture, frames, garden decorations, ornaments, garden furniture and architectural elements in its possession, custody or controls, which included assets asserted to be property of Salander Decorative Arts, LLC ("SDA"), an affiliate of the Debtor owned by Lawrence and Julie Salander, with the consent of the Chapter 7 Trustee, as the party in control of the Salanders' interest in SDA.  On June 7, 2008, Stair Galleries held an auction, at which approximately 150 participants were in attendance with approximately 110 persons participating by telephone throughout the auction.  The terms and conditions of sale that were read to the audience immediately prior to commencement of the sale were standard for the industry and standard in the business of Stair Galleries. Additionally, the sale was advertised in a method that was standard for the industry and standard in the business of Stair Galleries, as was the availability of the items for inspection. The auction realized net proceeds in the amount of $1,281,019 from the sale of 319 out of 329 total lots offered.  On July 12, 2008, Stair Galleries held another auction for the sale of 107 lots of "lesser frames," from with the Debtor's estate realized additional net proceeds in the amount of $44,229.00 (all such net auction proceeds, the "Stair Auction Proceeds").

---

[3] The Book Collection does not include any paintings, sculptures, antique furniture or other Artwork of the Debtor.

RAI asserted an ownership interest in three pieces that were sold by Stair Galleries (the "RAI Disputed Property"). The net proceeds of the sale of the RAI Disputed Property were in the amount of $29,000, which is being held in escrow pending further resolution. The net proceeds from the sale of the RAI Disputed Property will be distributed pursuant to the terms of the RAI Settlement Agreement.

On July 2, 2009, the Bankruptcy Court entered an order approving a settlement and compromise between the Debtor, the Chapter 7 Trustee, the Committee and the Bank, in which $1,000,000.00 of the Stair Auction Proceeds would be used to fund the Chapter 11 Case as a consented to use of the Bank's cash collateral, $125,000.00 of the funds would be transferred to the Chapter 7 Trustee, subject to the Bank's liens on such funds and such Stair Auction Proceeds representing the proceeds of art in which RAI asserts an ownership interest would be held in an escrow account by the Debtor subject to determination of the Bankruptcy Court as to ownership of such proceeds, as required by the Stair Order.

### c.    Rug Collection

By the order authorizing the Debtor to retain Tepper Galleries as its other auctioneers, the Bankruptcy Court also authorized Tepper Galleries to liquidate the Debtor's collection of Oriental rugs. Tepper Galleries held the primary auction, which featured only the Debtor's assets, on May 30, 2008, at which approximately 300-400 participants were in attendance or enabled to participate remotely. Tepper Galleries also held three secondary auctions, which included assets of the Debtor as well as from other sources, on June 14, 2008, June 28, 2008 and July 12, 2008 (the "Secondary Auctions"), with approximately 500-1,000 participants in attendance at each auction. The terms and conditions of sale that were read to the audience immediately prior to commencement of the sales were standard for the industry and standard in the business of Tepper Galleries. Additionally, the sales were advertised in a method that was standard for the industry and standard in the business of Tepper Galleries, as was the availability of the items for inspection. The Debtor's estate realized net proceeds in the amount of $226,917.00 from the sale of 252 out of the 282 total lots offered in the Primary Auction, and $8,226 from the sale of 28 of the 42 total lots offered in the Secondary Auctions.

### d.    Future Sales

After the expiration of the Art Claims Bar Date (as defined below), the Debtor was authorized to segregate those pieces of Artwork to which no claim has been laid pursuant to the Art Claims Protocol (as defined below), and take steps to sell such Artwork. In October 2008, the Debtor retained Gurr Johns as its art sales coordinator to provide the Gallery, the Committee and the Bank with general art advice and to advise them in connection with any sale, transfer, settlement or consignment in one or more transactions of Artwork owned by the Debtor. Gurr Johns is currently negotiating with various auction houses over the terms of art sales to occur at auctions to occur in the near future. No appraisals have been conducted of the Artwork due to the volatile and subjective nature of the art market and the time and expense involved in conducting appraisals. It is contemplated that on the Effective Date, all of the Debtors' interest in Artwork (together with all other Assets and property of the Debtor) will be transferred to the

3

SOG Liquidation Trust, to be sold by the Liquidation Trustee with the oversight and advice of the Oversight Committee, based upon consultation with Gurr Johns.

### 6. The Landlord Stipulation.

On January 22, 2008, the Landlord sought an order ruling that its lease with the Debtor was terminated prepetition and compelling the payment of rent or, in the alternative, lifting the automatic stay to permit eviction of the Debtor from the Premises. On March 14, 2008, the Bankruptcy Court entered an order approving a stipulation (the "Landlord Stipulation") among the Debtor, the Committee, the Bank, and the Landlord, pursuant to which the Landlord agreed to waive its prepetition claim and forgo its right to holdover penalties and the Debtor agreed to vacate the Premises by April 30, 2008 (the "Vacate Date") and pay the Landlord $994,374.97, representing postpetition rent through the Vacate Date, in full satisfaction of the Landlord's claims.

The Debtor vacated the Premises by the Vacate Date, before which, pursuant to Bankruptcy Court authorization, the Debtor moved Artwork from the Premises to the Transcon Facility and recovered books and records at the Premises. The Debtor also paid the Landlord the lump sum in the amount of $300,000 from cash on hand, as required by the Landlord Stipulation. Finally, the Debtor was required to market a painting titled *La Femme aux Chiens* by Edouard Manet (the "Manet") held by the Landlord as collateral for the Lease to repay the remaining $694,374.97, and repay any deficiency from subsequent asset sales. On August 22, 2008, with the consent of the Chapter 7 Trustee, the Bankruptcy Court entered an order authorizing the Debtor to engage Christie's, Inc. to affect a private sale of the Manet. As of October 2008, no sale of the Manet had occurred. Accordingly, by order entered on November 11, 2008, the Bankruptcy Court authorized the Debtor to remit the balance owed to the Landlord from other sale proceeds and cash collateral, at a reduced rate, and with the release of the Landlord's interest in the Manet. Gurr Johns is currently working to market and sell the Manet.

### 7. Schedules and Establishment of Bar Dates.

#### a. Art Claims Protocol

On February 1, 2008, the Debtor, Committee, and Bank jointly moved for an order approving the establishment of an art claims protocol (the "Art Claims Protocol") pursuant to which claims of third parties (the "Art Claimants") asserting an ownership claim (each, an "Art Claim")[4] to Artwork in the Debtor's possession, custody or control, and thus putatively property of the Debtor's estate, may be resolved. On March 11, 2008, the Bankruptcy Court entered an order approving the Art Claims Protocol (the "Art Claims Protocol Order"), pursuant to which, among other things, Art Claimants would file claims of ownership with supporting documentation and, once the Artwork is released, bear all responsibility regarding the removal and protection of the Artwork from the Premises, and waive all claims against the Debtor, the estate, or any member of the "Working Group" (consisting of the Debtor, the Committee, the Art Representative and the Bank) in respect of the Artwork or as a result of the return of any such artwork, except to the extent the Art Claimant informs the Debtor within thirty days of such return. Obtaining the Art Claims Protocol Order and implementing the Art Claims Protocol was

---

[4] Art Claims described any interest in Artwork asserted by Sotheby's, Inc. or Sotheby's Finance, Inc.

[3]

a crucial step toward ultimately determining the identification and value of the Debtor's most important asset, its Artwork, while at the same time resolving claims in an orderly and efficient manner.

### b. Art Claims Bar Date

The Art Claims Protocol Order fixed June 15, 2008 (the "Art Claims Bar Date") as the deadline for all holders of alleged Art Claims to assert such claims pursuant to the Art Claims Protocol. The Art Claims Protocol Order also approved the forms of notice to be served on all parties known to the CRO that may assert a claim against or an interest in any of the Art works in the Debtor's possession, custody or control. Notice of the Art Claims Bar Date was mailed on March 27, 2008 to approximately 18,000 of individuals and entities, including every customer, creditor and consigner listed in the Debtor's books and records since the Debtor's inception, and published in the March 20, 2008 issue of <u>The New York Times (National Edition)</u> and the May 2008 issues of <u>Maine Antique Digest</u> and <u>ARTnews</u> magazine.

As of the Art Claims Bar Date, Art Claims had been filed against approximately 2000 pieces of Artwork. The Working Group diligently reviewed all Art Claims, made supplemental informational requests to Art Claimants, and has sought to resolve disputes concerning the Art Claims in advance of non-binding mediation before the Honorable Martin Glenn, who was appointed as mediator to mediate disputed Art Claims pursuant to the Art Claims Protocol Order. On December 18, 2008, the Bankruptcy Court entered an order granting the Debtor, Committee, and Bank's joint application to release 559 pieces of Artwork to Art Claimants pursuant to the Art Claims Protocol; since then, the Debtor, in consultation with the Committee and the Bank, has worked diligently to return over 480 additional works of art to Art Claimants.

The Working Group determined that approximately eighty Art Claims filed by forty-three Art Claimants (including RAI) (such Art Claimants, the "Art Claimants Subject to Objection") should be classified as Estate Assets. After the Working Group made those determinations, the Art Claims Settlement Group met with approximately thirty-one of the Art Claimants Subject to Objection. In addition, the Committee and the Debtor have each held informal settlement discussion with approximately five of the remaining Art Claimants Subject to Objection. The Art Claims Settlement Group has entered into: (a) three stipulations and orders approved by the Bankruptcy Court resolving Art Claims with respect to twenty-eight pieces of Artwork; (b) one stipulation and order that was noticed for approval resolving two art claims for hundreds of pieces of Artwork; and (c) settlements in principal with thirteen Art Claimants resolving twenty-five Art Claims with respect to 251 pieces of Artwork. The Art Claims Settlement Group has also negotiated a comprehensive settlement with RAI that, among other things, resolves RAI's Art Claim. <u>See</u> Section VII.B.9.e below.

### c. General Claims

On April 28, 2008 and July 18, 2008, respectively, the filed its Chapter 11 Schedules and Statement of Financial Affairs. The aggregate scheduled liabilities for the Debtor were approximately $29.3 million without taking into account claims as yet unknown or undetermined in amount.

3

By order entered June 17, 2008 (the "General Bar Date Order"), the Bankruptcy Court fixed August 1, 2008 (the "General Bar Date") as the deadline for all holders of alleged Claims against the Debtor that are not Art Claims to file all proofs of claim against the Debtor. The General Bar Date Order also approved the form of notice and the form of the proof of claim which was to be served on all parties known to the CRO that may assert a claim against the Debtor (including all Persons who filed Art Claims and parties to contracts, leases and/or litigation), and the form of notice to be published in two specified publications. Notice of the General Bar Date was ultimately mailed on June 27, 2008, and published in the June 30, 2008 of The New York Times (National Edition) and the weekly issue dated July 7, 2008 of AntiqueWeek. By the General Bar Date, approximately 144 proofs of claim have been filed against the Debtor in this Chapter 11 Case in an amount exceeding $317,234,708.86 in the aggregate. If the RAI Settlement Agreement is approved, RAI and SGI will withdraw approximately $150,000,000 of claims asserted against the Debtor. The Plan Proponents have not yet reviewed the claims in detail, but believe that the approximate total amount of unsecured claims against the Debtor is approximately $100,000,000.

### 8. Motions for Relief from the Automatic Stay.

#### a. Relief from the Automatic Stay Granted to Automobile Lessors

As discussed above, the automatic stay under section 362 of the Bankruptcy Code provides that, as of the Petition Date, most pending litigation is stayed, and absent further order of the Bankruptcy Court, no party, subject to certain exceptions, may take any action, again subject to certain exceptions, to recover on prepetition claims against the Debtor. During the Chapter 11 Case, the Bankruptcy Court granted limited relief from the automatic stay to only two parties pursuant to stipulations agreed to by the Debtor. In both cases, the parties – the DCFS Trust, as assignee of Manhattan Jeep Chrysler Dodge, Inc., and GMAC – were authorized to retake possession of certain vehicles. However, in the case of relief as to GMAC, GMAC would be required to account to the Debtor for any surplus money realized on the sale of the vehicles and remit any such surplus to the Debtor.

#### b. Motion for Relief from the Automatic Stay by Renaissance Art Investors, LLC

By motion dated May 27, 2009, RAI moved for relief from the automatic stay under section 362 of the Bankruptcy Code to take possession of 643 pieces of Renaissance art identified in a purported settlement "so ordered" by a New York state court purportedly consummated 16 days prior to the commencement of the bankruptcy proceeding. A hearing on the motion has been adjourned and the Debtor intends to oppose the motion on various grounds, including that (i) a stay relief motion was an improper procedural vehicle to resolve disputed issues regarding the subject Artwork, (ii) the conditions for effectiveness of the settlement, namely, the consent of the Debtor's secured lender, was not obtained, and (iii) the transaction was avoidable on various grounds given that it was conceived on the eve of the Debtor's bankruptcy, at a time when the Debtor was insolvent and involved transactions for which the Debtor received no consideration. The Debtor also disputes RAI's contention that the Bankruptcy Court's jurisdiction was constrained by the Rooker-Feldman doctrine. The motion

3

has been adjourned to November 12, 2009, and will be further adjourned and resolved pursuant to the RAI Settlement Agreement.

      **c.**      **Motion for Relief from the Automatic Stay by Sotheby's, Inc. and Sotheby's Financial Services, Inc.**

      On November 28, 2007, Sotheby's, Inc. ("Sotheby's") and Sotheby's Financial Services, Inc. ("SFS," and collectively with Sotheby's, the "Sotheby's Entities") moved for relief from the automatic stay to sell certain Artwork in Sotheby's possession, custody or control.   The Sotheby's Entities alleged that (a) Sotheby's purportedly purchased a 50%an interest in certain Artwork allegedly owned by the Debtor (any such Artwork, the "Sotheby's Purchased Artwork") and (b) SFS purportedly extended loans to the Debtor that are secured by certain Artwork allegedly owned by the Debtor (any such Artwork, the "SFS Financed Artwork").   Sotheby's is currently in possession of certain of the Sotheby's Purchased Artwork and certain of the SFS Financed Artwork (any such Artwork, the "Sotheby's-Held Artwork").   The Court has not made any determination on account of the Sotheby's Entities withdrew their motion for stay relief, and various other Art Claimants have made Art Claims asserting an ownership interest in some or all of the Sotheby's-Held Artwork prior to the scheduled hearing thereon.

      **9.**      **Settlement with RAI.**

      **a.**      **The RAI Transaction**

      RAI is an investment group formed prior to commencement of the Debtor's Chapter 11 Case between and among various investors, including the Debtor and an affiliate of the Bank. RAI was formed to invest in "old master" paintings, drawings, sculptures, reliefs, tapestries and other objects of art created in Europe during or after the 12th century A.D. by artists born or in prior to the year 1725 (any such art, "Renaissance Art).  RAI was capitalized with approximately $45 million, including approximately $14 million from the Debtor, approximately $16 million from other investors and a $15 million line of credit from the Bank.

      Pursuant to a bill of sale dated as of January 1, 2006 (the "January Bill of Sale"), the Debtor made a capital contribution of 315 pieces of Renaissance Art (the "315 Pieces") to OMP, which at the time was a wholly-owned subsidiary of the Debtor.  Also as of January 1, 2006, the Debtor sold its equity interest in OMP to RAI (the "OMP Bill of Sale").  The OMP Bill of Sale represented, among other things, (a) that the 315 Pieces constitute all of the Renaissance Artwork that was in the Debtor's possession as of January 1, 2006 other than assets acquired by the Debtor after October 31, 2005 or which are held by the Debtor on consignment from one or more third party owners and (b) that the purchase price of the 315 Pieces equaled 106% of the verified direct costs paid by the Debtor for the 315 Pieces.  On April 18, 2006, OMP purchased an additional 45 pieces of artwork (the "45 Pieces") from Debtor pursuant to a bill of sale (the "April Bill of Sale").  On May 2, 2006, OMP purchased an additional two (2) pieces (the "2 Pieces") from the Debtor pursuant to a bill of sale (the "May Bill of Sale," and, collectively, with the January Bill of Sale and the April Bill of Sale, the "Bills of Sale").   Pursuant to the Consignment Agreement, RAI agreed to consign the 315 Pieces and any additional works of art acquired by RAI to the Debtor.

3

As part of their business arrangement, among other things, RAI consigned its Renaissance Art to the Debtor and the Debtor was prohibited from dealing in Renaissance Art other than on account for RAI, with limited exceptions.

### b.        RAI's Asserted Claims Against the Debtor

After RAI purchased its inventory from the Debtor, it alleges that it became aware of irregularities in the Renaissance Art purchased and the business relationship between RAI and the Debtor deteriorated. RAI commenced litigation in New York State Supreme Court alleging, among other things, that RAI was the owner of all pieces of Renaissance Art in the Debtor's possession, including art that was not listed on the bills of sale through which RAI acquired Artwork from the Debtor. A substantial portion of the Artwork in the Debtor's possession as of commencement of the Chapter 11 Case was Renaissance Art. In addition, RAI has asserted that it paid more than the stated, verifiable cost for a substantial portion of the Renaissance Art it acquired through OMP.

Pursuant to the Art Claims Protocol, on June 13, 2008, RAI filed an Art Claim (the "RAI Art Claim") alleging that RAI has an ownership interest in all Renaissance Art in the Debtor's possession, including Renaissance Art that was not sold to RAI by the Debtor. On August 29, 2008, RAI filed an Amended Art Claim (the "Amended RAI Art Claim") providing further detail of its ownership claim to all of the Renaissance Art in the Debtor's possession, custody or control.

RAI based its claim on an alleged stipulation read into the record of the State Court proceeding prior to commencement of the Chapter 11 Case, which purports to settle RAI's claims against the Debtor and others by conceding that all or substantially all of the Renaissance Art in the Debtor's possession at the time of the stipulation was RAI's property.

However, the Debtor and the Committee assert that the stipulation was subject to a condition precedent: consent by the Bank. However, the Bank did not give its consent and thus the Debtor and the Committee assert that the alleged stipulation is void because the condition precedent was not satisfied.

Moreover, the stipulation was read into the record seventeen (17) days before the Petition Date. Thus, the Debtor and the Committee assert that to the extent the stipulation is enforceable, it is subject to avoidance as a preference and/or fraudulent conveyance.

Finally, RAI asserted a claim against the Debtor in an unliquidated amount that appears to be no less than $125 million (the "RAI Claim"). In addition, The Schupak Group, Inc., an affiliate of RAI, asserts an additional $25 million claim against the Debtor (the "Schupak Group Claim").

### c.        RAI's Dispute with the Bank

On or about February 13, 2009, the Bank commenced an action against RAI by filing a Notice of Motion for Summary Judgment in Lieu of Complaint with the Supreme Court of the State of New York for the County of New York at Index No. 650086/09 (the "State Court Action"). In the State Court Action, the Bank seeks entry of a judgment against RAI in the

3

amount of $16,940,595.84, together with interest and the reasonable attorneys' fees, costs and disbursements of the State Court Action, upon the ground that RAI's indebtedness to the Bank is due and payable in full.  However, RAI asserts that it (a) is not liable to the Bank for such indebtedness or any other damages and (b) has claims against the Bank for, among other things, fraudulently inducing RAI to enter into the transaction with the Debtor and incur RAI's indebtedness to the Bank and additional frauds, breaches of fiduciary duties, negligence and other misfeasances and malfeasances.  The Bank, in turn, denies that it is liable to RAI for the claims asserted by RAI.

### d.    Committee and Debtor's Investigation of the RAI Transaction and Claims

As discussed in section VII.B.10 below, the Debtor, after consultation with the Committee, issued a subpoena to RAI seeking production of documents.  RAI produced documents in response to the subpoena and the Committee and the Debtor reviewed such documents.  The Committee also investigated RAI's conduct prior to commencement of the Chapter 11 Case.

The Protocol Working Group reviewed the RAI Art Claim and the Amended RAI Art Claim and disputed that RAI had an ownership interest in any Artwork not described on the Bills of Sale.  In addition, the Debtor and the Committee believe that the RAI Claim and the Schupak Group Claim are inflated, since RAI only paid the Debtor approximately $42 million for the Renaissance Art it purchased.  Moreover, RAI presently holds an ownership interest in numerous pieces of Renaissance Art it purchased from the Gallery.  Thus, the Debtor and the Committee assert that the RAI and the Schupak Group Claims would be subject to reduction.

However, the Committee concluded that RAI would be entitled to a substantial unsecured claim against the Debtor due to the likely substantial overstatement of the amounts charged to RAI by the Debtor.  In addition, the Committee concluded that it would be extremely difficult for the Committee to prevail in any case brought on behalf of the Debtor's estate with respect to RAI's or its affiliates' actions prior to commencement of the Debtor's Chapter 11 Case because (a) such an action would depend in large part on testimony by Lawrence Salander and (b) RAI and its affiliates would have meaningful defenses to any such claims.

### e.    Settlement with RAI[54]

During the pendency of the Debtor's Chapter 11 Case, RAI, the Bank, the Committee and the Debtor undertook good faith efforts to settle the various disputes between and among the parties regarding the RAI transaction and claims.  After the Plan Proponents filed the initial versions of the Plan and the Disclosure Statement, RAI informed the Plan Proponents that it would object to the Plan and the Disclosure Statement.  The parties thereafter negotiated a

---

[54] Capitalized terms used but not defined in this Section VII.B.9.e shall have the meanings and definitions ascribed to them in the RAI Settlement Agreement attached as Exhibit 2 to the Plan.

3

settlement agreement (the "RAI Settlement Agreement"), which remains subject to Court approval. The salient terms of the RAI Settlement Agreement are as follows:[65]

    i.          The Debtor or any successor in interest thereto, for itself and its bankruptcy estate, will be deemed to have abandoned any legal, equitable, ownership or possessory interest in Bucket 1 Art.

    ii.         The Debtor's estate or any successor in interest thereto, as the assignee of the RAI Indebtedness, will release and terminate all asserted claims, security interests and liens against Bucket 1 Art.

    iii.       As between the Debtor, the Committee, and the RAI Group, the RAI Group shall have exclusive right, title, interest, possession and control over all Bucket 1 Art. The RAI Group may in its sole discretion include some, all or none of the Bucket 1 Art in an auction or sale of the Debtor's Artwork~~, subject to any Art Claims filed by third parties in respect of any Bucket 1 Art~~.

    iv.       The Debtor or the Liquidation Trustee shall turn over to RAI any Bucket 1 Art that is in the Debtor's possession, custody or control ~~to RAI, subject to any Art Claims filed by third parties in respect of any Bucket 1 Art~~, so long as the Debtor, the Liquidation Trustee, the SOG Liquidation Trust, the Oversight Committee Committee, the Bank and other parties shall have received (a) releases and exculpation in a form satisfactory to them for any conduct associated with turning over Bucket 1 Art to RAI and (b) an order prohibiting any party from commencing any action or seeking any Claim on account of such turnover of Bucket 1 Art to RAI. Such releases, exculpation and injunction are described more fully in ~~section~~Section VIII.D.2 below.

    <u>v.</u>       <u>Promptly after the effective date of the RAI Settlement Agreement, RAI shall either remove all Bucket 1 Art from the warehouse maintained by the Debtor or reimburse the Debtor for any storage or insurance costs incurred with respect to Bucket 1 Art.</u>

    <u>vi.</u>      ~~v.~~The Debtor shall have exclusive ownership and control over Buckets 2 and 3 Art and Consigned Renaissance Art

---

[65] The terms of the RAI Settlement Agreement provided herein are for descriptive purposes only. In the case of any conflict between the description herein and the RAI Settlement Agreement, the terms of the RAI Settlement Agreement shall govern.

3

(each as defined in the RAI Settlement Agreement), subject to any Art Claims ~~or claims~~ filed by ~~third parties~~the Sotheby's Entities in respect of any Buckets 2 and 3 Art and Consigned Renaissance Art, with such third party Art Claims to be resolved pursuant to the Protocol.

vii.    ~~vi.~~ RAI will (a) abandon any ownership interest in Buckets 2 and 3 Art and Consigned Renaissance Art; (b) withdraw the RAI Claim, (c) withdraw the RAI Art Claims, including any assertion of ownership of Buckets 2 and 3 Art therein; (d) withdraw the RAI Stay Relief Motion; and (e) withdraw and terminate any liens or financing statements filed in respect of such Buckets 2 and 3 Art or Consigned Renaissance Art, provided that any liens asserted by RAI shall attach to any proceeds to which RAI is entitled pursuant to the RAI Settlement Agreement.

viii.    ~~vii.~~ The Schupak Group will withdraw the Schupak Group Claim.

ix.    ~~viii.~~ RAI and the Debtor and its successors will each be entitled to retain 50% of the Net Proceeds[6] (as defined in the RAI Settlement Agreement) of Buckets 2 and 3 Art. The Debtor or the SOG Liquidation Trust, as the case may be, shall remit 50% of the Net Proceeds to RAI promptly after receipt of the proceeds of any sale of Buckets 2 and 3 Art. Any proceeds retained by the Debtor or the SOG Liquidation Trust, as the case may be, shall be distributed pursuant to the terms of the Plan. ~~For the avoidance of doubt, and notwithstanding anything to the contrary in the RAI Settlement Agreement, any Artwork which is subject to an Art Claim (other than Bucket 1 Art) shall be subject to the Protocol and shall not be sold by the Debtor or its successors without prior consent of the Art Claimant or an order of a court of competent jurisdiction authorizing the sale thereof.~~

x.    ~~ix.~~ The Debtor and its successors shall be entitled to 75% of the Net Proceeds of Consigned Renaissance Art and RAI shall be entitled to 25% of the Net Proceeds of Consigned Renaissance Art; provided, however, that if and to the extent the Debtor's estate or its successor in interest is entitled to any of the proceeds of Madonna and Child by Sandro Botticelli (Triax No. 153) (the "Botticelli"), then (~~i~~a) the Debtor shall be entitled to retain 90% of the first

---

[6] Any sale proceeds received by the Debtor on account of sales of Buckets 2 and 3 Art or Consigned Renaissance Art shall be subject to any valid, enforceable liens thereon.

28

3

$8.5 million of the estate's interest in the Net Proceeds of a sale of the Botticelli; (iib) RAI shall be entitled to retain 10% of the first $8.5 million of the estate's interest in the Net Proceeds of a sale of the Botticelli; (iiic) the Debtor shall be entitled to retain 20% of the estate's interest in the Net Proceeds in excess of $8.5 million from a sale of the Botticelli; and (ivd) RAI shall be entitled to retain 80% of the estate's interest in the Net Proceeds in excess of $8.5 million from a sale of the Botticelli.

xi.    x. Until the Effective Date, the Committee shall (i) lead negotiations with any seller agreeable to all Parties (any such seller, an "Auctioneer") for a sale of all Artwork that the Debtor may sell, including, without limitation, any Buckets 2 and 3 Art or Consigned Renaissance Art; (ii) consult with each of the other Parties regarding negotiations with the Auctioneer; (iii) invite each Party to all calls and meetings with the Auctioneer; (iv) make reasonable efforts to accommodate the schedules of each of the Parties; and (v) provide copies of all drafts of sales agreements or sale terms to each of the Parties.  The Committee shall provide six (6) business days' notice and a statement of the negotiated terms prior to execution of any agreement between the Debtor's estate and an Auctioneer to each of the Parties.  Each of the Bank and RAI shall have the absolute right to remove up to ten percent (10%) in number of the Renaissance Art in Buckets 2 and 3 from any sale or sales program that will be administered by the Auctioneer.

xii.    xi. The Debtor's estate shall retain an expert mutually acceptable to the Parties to assist the Parties in determining the sales strategy for Buckets 2 and 3 Art and Consigned Renaissance Art.  The expert may be the same expert retained by RAI to advise RAI with respect to sales of Bucket 1 Art.

xiii.    xii. The Oversight Committee of the SOG Liquidation Trust shall consist of five members, as follows:  two (2) members designated by the Committee, one of whom shall be Donald Schupak if and to the extent he is willing to serve; two (2) members designated by the Bank; and one independent member agreeable to all other members (the "Independent Member").

xiv.    xiii. After the Effective Date, with respect to Buckets 2 and 3 Art and Consigned Renaissance Art, the Liquidation

3

Trustee will have the authority to (a) negotiate the terms of the sale(s) of any items that the Auctioneer did not sell prior to the Effective Date, (b) negotiate the sale(s) of items that will be more appropriate to sell through a different party, subject to the terms hereof, and (c) negotiate the sale(s) of any Renaissance Art that was removed from the sale by the Auctioneer.  The Liquidation Trustee shall seek authorization from the Oversight Committee regarding any deviation from any agreement entered into prior to the Effective Date with the Auctioneer or the Auctioneer's pre-Effective Date sales plan.  The Liquidation Trustee shall seek prior authorization from the Oversight Committee regarding the sale of any piece of Buckets 2 and 3 Art or Consigned Renaissance Art with an estimated value in excess of $20,000.

xv.    xiv. After the Effective Date, the Liquidation Trustee shall have the authority to negotiate settlements of Art Claims, including Art Claims for Renaissance Art that is part of Buckets 2 and 3 Art and Consigned Renaissance Art.

xvi.    xv. **The RAI Group shall have the sole responsibility of settling competing ownership claims regarding with respect to claims or other interests asserted by Bucket 1 Competing Claimants against Bucket 1 Art.**

xvii.    **Claims of Bucket 1 Competing Claimants shall be resolved by any applicable non-bankruptcy court with personal and subject matter jurisdiction over such Claims and the parties thereto.**

xviii.    xvi. The Liquidation Trustee shall seek prior authorization from the Oversight Committee prior to settling an Art Claim for any piece of Buckets 2 and 3 Art or Consigned Renaissance Art with an estimated value in excess of $20,000.

xix.    xvii. The Liquidation Trustee shall seek prior authorization from the Oversight Committee before settling any Art Claim asserted by Lawrence Salander, Julie Salander, their bankruptcy estate(s), the chapter 7 trustee of their bankruptcy estates, or any entity or individual asserting an Art Claim on behalf of their bankruptcy estates, regardless of the value of the Art Claim or proposed settlement thereof.

30

3

xx.    xviii. All parties to the RAI Settlement Agreement will provide mutual global releases as described in the RAI Settlement Agreement and Section VIII.D.2 on page 5658 below.

xxi.    For the avoidance of doubt, any Artwork which is subject to an Art Claim (other than Bucket 1 Art) shall be subject to the Protocol and any Artwork (other than Bucket 1 Art) subject to an Art Claim or the secured claim asserted by the Sotheby's Entities shall not be sold by the Debtor or its successors in interest without prior consent of the Art Claimant or the Sotheby's Entities, as applicable, or an order of a court of competent jurisdiction authorizing the sale thereof.

**The RAI Settlement Agreement does not affect third parties' legal rights, claims to, or interests in Bucket 1 Art; provided, however, that the under the terms of the RAI Settlement Agreement, RAI may take possession of Bucket 1 Art upon the effective date of the RAI Settlement Agreement.**

## 10.    Litigation.

### a.    Prior or Pending Adversary Proceedings

During the course of the Chapter 11 Case, two associated adversary proceedings have been commenced, both of which have been or soon will be closed. On January 10, 2008, the Bankruptcy Court deemed the Debtor's motion for turnover of property from the Salanders' bankruptcy estate described in greater detail above, and the latter's response thereto, to constitute an adversary proceeding, thereby commencing Adv. Pro. No. 08-09002. On January 25, 2008, after the Bankruptcy Court entered a stipulation and order resolving the matter, the adversary proceeding was closed. The second adversary proceeding is discussed in Section VII.B.10.b below.

### b.    The Committee Investigation

The Debtor, through its CRO, entered into a stipulation with the Committee (the "Committee Standing Stipulation"), approved by the Bankruptcy Court by order entered February 4, 2008, whereby the Debtor and the Committee agreed to a division of responsibilities with respect to the investigation and prosecution of certain estate claims. The Committee Standing Stipulation also established a protocol for the sharing of information between the Debtor and the Committee in furtherance of such investigations. The Committee Standing Stipulation provided the basis for an effective working relationship between the Debtor and the

3

Committee and unfettered access by the Committee and its professionals to the Debtors' books and records.

Pursuant to the Committee Standing Stipulation, the Committee was authorized to prosecute any and all claims on behalf of the Debtor's estate, including any claims pursuant to sections 544 through 552 of the Bankruptcy Code ("Chapter 5 Actions"), any claims pursuant to section 541 of the Bankruptcy Code ("Turnover Actions"), and any of the Debtor's commercial tort claims (collectively with the Chapter 5 Actions and Turnover Actions, the "Estate Claims"), provided, except for Estate Claims against any member of the Committee (each, a "Committee Member") or any Turnover Action against the Salanders seeking property of the Debtor in the Salanders' possession, custody, or control (the "Excepted Estate Claims"). The Debtor relinquished standing and authority to commence or prosecute any Estate Claims except for the Excepted Estate Claims. The Debtor also retained standing to prosecute Estate Claims against any affiliate(s) of Committee Members (the "Affiliate Claims") upon consultation with the Committee, and the Committee has standing to intervene in any action commenced by the Debtor on account of Affiliate Claims.

In order to act on its rights under the Committee Standing Stipulation and otherwise perform its statutory duties, the Committee, through its professionals, conducted a forensic investigation of the Debtor's prepetition financial condition and dispositions of the Debtor's assets in order to determine if any causes of action exist against third parties. The Committee's Investigation also examined whether and to what extent there are assets that belong to the Debtor that are not in the Debtor's possession, custody or control.

On May 15, 2008, the Bankruptcy Court entered an Order (the "Committee Subpoena Order") authorizing the Committee to seek Rule 2004 examinations and issue Rule 2004 subpoenas for documents, information and/or testimony pursuant to a set of procedures. The Committee issued subpoenas to various parties, and has received documents responsive to many of the subpoenas it issued. The Committee conducted examinations pursuant to Rule 2004 of among others Michael Altman, Asher Edelman and Myron Kunin. The Committee also interviewed, on in informal basis, various employees of the Debtor, including Lawrence Salander, William Thibodeaux and Steven Harvey.

The Committee was also given standing by the Bankruptcy Court to commence, on behalf of the Debtor's estate, an adversary proceeding or contested matter against the Bank on account of certain claims. Specifically, the Committee was granted standing to challenge the validity, enforceability or priority of the Debtor's obligations under the Prepetition Loan Agreement and DIP Facility, as well as any of the liens and security interests granted thereunder (any such adversary proceedings or contested matter, a "Challenge Proceeding") within 120 days after entry of the Final DIP Order as extended for cause. Pursuant to the terms of the Amended DIP Order, the Committee was granted standing until July 15, 2008 to challenge the perfection of the Debtor's obligations under the Prepetition Loan Agreement or any of the liens and security interests granted thereunder (any such action, a "Perfection Challenge"), before the Bank would be deemed perfected in those assets described in certain of its lien perfection documents. Finally, also pursuant to the terms of the Amended DIP Order, failure of the Committee to timely commence a Perfection Challenge did not preclude later assertion of other counterclaims, setoffs or defenses or of any claim under section 510 of the Bankruptcy Code or

3

any avoidance or any other or further challenge or claim (any such action, including any Challenge Proceeding except a Perfection Challenge, a "Modified Challenge Proceeding"). Through a series of stipulations with the Bank, the Committee has received extensions to commence a Modified Challenge Proceeding against the Bank (the "Challenge Deadline").

Pursuant to the Amended DIP Order and the Committee Standing Stipulation, the Committee issued three requests for production of documents to the Bank. The Bank produced approximately 218,459 pages of documents to the Committee in response to such requests. On February 6, 2009, the Committee issued subpoenas to six current and former Bank employees pursuant to Rule 2004. On February 13, 2009, the Bank commenced an adversary proceeding (the "Bank Adversary Proceeding"), Adv. Pro. No. 09-09014 (CGM), against the Debtor and the Committee, seeking declaratory judgment that its claims were valid and enforceable, without defense, counterclaim or offset, and could not be subordinated or recharacterized. On February 21, 2009, the Bank moved to quash the Committee's subpoenas. After a hearing, the Bankruptcy Court ruled that the Committee could not conduct examinations pursuant to Rule 2004 due to the pending Bank Adversary Proceeding. However, the Bankruptcy Court ruled that the Committee could take depositions of current and former Bank employees prior to the Committee's deadline to file an answer in the Bank Adversary Proceeding. Thus, pursuant to the Bankruptcy Court's Order, the Committee conducted examinations of four current and one former Bank employees. Upon the Effective Date of the Plan, the Bank Adversary Proceeding will be withdrawn without prejudice.

The Committee's professionals worked to create databases derived from documents in the Debtor's possession and documents received in response to its subpoenas. These databases were supplemented by input from the physical inventory and photographs of every item in the Debtor's inventory created by the CRO and Triax, inventories prepared prior to the Petition Date at the request of the Bank, inventory reflecting the Bank's records on its collateral and cost information derived from Filemaker and other Debtor accounting records. The databases prepared by the Committee's professionals during the Chapter 11 Case were used for a variety of purposes, including assisting with the Protocol process, providing information to aid Gurr Johns in its efforts to market the Debtors' Artwork, and litigation support for, among other things, the Committee's investigation of the Bank, the Committee's investigation of third parties, and in support of the Committee's position on various matters throughout the Chapter 11 Case.

   c.  **Other Rule 2004 Examinations**

As of the date of the Disclosure Statement, the Bankruptcy Court has granted three requests for discovery (in addition to the Committee Subpoena Order) in connection with investigating certain claims in the Chapter 11 Case.

On February 14, 2008, the Bankruptcy Court granted Carol F. Cohen's application to take the Rule 2004 examination of the Debtor through Mr. Salander and the Debtor's corporate representative with the most knowledge of the disposition of Cohen's purported Artwork and its related paperwork thereto, to assist Cohen to gain a better understanding of the disposition of the Artwork and its effect on potential assets and liabilities of the estate.

3

On August 8, 2008, the Bankruptcy Court granted the Debtor's application for oral examination of and production of documents by RAI pursuant to Rules 2004 and 9016 to assist the Debtor in its evaluation of RAI's claims that it holds title to certain Renaissance artwork (the "Disputed Art") purportedly acquired by the Debtor following the closing of the transaction by which RAI purportedly purchased the Debtor's interest in Old Master Properties LLC, and determination of the nature and extent of the Estate's interest in the Disputed Art and the Debtor's interest in RAI.   The Debtor issued a subpoena to RAI, and RAI produced documents to the Debtor in response to its subpoena.

On January 23, 2009, Michael P. Luyckx, as trustee for the Elaine de Kooning Trust, submitted an application for a Rule 2004 examination of and production of documents by the Debtor concerning, inter alia, the disposition, location, and/or sale of works of allegedly turned over to the Debtor on consignment but which do not appear to be in the Debtor's possession as indicated by the CRO's inventory list in connection with the Art Claim Protocol.   The Committee, on behalf of the Estate and in consultation with the Debtor, produced documents to Mr. Luyckx in lieu of a subpoena.

All other requests for Rule 2004 discovery have been withdrawn.

### d.    Avoidance Actions

On or about September 11, 2009, the Committee commenced an adversary proceeding before the Bankruptcy Court against Edelman Arts, Inc. ("EAI") alleging, among other things, that EAI received various fraudulent transfers and conveyances in the amount of at least $1,375,000.  On or about October 30, 2009, the Committee commenced an adversary proceeding before the Bankruptcy Court against Antonette Favuzza ("FAvuzza") alleging, among other things, that Favuzza received various fraudulent transfers and conveyances in the amount of at least $67,756.56.   On or about October 30, 2009, the Committee commenced an adversary proceeding before the Bankruptcy Court against Gander & White Shipping, Inc. ("G&W") alleging, among other things, that G&W received various preferential payments in the amount of at least $39,195.84.   On or about October 30, 2009, the Committee commenced an adversary proceeding before the Bankruptcy Court against Lambert & Shackman, PLLC ("L&S") alleging, among other things, that L&S received various preferential payments in the amount of at least $45,000.   On or about October 30, 2009, the Committee commenced an adversary proceeding before the Bankruptcy Court against Pure Imaging, Inc. ("PII") alleging, among other things, that EAI received various preferential payments in the amount of at least $24,000.  On or about November 9, 2009, the Committee commenced an adversary proceeding before the Bankruptcy Court against Consolidated Edison of New York, Inc. ("Con Ed") alleging, among other things, that Con Ed received various preferential payments in the amount of at least $22,877.77.  On or about November 9, 2009, the Committee commenced an adversary proceeding before the Bankruptcy Court against Donald Dowden ("Dowden") alleging, among other things, that Dowden received various fraudulent transfers and conveyances in the amount of at least $58,500. On or about November 9, 2009, the Committee commenced an adversary proceeding before the Bankruptcy Court against Glass House Productions, LLC ("GHP") alleging, among other things, that GHP received various fraudulent transfers and conveyances in the amount of at least $721,921.73.   On or about November 9, 2009, the Committee commenced an adversary proceeding before the Bankruptcy Court against Joseph P. Carroll and Joseph P. Carroll, Ltd.

34

3

(collectively, "Carroll") alleging, among other things, that Carroll received various fraudulent transfers and conveyances in the amount of at least $6,187,200.  On or about November 9, 2009, the Committee commenced an adversary proceeding before the Bankruptcy Court against Leigh Morse ("Morse") alleging, among other things, that Morse received various fraudulent transfers and conveyances and improper payments in the amount of at least $238,615.64.  On or about November 9, 2009, the Committee commenced an adversary proceeding before the Bankruptcy Court against Andrew Kelly ("Kelly") and American Express ("Amex") alleging, among other things, that (a) Amex was the beneficiary of various fraudulent obligations and conveyances in the amount of at least $102,490 and (b) Kelly breached his fiduciary duties to the Debtor and was unjustly enriched by causing the Debtor to become obligated to Amex in the amount of $102,490.  On or about November 9, 2009, the Committee commenced an adversary proceeding before the Bankruptcy Court against One Ness West, LLC ("ONW") alleging, among other things, that ONW received various preferential payments in the amount of at least $40,000.

## VIII.

## THE CHAPTER 11 PLAN

As a result of the chapter 11 process and through the Plan, the Plan Proponents expect that creditors will obtain a substantially greater recovery from the Estate than the recovery that would be available if the Assets had been liquidated under chapter 7 of the Bankruptcy Code.  The Plan is annexed hereto as **Exhibit A** and forms part of this Disclosure Statement.  The summary of the Plan set forth below is qualified in its entirety by the more detailed provisions set forth in the Plan.

### A.    Classification and Treatment of Claims and Equity Interests.

For the purposes of organization, voting and all confirmation matters, except as otherwise provided herein, all Claims against and all Equity Interests in the Debtor shall be classified as set forth below.  For purposes of the Plan and the Classes of Claims below, Art Claims are excluded from the definition of Claims and thus are not affected by the below classification of Claims.

### 1.    Unclassified Claims (Administrative Claims, Priority Tax Claims, and Professional Fee Claims).

As provided by section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Professional Fee Claims shall not be classified under the Plan, and shall instead be treated separately as unclassified Claims and in accordance with section 1129(a)(9) of the Bankruptcy Code.  Such Claims are not designated as classes of Claims for the purposes of the Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.  Entities that hold Administrative Expense Claims and that do not timely file and serve a motion or application seeking payment in accordance with Article V of the Plan will be forever barred from asserting those Administrative Expense Claims against the Debtor, its Estate or the SOG Liquidation Trust

3

### a.    Administrative Expense Claims (including DIP Facility Claims and Allowed Professional Fee Claims)

Allowance:  To be eligible to receive distributions under the Plan on account of an Administrative Expense Claim (other than a Professional Fee Claim, the DIP Facility Claim or statutory fees due to the United States Trustee) that is not otherwise allowed by the Plan, a proof of Administrative Expense Claim must be filed with the Bankruptcy Court so as to be received on or before the Administrative Claims Bar Date, or such other date as may be agreed to by the SOG Liquidation Trust.  A Professional Fee Claim for the period from the Petition Date through the Effective Date for services rendered on behalf of the Debtor's Estate will be allowed only if (a) the Professional requesting compensation files and serves a properly noticed fee application by no later than forty-five (45) days after the Effective Date; and (b) the Bankruptcy Court allows the Claim pursuant to a Final Order.  Any holder of an Administrative Claim that does not assert such Claim in accordance with Article V of the Plan shall have its Claim be deemed Disallowed under this Plan and be forever barred from asserting such Claim against any of the Estate, the SOG Liquidation Trust, or any of their Assets or property.  Any such Claim shall be Disallowed and the holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.  The Plan Proponents estimate that the amount of the Allowed Administrative Claims (other than the DIP Facility Claim) will be approximately $3.7 million.

Treatment:  On the later to occur of (i) the Effective Date (or as soon as reasonably practicable thereafter) (ii) the date on which such Claim shall become an Allowed Administrative Expense Claim, and (iii) the date that the Unsecured Creditors Fund has been fully funded, the Liquidation Trustee, on behalf of the SOG Liquidation Trust, shall: (a) pay to each Holder of an Allowed Administrative Expense Claim its Pro Rata share of the DIP Facility/Administrative Claims Fund or (b) satisfy and discharge such Administrative Expense Claim in accordance with such other and less favorable terms as may be agreed upon by and between the Holder thereof and the Liquidation Trustee, subject to the consent of the Oversight Committee.  After the Effective Date and as often as reasonable in the Liquidation Trustee's discretion (in consultation with the Oversight Committee), after the establishment or maintenance of appropriate Plan Reserve Accounts, the Liquidation Trustee on behalf of the SOG Liquidation Trust shall make additional periodic Cash distributions to Holders of Allowed Administrative Expense Claims from Available Cash on a Pro Rata basis until the earlier of the date that (i) such Claims are paid in full and (ii) all Estate assets have been exhausted.  The failure to object to confirmation of this Plan by a Holder of an Administrative Expense Claim shall be deemed to be such Holder's agreement to receive treatment for such Claim that is different from that set forth in 11 U.S.C. § 1129(a)(9).

### b.    Priority Tax Claims

Allowance:  To be eligible to receive distributions under the Plan on account of a Priority Tax Claim, a proof of Claim must be filed with the Bankruptcy Court so as to be received on or before the Governmental Unit Claims Bar Date, or such other date as may be agreed to by the SOG Liquidation Trust.  Any holder of a Priority Tax Claim that does not assert such Claim in accordance with Article V of the Plan shall have its Claim be deemed Disallowed under this Plan and be forever barred from asserting such Claim against the Estate, the SOG Liquidation Trust,

3

or any of their Assets or property.  Any such Claim shall be Disallowed and the holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.  The Plan Proponents estimate that the amount of the Allowed Priority Tax Claims will be approximately $2.5 million.

Treatment:  On the later to occur of (i) the Effective Date (or as soon as reasonably practicable thereafter) and, (ii) the date on which such Claim shall become an Allowed Claim, the Liquidation Trustee on behalf of the SOG Liquidation Trust shall either (in his sole option and discretion): (a) pay to each Holder of an Allowed Priority Tax Claim a Pro Rata portion of Available Cash at that time, after such time that (1) the Unsecured Creditors Fund has been fully funded, (2) the Administrative Expense Claims Fund has been fully funded, (3) the FRB Secured Claim has been paid in full, and (4)the Priority Claim Payment Fund, after the establishment of appropriate Plan Reserve Accounts (for, among other things, Disputed Administrative Expense Claims, Disputed Professional Fee Claims, Disputed Priority Tax Claims, and the Post-Effective Date Trust Expense Reserve), Disputed Priority Tax Claims and Disputed Other Priority Claims), at that time, and thereafter make periodic Cash payments as set forth in the next sentence.; or (b) satisfy and discharge such Allowed Priority Tax claimClaim in accordance with such other and less favorable terms as may be agreed upon by and between the Holder thereof and the Liquidation Trustee, subject to the consent of the Oversight Committee.  After the Effective Date and as often as reasonable in the Liquidation Trustee's discretion (in consultation with the Oversight Committee), and after the establishment or maintenance of appropriate Plan Reserve Accounts, the Liquidation Trustee on behalf of the SOG Liquidation Trust shall make additional periodic Cash distributions to Holders of Allowed Priority Tax Claims from Available Cash on a Pro Rata basis, along with Holders of Allowed Other Priority Claims, from the Priority Claims Payment Fund until the earlier of the date that (i) such Claims are paid in full and (ii) all Estate assets have been exhausted.  The failure to object to confirmation of this Plan by a Holder of a Priority Tax Claim shall be deemed to be such Holder's agreement to receive treatment for such Claim that is different from that set forth in 11 U.S.C. § 1129(a)(9).

## 2. Classification and Treatment of FRB Secured Claim (Class 1)

Classification:  Class 1 consists of the FRB Secured Claim.

Treatment:  Subject to the terms herein and the establishment of appropriate Plan Reserve Accounts, the Bank will receive on account of its FRB Secured Claim (a) $3.0 million and (b) 60% of any Available Cash, after such time that (1: (1) a Pro Rata share of the Residual Fund Amount based on the proportion of the Residual Fund Amount attributable to the Bank Residual Fund until such time as the Bank Residual Fund is fully funded, after such time that (a) appropriate Plan Reserve Accounts (for, among other things, the Post-Effective Date Trust Expense Reserve, Disputed Priority Tax Claims, Disputed Other Priority Claims, Disputed Other Secured Claims , Disputed Administrative Expense Claims and Disputed Professional Fee Claims) have been established by the SOG Liquidation Trust (b) Allowed Priority Tax Claims and Allowed Other Priority Claims have been paid in full or appropriate Plan Reserve Accounts therefor have been established by the SOG Liquidation Trust, (c) the Unsecured Creditors Fund has been fully funded, (2) the Administrative Expense Claims Fund has been fully funded and (3) the establishment of appropriate Plan Reserve Accounts and (d) the Administrative Expense Claims Fund has been fully funded; and (2) 60% of any Available Cash, after such time that (a)

37

appropriate Plan Reserve Accounts (for, among other things, the Post-Effective Date Trust Expense Reserve, Disputed Priority Tax Claims, Disputed Other Priority Claims, Disputed Other Secured Claims , Disputed Administrative Expense Claims and Disputed Professional Fee Claims) have been established by the SOG Liquidation Trust, (b) the Post-Effective Date Trust Expense Reserve is funded, (c) Allowed Priority Tax Claims and Allowed Other Priority Claims have been paid in full or appropriate Plan Reserve Accounts therefor have been established by the SOG Liquidation Trust, (d) the Unsecured Creditors Fund has been fully funded (e) the Administrative Expense Claims Fund has been fully funded, (e) the Unsecured Creditors Residual Fund has been fully funded and (f) the Bank Residual Fund has been fully funded.  The Bank shall also have the right to credit bid at any auction or sale of the Debtor's assets, which successful bid will result in a reduction of the FRB Secured Claim by the amount of the successful bid; provided, however, that any credit bid by the Bank shall be at least in an amount that is low pre-auction estimate for the piece of Artwork subject to the credit bid; provided further, however, that if there is no pre auction estimate for the piece of Artwork subject to the credit bid, then the credit bid shall be in an amount that is the estimated fair market value of the piece of Artwork subject to the credit bid.  After the Effective Date and as often as reasonable in the Liquidation Trustee's discretion (in consultation with the Oversight Committee), after the establishment or maintenance of appropriate Plan Reserve Accounts, the Liquidation Trustee on behalf of the SOG Liquidation Trust shall make periodic Cash distributions to the Bank equal to 60% of Available Cash on account of its FRB Secured Claim from Available Cash until the earlier of the date that (i) the FRB Secured Claim (less any amounts credited towards the purchase of any Asset) is paid in full and (ii) all Estate Assets have been exhausted.  The Plan Proponents estimate that the amount of the Allowed FRB Secured Claim will be $29,680,244.  Further, upon the Effective Date, in partial consideration for the distributions it is receiving under the Plan, FRB andor FRH, as the case may be, shall be deemed to convey to the Debtor all of its claims, liens and security interests arising under the RAI Indebtedness and the FRH Equity Interest, which in turn shall be conveyed to the SOG Liquidation Trust upon the Effective Date.

### 3.    Classification and Treatment of Other Secured Claims (Class 2)

Classification:  Class 2 consists of all Other Secured Claims.

Treatment:  On the Effective Date (or as soon as reasonably practicable thereafter), each Person holding an Allowed Class 2 Claim will receive, at the election of the Liquidation Trustee in consultation with the Oversight Committee, one of the following treatments in full satisfaction of its Allowed Class 2 Claim:

> (a1)    The Liquidation Trustee will convey to the entity holding the Claim the collateral in which that entity has a security interest; or

> (b2)    The Liquidation Trustee will pay to the entity holding the Claim any net proceeds actually received from the sale or disposition of the collateral in which that entity has a security interest up to the amount of any such claim; or

3

(e3)    The Liquidation Trustee will pay to the entity holding the Claim cash in the amount of that entity's Allowed Class 2 Claim; or

(d4)    Such other distributions or treatment as are necessary to leave the rights of the Holder of an Allowed Class 2 Claim unimpaired or as are necessary to otherwise satisfy the requirements of Chapter 11 of the Bankruptcy Code; or

(5) (e)    Such other and less favorable distributions or treatments as may be agreed upon by and between the entity holding the claim and the Liquidation Trustee, subject to the consent of the Oversight Committee.

The Liquidation Trustee may, in his discretion and after consultation with the Oversight Committee, select which of these treatments or any combination thereof each Person holding an Allowed Class 2 Claim will receive. Subject to any agreement between the Liquidation Trustee and the Holder of such Claim, the Liquidation Trustee shall have one hundred twenty (120) days after a holder of an Allowed Class 2 Claim has its claim Allowed by the Bankruptcy Court to elect which treatment to provide to such holder of an Allowed Class 2 Claim.

## 4.    Classification and Treatment of Other Priority Claims (Class 3)

Classification:  Class 3 consists of all Priority Claims other than Priority Tax Claims.

Treatment:  On the later to occur of (i) the Effective Date (or as soon as reasonably practicable thereafter) and, (ii) the date on which such Claim shall become an Allowed Claim, the Liquidation Trustee on behalf of the SOG Liquidation Trust shall either (in his sole option and discretion); (ia) pay to each Holder of an Allowed Other Priority Claim a Pro Rata portion of Available Cash at that time, after (1) the Unsecured Creditors Fund has been fully funded, (2) the Administrative Expense Claims Fund has been fully funded, (3) the FRB Secured Claim has been paid in full, and (4)the Priority Claim Payment Fund, after the establishment of appropriate Plan Reserve Accounts (for, among other things, Disputed Administrative Expense Claims, Disputed Professional Fee Claimsthe Post-Effective Date Trust Expense Reserve , Disputed Priority Tax Claims, Disputed Other Priority Claims and the Post-Effective Date Expense Reserve), and thereafter make periodic and Disputed Other Priority Claims), at that time, and thereafter make Cash payments as set forth in the next sentence.; or (iib) satisfy and discharge such Allowed Other Priority Claim in accordance with such other and less favorable terms as may be agreed upon by and between the Holder thereof and the Liquidation Trustee, subject to the consent of the Oversight Committee.  After the Effective Date and as often as reasonable in the Liquidation Trustee's discretion (in consultation with the Oversight Committee), and after the establishment or maintenance of appropriate Plan Reserve Accounts, the Liquidation Trustee on behalf of the SOG Liquidation Trust shall make additional periodic Cash distributions to Holders of Allowed Other Priority Claims from Available Cash on a Pro Rata basis, along with Holders of Allowed Other Priority Claims, from the Priority Claims Payment Fund until the earlier of the date that (i) such Claims are paid in full and (ii) all Estate assets have been exhausted.  The failure to object to confirmation of this Plan by a Holder of an Other Priority Claim shall be deemed to be such Holder's agreement to receive treatment for such Claim that is different from that set forth in 11 U.S.C. § 1129(a)(9).

3

5.    **Classification of General Unsecured Claims (Class 4)**

Classification:  Class 4 consists of all General Unsecured Claims.

Treatment:  Subject to the terms herein and the establishment or maintenance of appropriate Plan Reserve Accounts, each Holder of an Allowed Consenting General Unsecured Claim will receive its Pro Rata share of: (a1) the Unsecured Creditors Fund ~~and (b) after (i) the~~, after such time that (a) appropriate Plan Reserve Accounts (for, among other things, the Post-Effective Date Trust Expense Reserve, Disputed Priority Tax Claims, Disputed Other Priority Claims, Disputed Other Secured Claims , Disputed Administrative Expense Claims ~~Fund has been fully funded, (ii) the Bank has been paid $3.0 million on account of the FRB Secured Claim and (iii) the establishment or maintenance of appropriate Plan Reserve Accounts,~~, Disputed Professional Fee Claims and Disputed General Unsecured Claims) have been established by the SOG Liquidation Trust and (b) Allowed Priority Tax Claims and Allowed Other Priority Claims have been paid in full or appropriate Plan Reserve Accounts therefor have been established by the SOG Liquidation Trust; and (2) a Pro Rata share of the Residual Fund Amount based on the proportion of the Residual Fund Amount attributable to the Unsecured Creditors Residual Fund until such time as the Unsecured Creditors Residual Fund is fully funded, after such time that (a) appropriate Plan Reserve Accounts (for, among other things, the Post-Effective Date Trust Expense Reserve, Disputed Priority Tax Claims, Disputed Other Priority Claims, Disputed Other Secured Claims , Disputed Administrative Expense Claims, Disputed Professional Fee Claims and Disputed General Unsecured Claims) have been established by the SOG Liquidation Trust, (b) Allowed Priority Tax Claims and Allowed Other Priority Claims have been paid in full or appropriate Plan Reserve Accounts therefor have been established by the SOG Liquidation Trust and (c) the Administrative Expense Claims Fund has been fully funded; and (3) 40% of any Available Cash, after such time that (a) appropriate Plan Reserve Accounts (for, among other things, the Post-Effective Date Trust Expense Reserve, Disputed Priority Tax Claims, Disputed Other Priority Claims, Disputed Other Secured Claims , Disputed Administrative Expense Claims, Disputed Professional Fee Claims and Disputed General Unsecured Claims) have been established by the SOG Liquidation Trust, (b) Allowed Priority Tax Claims and Allowed Other Priority Claims have been paid in full or appropriate Plan Reserve Accounts therefor have been established by the SOG Liquidation Trust, (c) the Unsecured Creditors Fund has been fully funded (d) the Administrative Expense Claims Fund has been fully funded, (e) the Unsecured Creditors Residual Fund has been fully funded and (f) the Bank Residual Fund has been fully funded.  After the Effective Date and as often as reasonable in the Liquidation Trustee's discretion (in consultation with the Oversight Committee), the Liquidation Trustee on behalf of the SOG Liquidation Trust shall make periodic Cash distributions to each Holder of an Allowed Consenting General Unsecured Claim on account of its Allowed General Unsecured Claim from Available Cash until the earlier of the date that (i) such Claims are paid in full and (ii) all Estate assets have been exhausted.  After the FRB Secured Claim and the Allowed General Unsecured Claims of all Holders of Allowed Consenting General Unsecured Claim have been paid in full, each Holder of an Allowed General Unsecured Claim that is not a Consenting General Unsecured Claim shall be paid a Pro Rata share of Available Cash.

3

6.      **Classification and Treatment of Interests (Class 5)**

Classification:  Class 5 consists of all Membership Interests.

Treatment:  Class 5 Membership Interests will receive and retain no value under the Plan, and all Class 5 Membership Interests will be cancelled on the Effective Date.

B.      **Means for Implementation of the Plan.**

1.      **The SOG Liquidation Trust.**

a.      **Formation of the SOG Liquidation Trust**

As set forth in Article VII of the Plan, on the Effective Date, the Liquidation Trustee and the CRO shall execute the SOG Liquidation Trust Agreement.  The SOG Liquidation Trust shall then be deemed created and effective without any further action by the Bankruptcy Court or any party.  Upon execution of the SOG Liquidation Trust Agreement by the parties thereto, the SOG Liquidation Trust be deemed to have accepted all Assets of the Estate on behalf of the Beneficiaries thereof, and the Liquidation Trustee, on behalf of the SOG Liquidation Trust and its Beneficiaries, shall be authorized to obtain, liquidate, and collect all of the Assets of the Estate not in its possession and pursue all of the Causes of Action.  The SOG Liquidation Trust shall be established for the purpose of (a) administering and monetizing the Assets of the SOG Liquidation Trust, including by the sale of Artwork and pursuit of Causes of Action, (b) resolving all Claims, and (c) making all Distributions provided for under the Plan.  The SOG Liquidation Trust shall not have the objective to continue or engage in the conduct of a trade or business, other than the sale of Trust Assets (including Artwork that the SOG Liquidation Trust is authorized to sell), and the purchase of assets incidental to the sale of Trust Assets and the retention of advisors or other professionals necessary for the disposition of Trust Assets.  The beneficiaries of the SOG Liquidation Trust shall be bound by the SOG Liquidation Trust Agreement.  The SOG Liquidation Trust Agreement shall make distributions to the Beneficiaries in accordance with the Plan and the SOG Liquidation Trust Agreement.  Interests in the SOG Liquidation Trust shall be uncertificated and shall be nontransferable except upon death of the interest holder or by operation of law.  The SOG Liquidation Trust shall have a term of seven (7) years from the Effective Date, without prejudice to the rights of the Liquidation Trustee to extend such terms as applicable law shall allow.  The SOG Liquidation Trust may invest Cash (including any earning thereon or proceeds therefrom) as permitted by Bankruptcy Code section 345 or in other prudent investments, as authorized by the Oversight Committee; provided, however, that such investments are permitted to be made by a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

The Liquidation Trustee shall be the exclusive trustee of the assets of the SOG Liquidation Trust for purposes of 31 U.S.C. Section 3713(b) and 26 U.S.C. Section 6012(b)(3).  The powers, rights, and responsibilities of the Liquidation Trustee shall be specified in the SOG Liquidation Trust Agreement and, under the supervision of the Oversight Committee, shall include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect trust assets; (b) pay taxes or other obligations incurred by the SOG Liquidation Trust; (c) retain

3

and compensate, without further order of the Bankruptcy Court, the services of employees, professionals and consultants to advise and assist in the administration, prosecution and distribution of trust assets; (d) calculate and implement distributions of trust assets; (e) prosecute, compromise, and settle, in accordance with the specific terms of that agreement, all Claims and Causes of Action vested in the SOG Liquidation Trust; (f) resolve issues involving Claims and Interests pursuant to Article VII of the Plan; and (g) undertake all administrative functions of the Chapter 11 Case, including the ultimate closing of the Chapter 11 Case.

All costs and expenses associated with the administration of the SOG Liquidation Trust, including reasonable professional costs related to the prosecution of Causes of Action, objection to Disputed Claims or Interests, and reasonable compensation for the Liquidation Trustee and, as set forth in the SOG Liquidation Trust Agreement, the Oversight Committee, shall be the responsibility of and paid by the SOG Liquidation Trust from Available Cash in accordance with the SOG Liquidation Trust Agreement. The SOG Liquidation Trust is the successor to the Debtor's and the Estate's rights to books and records.

The Liquidation Trustee shall be responsible for filing all federal, state, and local tax returns for the SOG Liquidation Trust. The SOG Liquidation Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions made by the SOG Liquidation Trust shall be subject to any such withholding and reporting requirements. The SOG Liquidation Trust shall provide reasonably detailed reports to holder of beneficial interests in the SOG Liquidation Trust, as the Oversight Committee deems appropriate, but not less than annually.

### b.    Federal Income Tax Treatment of the SOG Liquidation Trust for the SOG Liquidation Trust Assets.

For federal income tax purposes, it is intended that the SOG Liquidation Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury regulations and that such trust be owned by its Beneficiaries (i.e., holders of Allowed Claims in Class 1, Class 3 and Class 4). Accordingly, for federal income tax purposes, it is intended that the Beneficiaries be treated as if they had received a distribution from the Estate of an undivided interest in each of the assets of the SOG Liquidation Trust and then contributed such interest to the SOG Liquidation Trust.

### c.    SOG Liquidation Trust Assets Treated as Owned by Holders of Allowed Claims

For all federal income tax purposes, all parties shall treat the transfer of Assets to the SOG Liquidation Trust for the benefit of the holders of Allowed Administrative Expense and Priority Tax Claims and Allowed Claims in Class 1, Class 3 and Class 4 as (a) a transfer of the assets of the SOG Liquidation Trust directly to the holders of Allowed Administrative Expense and Priority Tax Claims and Allowed Claims in Class 1, Class 3 and Class 4 followed by (b) the transfer by such holders to the SOG Liquidation Trust of the Assets of the SOG Liquidation Trust in exchange for the beneficial interests in the SOG Liquidation Trust. Accordingly, the holders of such Allowed Administrative Expense and Priority Tax Claims and Allowed Claims

42

in Class 1, Class 3 and Class 4 shall be treated for federal income tax purposes as the grantors and owners of their respective share of the Assets of the SOG Liquidation Trust.

### d.        Tax Reporting

The Liquidation Trustee shall file returns for the SOG Liquidation Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and in accordance with Article VII of the Plan.  The SOG Liquidation Trust also shall annually send to each holder of a beneficial interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct all such holders to report such items on their federal income tax returns. The SOG Liquidation Trust's taxable income, gain, loss, deduction or credit will be allocated to holders of Allowed Administrative Expense and Priority Tax Claims and Allowed Claims in Class 1, Class 3 and Class 4 in accordance with their relative beneficial interests in the SOG Liquidation Trust.

As soon as possible after the Effective Date, the Liquidation Trustee shall make a good faith valuation of assets of the SOG Liquidation Trust, and such valuation shall be used consistently by all parties, for all federal income tax purposes.  The Liquidation Trustee also shall file (or cause to be filed any other statements, returns, or disclosures relating to the SOG Liquidation Trust that are required by any Governmental Unit for taxing purposes.

Notwithstanding anything else in the Plan, subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary, the SOG Liquidation Trust shall (i) treat any assets allocable to, or retained on account of, Disputed Claims as held by one or more discrete trusts for federal income tax purposes (the "Disputed Claims Reserve"), consisting of separate and independent shares to be established in respect of each Disputed Claim, in accordance with the trust provisions of the Tax Code (Sections 641 et seq.), (ii) treat as taxable income or loss of the SOG Liquidation Trust that would have been allocated to the holders of Disputed Claims had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved), (iii) treat as a distribution from the Disputed Claims Reserve any increased amounts distributed by the SOG Liquidation Trust as a result of any Disputed Claims resolved earlier in the taxable year, to the extent such distributions relate to taxable income or loss of the Disputed Claims Reserve determined in accordance  with the provisions hereof, and (iv) to the extent permitted by applicable law, shall report consistent with the foregoing for state and local income tax purposes. All holders of Allowed Administrative Expense and Priority Tax Claims and Allowed Claims in Class 1, Class 3 and Class 4 shall report, for tax purposes, consistent with the foregoing.

The SOG Liquidation Trust shall be responsible for payments of any taxes imposed on the trust or its Assets, including the Disputed Claims Reserve.  In the event, and to the extent, and Cash retained on account of Disputed Claims in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts distributable by the SOG Liquidation Trust as a result of the resolutions of such Disputed Claims.

3

The SOG Liquidation Trust may request an expedited determination of Taxes of the Debtor or of the SOG Liquidation Trust, including the Disputed Claims Reserve, under Bankruptcy Code Section 505(b) for all returns filed for, or on behalf of, the Debtor and the SOG Liquidation Trust for all taxable periods through the dissolution of the SOG Liquidation Trust.

### e.    Dissolution

The Liquidation Trustee shall be discharged and the SOG Liquidation Trust shall be terminated, at such time as (a) all Disputed Claims have been resolved, (b) all of the Assets of the SOG Liquidation Trust have been liquidated, and (c) all distributions required to be made by the SOG Liquidation Trust under the Plan and the SOG Liquidation Trust Agreement have been made, but in no event shall the SOG Liquidation Trust be dissolved later than seven (7) years from the Effective Date unless the Liquidation Trustee, with the approval of the Oversight Committee, determines that a fixed period extension is necessary to facilitate or complete the recovery and liquidation of assets of the SOG Liquidation Trust.

### f.    Vesting and Transfer of Assets to the SOG Liquidation Trust

Pursuant to Bankruptcy Code Section 1141(b), the Assets of the Estate (including, without limitation, the Debtor's right, title and interest in any Artwork) shall vest in the SOG Liquidation Trust; provided, however, that the SOG Liquidation Trust, with the consent of the Liquidation Trustee, may abandon or otherwise not accept any Assets that the SOG Liquidation Trust believes, in good faith, have no value to the SOG Liquidation Trust. Any Assets the SOG Liquidation Trust so abandons or otherwise does not accept shall not vest in the SOG Liquidation Trust and shall revest in the Debtor. Any Artwork transferred to the possession, custody or control of the SOG Liquidation Trust shall be subject to the rights, if any, of Art Claimants that have filed valid Art Claims and such Art Claims shall be resolved pursuant to the Art Claims Protocol.

On the Effective Date, the SOG Liquidation Trust shall (i) take possession of all books, records, and files of the Debtor and its Estate; and (ii) provide for the retention and storage of such books, records, and files until such time as the Liquidation Trustee determines, in accordance with the SOG Liquidation Trust Agreement, that retention of same is no longer necessary or required.

As of the Effective Date, all Assets vested in the SOG Liquidation Trust and all Assets dealt with in the Plan, shall be free and clear of all Claims, Liens, and interests except as otherwise specifically provided in the Plan or in the Confirmation Order. The Liquidation Trustee shall make distributions in accordance with the Plan and the SOG Liquidation Trust Agreement.

### g.    Appointment of the Liquidation Trustee

The Liquidation Trustee for the SOG Liquidation Trust shall be an independent and disinterested Person. The Liquidation Trustee shall be the successor to all of the privileges of the Estate and the Debtor.

3

### h.  Rights and Powers of the SOG Liquidation Trust

On the Effective Date, all of the Assets of the Estate, as well as the rights and powers of the Estate, the Debtor and the Committee, shall automatically vest in the SOG Liquidation Trust. Each of the Estate, the Debtor and the Committee, and any professionals or advisors thereto, shall turn over to the SOG Liquidation Trust any and all property of the Estate, the Debtor and the Committee, including without limitation business and financial records of the Estate, the Debtor and the Committee. The SOG Liquidation Trust, acting through the Liquidation Trustee under the supervision and direction of the Oversight Committee, shall be authorized to exercise and perform the rights, powers and duties held by the Estate, including without limitation authority under section 1123(b)(3) of the Bankruptcy Code, to provide for the prosecution, settlement, adjustment, retention and enforcement of claims and interests of the Estate, including but not limited to the sale of Artwork and the Causes of Action, and the authority to exercise all rights and powers under sections 506(c), 544-551, 1106, 1107 and 1108 of the Bankruptcy Code.

### 2.  Termination of the CRO.

As set forth in Article VII of the Plan, as of the Effective Date, the CRO will be removed and relieved of any further responsibilities to the Debtor and the Estate. The CRO shall turn over to the SOG Liquidation Trust any and all property of the Estate, including without limitation business and financial records of the Estate.

### 3.  Liquidation Trustee.

#### a.  Identity

On the Effective Date, Alan M. Jacobs will be appointed the Liquidation Trustee, as trustee of the SOG Liquidation Trust; provided, however, that the Plan Proponents may appoint another Liquidation Trustee at or prior to confirmation of the Plan if Al Jacobs cannot or will not serve as the Liquidation Trustee upon terms agreeable to the Plan Proponents.

#### b.  Responsibilities of Liquidation Trustee

The responsibilities of the Liquidation Trustee shall include, but shall not be limited to: (i) conducting sales of the Debtor's Assets (including Artwork); (ii) prosecuting and/or settling the Causes of Action; (iii) facilitating the prosecution and/or settlement of objections to, and estimations of, Claims implementing and/or consummating the objectives of the Protocol; (iv) liquidating the remaining property of the SOG Liquidation Trust, and providing for the distribution of the net proceeds thereof, in accordance with the provisions of the Plan; (v) calculating and implementing all distributions required under the Plan; (vi) filing all required tax returns, and paying taxes and all other obligations on behalf of the SOG Liquidation Trust from SOG Liquidation Trust funds; (vii) otherwise administering the SOG Liquidation Trust; (viii) providing periodic reports to the Oversight Committee and various parties-in-interest as necessary, reflecting periodic expenditures, receipts and distributions and aggregate expenditures, receipts and distributions from the Effective Date; (ix) providing periodic status reports to the Oversight Committee (on a periodic basis and as may be reasonably requested by any member of the Oversight Committee) and various parties-in-interest as appropriate with

respect to the Claims resolution process, distributions on Allowed Claims, and prosecution and resolutions of Causes of Action and objections to Claims; and (x) such other responsibilities as may be vested in the Liquidation Trustee pursuant to the Confirmation Order or as may be necessary and proper to carry out the provisions of the Plan.  The Liquidation Trustee shall use the SOG Liquidation Trust's cash on hand or cash in a designated Plan Reserve Account to pay the premiums on such bond.  To the extent there are available funds, the Liquidation Trustee shall establish all reserves required to be established pursuant to the Plan, including, but not limited to, the Post Effective Date Expense Reserve.

### c.    Powers and Authority of Liquidation Trustee

The Liquidation Trustee shall be the exclusive trustee of the assets of the SOG Liquidation Trust for purposes of 31 U.S.C. Section 3713(b) and 26 U.S.C. Section 6012(b)(3). The powers and authority of the Liquidation Trustee shall include, without limitation other than as provided in the Plan or the SOG Liquidation Trust Agreement, the power to: (i) invest funds of the SOG Liquidation Trust, and withdraw funds of the SOG Liquidation Trust, make distributions, incur obligations for reasonable and necessary expenses in liquidating and converting any remaining assets of the SOG Liquidation Trust to Cash, and pay taxes and other obligations owed by the SOG Liquidation Trust from funds held by the Liquidation Trustee in accordance with the Plan; (ii) perform all of the obligations and agreements of the SOG Liquidation Trust and/or of the Liquidation Trustee provided for in the Plan and in the SOG Liquidation Trust Agreement; (iii) hold legal title to any and all rights of the holders of the Liquidation Trust Interests in or arising from the Trust Assets, including without limitation, the right to vote any claim or interest in a case under the Bankruptcy Code and receive any distribution therein; (iv) protect and enforce the rights to the Trust Assets by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity; (v) perform the duties, exercise the powers, and assert the rights of a trustee under Sections 704 and 1106 of the Bankruptcy Code, including, without limitation, commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting claims, defenses, offsets and privileges; (vi) determine, satisfy, object to and estimate any and all claims or liabilities created, incurred or assumed by the SOG Liquidation Trust; (vii) pay all expenses and make all other payments relating to the SOG Liquidation Trust; (viii) establish, keep and maintain the Disputed Claims Reserve (as defined in Article VII of the Plan) for the benefit of the Disputed Claims; (ix) account separately for a Disputed Claim Reserve for each Disputed Claim until the claim is an Allowed Claim or Disallowed Claim; (x) except as otherwise provided in the Plan, in the discretion of the Liquidation Trustee, set off against any Claim (and the payments or other distributions to be made pursuant to the Plan with respect to such Claims) any Cause of Action comprising Trust Assets against the holder of such Claim, but neither the failure to so set off any Cause of Action nor the allowance of any Claim shall constitute a waiver or release by the SOG Liquidation Trust or Liquidation Trustee of any Cause of Action constituting Trust Assets; (xi) market, negotiate, enter into and perform agreements for the sale or other disposition of the Trust Assets; (xii) consult with and provide information to the Oversight Committee at such times and with respect to such issues relating to the conduct of the Trust as is appropriate; (xiii) prepare and deliver written statements or notices, quarterly or otherwise, required by law to be delivered to Beneficiaries and the Oversight Committee; (xiv) prepare, or have prepared, and file with the appropriate taxing authority on behalf of the SOG Liquidation Trust any and all tax and

3

information returns with respect to the SOG Liquidation Trust (including, without limitation, United States federal, state, local or foreign tax or information returns required to be filed by the Liquidation Trust) and pay taxes properly payable by the SOG Liquidation Trust, if any, and cause all taxes payable by the SOG Liquidation Trust, if any, to be paid exclusively out of the Trust Assets; (xv) maintain and preserve the originals of any and all instruments and documents pertaining to the Trust Assets; (xvi) take any of the foregoing actions, and execute any documents relating thereto, in the Liquidation Trustee's own name, on behalf of the SOG Liquidation Trust (including but not limited to all settlement agreements); (xvii) exercise and perform the rights, powers and duties held by the Estate, including without limitation the authority under section 1123(b)(3) of the Bankruptcy Code, to provide for the prosecution, settlement, adjustment, retention and enforcement of claims and interests of the Estate, including but not limited to the sale of Artwork, the prosecution and settlement of the Causes of Action, and the authority to exercise all rights and powers under sections 506(c), 544-551, 1106, 1107 and 1108 of the Bankruptcy Code; (xviii) engage employees and professionals to assist the Liquidation Trustee with respect to his responsibilities, including, but not limited to, any professionals employed by the Committee or the Debtor; (xix) prosecute, compromise and/or settle claims and Causes of Action and objections to Claims on behalf of the SOG Liquidation Trust; (xx) liquidate any remaining Assets of the SOG Liquidation Trust, and provide for the distributions therefrom in accordance with the provisions of the Plan; (xxi) manage the continued liquidation of the SOG Liquidation Trust's assets, and to otherwise administer the SOG Liquidation Trust; (xxii) stand in the shoes of the Debtor or the Committee (solely with causes of action assigned to the Committee pursuant to the Committee Standing Stipulation) and assert or waive attorney client privilege and other privileges between the Debtor and its professionals (whether such professionals represented the Debtor prior to, or after, the Petition Date) or, in the case of Committee Assigned Actions, the Committee and its professionals, (xxiii) interpret the Plan in the Liquidation Trustee's reasonable discretion; and (xxiv) exercise such other powers and authority as may be vested in or assumed by the Liquidation Trustee by any Final Order, at the direction of the Oversight Committee, or as may be necessary and proper to carry out the provisions of the Plan.  Subject to any requirement to obtain prior approval of the Oversight Committee before instituting or settling any proceeding, asserting a Cause of Action or objecting to or settling an objection to a Claim, the Liquidation Trustee, on behalf of the SOG Liquidation Trust, shall have discretion to pursue, not pursue and/or settle any and all Causes of Action and objections to Claims as the Liquidation Trustee and, where applicable, the Oversight Committee determine(s) is in the best interests of the SOG Liquidation Trust, and neither the Liquidation Trustee nor any member of the Oversight Committee shall have any liability whatsoever for the outcome of that decision, except in the event that there is a Final Order determining that any such person committed gross negligence or intentional misconduct.  In connection with the administration of the SOG Liquidation Trust, the Liquidation Trustee is authorized to perform any and all acts necessary and desirable to accomplish the purposes of the Plan.  In the event that the Liquidation Trustee cannot take any action, including without limitation the prosecution of any Causes of Action or the objection to any Claim, by reason of an actual or potential conflict of interest, the Oversight Committee acting by majority shall be authorized to take any such action(s) in his place and stead, including without limitation the retention of professionals (which may include professionals retained by the Liquidation Trustee) for such purpose of taking such actions.

3

d.        **Retention and Compensation of Professionals**

The Liquidation Trustee may, without further order of the Bankruptcy Court, employ various professionals, including, but not limited to, counsel, consultants, and financial advisors, as needed to assist him in fulfilling his obligations under the Plan, and on whatever fee arrangement the Liquidation Trustee deems appropriate, including, without limitation, contingency fee arrangements, subject to the approval of the Oversight Committee.  The Liquidation Trustee may employ professionals that were previously employed by the Committee or the Debtor.

To the extent there are sufficient available funds, the Liquidation Trustee shall include in the reserve created for Post-Effective Date Expenses reasonably sufficient cash to cover the reasonably foreseeable fees and expenses of such professionals incurred, or to be incurred, after the Effective Date.

e.        **Compensation of Liquidation Trustee**

In addition to reimbursement for actual out-of-pocket expenses incurred by the Liquidation Trustee, the Liquidation Trustee shall be entitled to receive reasonable compensation for services rendered on behalf of the SOG Liquidation Trust on terms to be determined by the Oversight Committee which may include reasonable compensation determined on a contingency basis.  The Liquidation Trustee shall not be required to file an application for compensation in order to receive the compensation provided for herein.

To the extent there are sufficient available funds, the Liquidation Trustee shall include in the reserve created for Post-Effective Date Expenses reasonably sufficient monies to cover the reasonably foreseeable fees and expenses of the Liquidation Trustee incurred, or to be incurred, after the Effective Date, subject to review of the Oversight Committee.

f.        **Liquidation Trustee and Professional Compensation Procedures**

The Liquidation Trustee and any and all professionals retained after the Effective Date will be paid for their services and reimbursed for their expenses pursuant to the following procedures:  On or before the twenty-fifth (25th) day of each month following the month for which compensation is sought, the Liquidation Trustee and all professional retained after the Effective Date shall file with the Bankruptcy Court a monthly statement describing with reasonable particularity the time expended and the nature, extent and value of the services provided during the period covered by such request.  Any party in interest shall have until the fifteenth (15th) day after the submission of the statement to review it.  If no objections are filed, the Liquidation Trustee shall promptly pay 100% of the fees and 100% of the disbursements identified in each statement.  In the event that any party in interest determines that the compensation or reimbursement sought in a particular statement is inappropriate or unreasonable, or that any number of calculation is incorrect, that party shall, on or before the fifteenth (15th) day after the submission of the statement, serve upon the party whose statement is objected to, a "Notice of Objection to the Monthly Statement" setting forth the precise nature of the objection and the amount in issue.  Thereafter, the objecting party and the party whose statement is objected to shall meet or confer to attempt to reach an agreement regarding the

48

3

correct payment to be made, and if no agreement is reached with regard to such objection, the Liquidation Trustee shall not pay any portion of the fees and disbursements requested that are not the subject of a Notice of Objection, as well as any adjusted fees and disbursements that have been agreed to by the objecting party and the party requesting compensation and reimbursement.

### g.    Removal of Liquidation Trustee

The Liquidation Trustee or any successor Liquidation Trustee appointed pursuant to the Plan may be removed as Liquidation Trustee by the affirmative unanimous vote of the members of the Oversight Committee.

### h.    Successor Liquidation Trustee

In the event that the Liquidation Trustee is removed, resigns (with 30 days' notice to the Oversight Committee) or otherwise ceases to serve as Liquidation Trustee, the Oversight Committee shall select a successor Liquidation Trustee within twenty (20) Business Days of such resignation, removal, or cessation of service by the incumbent Liquidation Trustee. The Oversight Committee shall file with the Bankruptcy Court a notice of such successor, which shall be served on the U.S. Trustee and all parties that have requested notice in the Chapter 11 Case. Any successor Liquidation Trustee shall be subject to the same qualifications and shall have the same rights, powers, duties and discretion, and otherwise be in the same position, as the originally named Liquidation Trustee. If the Liquidation Trustee ceases to act as Liquidation Trustee for any reason whatsoever, such Liquidation Trustee shall turn over to any successor Liquidation Trustee, upon written request, any and all property of the SOG Liquidation Trust, including without limitation business and financial records of the SOG Liquidation Trust, within 20 days of the receipt of such written request. References herein to the Liquidation Trustee shall be deemed to refer to the successor Liquidation Trustee acting hereunder.

### i.    Termination of SOG Liquidation Trust

The duties, responsibilities and powers of the Liquidation Trustee and the Oversight Committee shall terminate after (a) all the Trust Assets, including Causes of Action and interest in Artwork, transferred and assigned to the Liquidation Trust or involving the Liquidation Trustee on behalf of the Liquidation Trust are fully resolved, abandoned or liquidated of SOG Liquidation Trust, (b) all Distributions to be made in accordance with the Plan and this Agreement have been made, and (c) all Disputed claims have been resolved and (d) all Art Claims have been resolved or the SOG Liquidation Trust has abandoned its interest with respect to Artwork subject to Art Claims. The SOG Liquidation Trust shall terminate no later than seven (7) years from the Effective Date. However, if warranted by the facts and circumstances provided for in the Plan, and subject to the approval of the Oversight Committee and the Bankruptcy Court upon a finding that an extension is necessary for the purpose of the SOG Liquidation Trust, the term of the SOG Liquidation Trust maybe extended, one or more times for a finite period, based on the particular circumstances at issue, provided that any such extension must be approved by the Bankruptcy Court within six (6) months prior to the beginning of the extended term with notice thereof to all of the known unpaid beneficiaries of the SOG Liquidation Trust. Upon the occurrence of the termination of the SOG Liquidation Trust, the Liquidation Trustee shall file with the Bankruptcy Court a report thereof, seeking an order

49

3

discharging the Liquidation Trustee and a final decree closing the Debtor's bankruptcy case. The Liquidation Trustee shall not unduly prolong the duration of the SOG Liquidation Trust and shall at all times endeavor to resolve, settle or otherwise dispose of all claims that constitute Trust Assets and to effect the distribution of the Trust Assets to the holders of the Liquidation Trust Interests in accordance with the terms hereof and the Plan and terminate the Liquidation Trust as soon as practicable. Prior to and upon termination of the SOG Liquidation Trust, the Trust Assets will be distributed to the holders of Liquidation Trust Interests, pursuant to the provisions set forth in Sections 3.7, 5.3, 6.4 and 6.5 of the SOG Liquidation Trust Agreement. If any Trust Assets are not duly claimed, such Trust Assets will be distributed, pro rata, according to holders' Liquidation Trust Interests. Thereafter, if there are still any Trust Assets not duly claimed, such Trust Assets will be disposed of in accordance with applicable law or the Plan.

### j.    Records

The Liquidation Trustee shall maintain good and sufficient books and records of account relating to the Assets of the SOG Liquidation Trust, the cash, the management thereof, all post-Confirmation transactions undertaken by the Liquidation Trustee, all expenses incurred by or on behalf of the Liquidation Trustee after the Effective Date, and all distributions contemplated or effectuated under the Plan.

### k.    The Oversight Committee

The Oversight Committee is established pursuant to the terms of the Plan. The Oversight Committee will advise the Liquidation Trustee and make certain determinations set forth herein and in the Plan. The Oversight Committee shall consist of (a) two (2) members to be identified by the Committee at the Confirmation Hearing, (b) two (2) member to be identified by the Bank at the Confirmation Hearing and (c) one (1) member designated jointly and unanimously by the Committee's and the Bank's designees. Nothing herein shall prohibit any member of the Oversight Committee from providing a proxy for such members vote on Oversight Committee matters to any other member of the Oversight Committee. Unless otherwise specified herein or in the SOG Liquidation Trust Agreement, approval of a majority of the members of such Oversight Committee shall be required for the Oversight Committee to act. In the event that a member of the Oversight Committee resigns, the party or parties that designated such resigning member shall select a successor to serve in the place of the resigning member, provided, however, that if the resigning Oversight Committee members was one identified by the Committee, to the extent the Committee is no longer in existence the successor member shall be designated by the other Oversight Committee member designated by the Committee. The identities of the members of the Oversight Committee shall be set forth in a statement filed with the Court within five (5) business days of the Effective Date, and supplemented within five (5) business days after any change in its membership. The Oversight Committee shall have the right to remove and appoint a successor Liquidation Trustee in accordance with the express terms of this Plan. Except for (a) reimbursement of reasonable expenses, (b) the Oversight Committee Members Fees and (c) indemnification, the members of the Oversight Committee shall receive no other compensation or other payment for the performance of their duties hereunder. The Oversight Committee may adopt by-laws with respect to its operation so long as such by-laws are consistent with the terms of the Plan and this Agreement.

3

l.        **Liability of the Liquidation Trustee**

The Liquidation Trustee shall not be personally liable for any claim asserted against the SOG Liquidation Trust or the Liquidation Trustee, except as set forth below.  Notwithstanding anything to the contrary set forth herein, no provision of this Agreement shall be construed to relieve the Liquidation Trustee from liability for its own gross negligence, fraud or willful misconduct, except that:

i.        the Liquidation Trustee shall be liable only for the performance of such duties and obligations as are specifically set forth in this Agreement, the Plan or the Confirmation Order; and

ii.        the Liquidation Trustee shall not be liable for any error of judgment made in good faith, or with respect to any action taken or omitted to be taken in good faith, unless the Liquidation Trustee was grossly negligent.

m.        **Liability of the Liquidation Trustee**

The Liquidation Trustee shall not be personally liable for any claim asserted against the SOG Liquidation Trust or the Liquidation Trustee, except as set forth below.  Notwithstanding anything to the contrary set forth herein, no provision of this Agreement shall be construed to relieve the Liquidation Trustee from liability for its own gross negligence, fraud or willful misconduct, except that:

i.        the Liquidation Trustee shall be liable only for the performance of such duties and obligations as are specifically set forth in this Agreement, the Plan or the Confirmation Order; and

ii.        the Liquidation Trustee shall not be liable for any error of judgment made in good faith, or with respect to any action taken or omitted to be taken in good faith, unless the Liquidation Trustee was grossly negligent.

n.        **Indemnification**

From and after the Effective Date, the Liquidation Trustee and the members of the Oversight Committee, and their respective Related Parties (collectively, the "Indemnified Parties" and each an "Indemnified Party") shall be, and hereby are, indemnified by the SOG Liquidation Trust, to the fullest extent permissible by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, causes of action, bonds, covenants, judgments, damages, attorneys' fees and defense costs and other assertions of liability (collectively, "Liability Claims") arising out of any such Indemnified Parties' good faith exercise of what such Indemnified Party reasonably understands to be its powers or the discharge of what such Indemnified Party reasonably understands to be its duties conferred by the Plan or by any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, applicable law, or otherwise (except only for actions or omissions to act to the extent determined by a Final Order of a court of competent jurisdiction to be due to such Indemnified Party's own respective fraud,

3

gross negligence or willful misconduct), including but not limited to, acts or omissions concerning pursuing or not pursuing the Causes of Action or objections to Claims, on and after the Effective Date. The foregoing indemnification shall also extend to matters directly or indirectly, in connection with, arising out of, based on, or in any way related to (i) the Plan; (ii) the services to be rendered pursuant to the Plan; (iii) any document or information, whether verbal or written, referred to herein or supplied to the Liquidation Trustee; or (iv) proceedings by or on behalf of any creditor, except to the extent any member of the Oversight Committee is acting on behalf of itself as a creditor or as agent for any creditor in its individual capacity. Subject to the terms of the Liquidation Trust Agreement, the SOG Liquidation Trust shall, on demand, advance or pay promptly out of Available Cash or a Plan Reserve Account set up specifically for this purpose if such an account is established by the Liquidation Trustee at the direction of the Oversight Committee, on behalf of each Indemnified Party, reasonable attorneys' fees and other expenses and disbursements which such Indemnified Party would be entitled to receive pursuant to the foregoing indemnification obligation; provided, however, that any Indemnified Party receiving any such advance shall execute a written undertaking to repay such advance amounts if a court of competent jurisdiction ultimately determines that such Indemnified Party is not entitled to indemnification hereunder due to the gross negligence or willful misconduct of such Indemnified Party.

The Liquidation Trustee is authorized, but not required, to obtain and purchase (by using cash of the SOG Liquidation Trust) insurance coverage with respect to the responsibilities, liabilities, and obligations of the Indemnified Parties (or any other professionals hired by the Liquidation Trustee) under the Plan. Any person entitled to indemnification shall have the right to employ such person's own separate counsel reasonably acceptable to the Liquidation Trustee and the Oversight Committee in any such action, at the SOG Liquidation Trust's expense, subject to the terms and conditions of the SOG Liquidation Trust.

## 4. The Source of Distributions.

The sources of all distributions and payments under this Plan are the Assets (or proceeds of any Assets) of the Debtor, including all Available Cash, Artworks, proceeds of the Causes of Action and any other remaining property of the Debtor. Upon the Effective Date, the Bank in its capacity as the holder of the Allowed DIP Facility Claim and the Allowed FRB Secured Claim releases, and is deemed to assign to the SOG Liquidation Trust, its lien against all the Assets and otherwise consents to the use of such collateral in accordance with the terms of this Plan and the SOG Liquidation Trust Agreement.

## 5. Provision for Treatment of Disputed Claims.

Unless otherwise ordered by the Bankruptcy Court, the Liquidation Trustee shall have the exclusive right (subject to obtaining the prior consent of the Oversight Committee, where required pursuant to the terms of the SOG Liquidation Trust Agreement), except with respect to applications for the allowance of compensation and reimbursement of expenses of professionals under sections 330 and 503 of the Bankruptcy Code, to object to the allowance of Claims filed with the Bankruptcy Court with respect to which the liability is disputed in whole or in part. All objections may be litigated to Final Order; however, the Liquidation Trustee may (subject to obtaining the prior consent of the Oversight Committee) compromise and settle any objection to

3

Claims without the approval of the Bankruptcy Court.  At such time as a disputed claim is resolved by Final Order and is Allowed or is settled by the Liquidation Trustee with the consent of the Oversight Committee, the Holder thereof will receive, as soon as practicable thereafter, the distributions to which such Holder is then entitled under the Plan.

      **6.**      **<u>Distribution of Property Under the Plan.</u>**

      **a.**      **Manner of Cash Payments**

Cash payments to domestic entities holding Allowed Claims will be denominated in U.S. dollars and will be made by checks drawn on a domestic bank selected by the Liquidation Trustee or, at the Liquidation Trustee's option, by wire transfer from a domestic bank.  Cash payments to foreign entities holding Allowed Claims may be paid, at the Liquidation Trustee's option, either in the same manner as payments to domestic entities or in any funds and by any means that are necessary or customary in the particular foreign jurisdiction.

      **b.**      **Setoff and Recoupment**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, THE LIQUIDATION TRUSTEE, ON BEHALF OF THE SOG LIQUIDATION TRUST, MAY SET OFF, RECOUP, OR WITHHOLD AGAINST THE DISTRIBUTIONS TO BE MADE ON ACCOUNT OF ANY ALLOWED CLAIM, INCLUDING ANY DISTRIBUTIONS TO ANY OFFICER OR DIRECTOR ANY CLAIMS THAT THE DEBTOR OR THE ESTATE MAY HAVE AGAINST THE ENTITY HOLDING THE ALLOWED CLAIM. THE SOG LIQUIDATION TRUST AND THE LIQUIDATION TRUSTEE WILL NOT WAIVE OR RELEASE ANY CLAIM AGAINST THOSE ENTITIES BY FAILING TO EFFECT SUCH A SETOFF OR RECOUPMENT; BY ALLOWING ANY CLAIM AGAINST THE DEBTOR OR THE LIQUIDATION TRUST; OR BY MAKING A DISTRIBUTION ON ACCOUNT OF AN ALLOWED CLAIM.**

      **c.**      **No *De Minimis* Distributions**

Notwithstanding anything to the contrary in this Plan, no cash payment of less than $100 will be made by the Liquidation Trustee to any entity holding an Allowed Claim.  No consideration will be provided in lieu of the *de minimis* distributions that are not made under this Section.  Allowed Claims that are entitled to a Pro Rata distribution of less than $100 shall continue to accrue until such time as the Pro Rata distribution on account of such Claim will be $100 or more.

      **d.**      **No Distributions With Respect to Disputed Claims**

Notwithstanding any other Plan provision, distributions will be made on account of a Disputed Claim only after, and only to the extent that, the Disputed Claim becomes an Allowed Claim or is deemed to be an Allowed Claim for Distribution purposes.

e.    **Undeliverable, Unclaimed Non-Negotiated Distributions**

Distributions to Beneficiaries holding Allowed Claims will initially be made by mail as follows:

(a)    Distributions will be sent to the address, if any, set forth on a filed proof of claim as amended by any written notice of address change received by the Liquidation Trustee no later than ten (10) business days prior to the date of any Distribution; or

(b)    If no such address is available, distributions will be sent to the address set forth on the Bankruptcy Schedules.

If no address is available either on a proof of claim or on the Bankruptcy Schedules, the Distribution will be deemed to be undeliverable. If a Distribution is returned to the Liquidation Trustee as an undeliverable Distribution or is deemed to be an undeliverable Distribution, the Liquidation Trustee shall make no further Distribution to the entity holding the Claim on which the Distribution is being made unless and until the Liquidation Trustee is timely notified in writing of that entity's current address. Subject to the following paragraph, until they become deliverable, the Liquidation Trustee will create a reserve for undeliverable Distributions for the benefit of the entities entitled to the Distributions. These entities will not be entitled to any interest on account of the undeliverable Distributions.

Any Beneficiary that is otherwise entitled to an undeliverable Distribution and that does not, within thirty (30) days after a Distribution is returned to the Liquidation Trustee as undeliverable, or is deemed to be an undeliverable Distribution, provide the Liquidation Trustee with a written notice asserting its claim to that undeliverable Distribution and setting forth a current, deliverable address will be deemed to waive any claim to that undeliverable Distribution and will be forever barred from receiving that undeliverable Distribution or asserting any Claim against the SOG Liquidation Trust, or its property or the Liquidation Trustee or the Oversight Committee. Any undeliverable Distributions that are not claimed under this Section will become Available Cash. Nothing in the Plan requires the SOG Liquidation Trust, the Liquidation Trustee or the Oversight Committee or any of its members to attempt to locate any entity holding an Allowed Claim and whose Distribution is undeliverable.

If an instrument delivered as a Distribution to a Beneficiary is not negotiated within 120 day after such instrument was sent to the beneficiary, then the instrument shall be null and void and the Beneficiary shall be deemed to have waived such Distribution.

C.    **Litigation**

1.    **Preservation of Causes of Action.**

The Liquidation Trustee, on behalf of the SOG Liquidation Trust, shall retain, and, subject to the requirement of obtaining Oversight Committee approval, may exclusively enforce, any and all such claims, rights or Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal, including, without limitation, a bankruptcy court adversary proceeding filed in this Chapter 11 Case. The Liquidation Trustee, on behalf of the SOG

3

Liquidation Trust, shall have the exclusive right, authority, and discretion (except in cases where the Liquidation Trustee is conflicted, in which case such right, authority and discretion shall be vested in and exercised by the Oversight Committee) to institute, prosecute, abandon, settle, or compromise any and all such claims, rights and Causes of Action, subject to the requirement of obtaining Oversight Committee approval before taking any such action, but shall not be required to seek Bankruptcy Court approval.  The Liquidation Trustee (or the Oversight Committee, as the case may be) stands in the shoes of the Debtor, the Estate, the CRO, the Committee and the SOG Liquidation Trust and may take such actions in their name without the need to intervene in, amend any pending actions or obtain any further order of the Bankruptcy Court.

The Liquidation Trustee (or the Oversight Committee, as the case may be) as trustee of the SOG Liquidation Trust is authorized to exercise and perform the rights, powers and duties held by the Debtor's Estate, including without limitation the authority under Bankruptcy Code section 1123(b)(3) to provide for the settlement, adjustment, retention and enforcement of claims and interests of the Estate, including, but not limited to all Causes of Action, subject to the requirement of obtaining Oversight Committee approval.

Annexed to this Disclosure Statement as **Exhibit C** is a non-exclusive List of Certain Preserved Causes of Action, which are expressly identified and preserved for prosecution on and after the Effective Date.  The Debtor, its estate or the SOG Liquidation Trust may assert claims pursuant to sections 542, 5443, 544, 545, 547, 548, 549 and 550 against any person or entity listed on Exhibit C hereto.  In addition, the Debtor, its estate or the SOG Liquidation Trust may assert any and all claims (including counter-claims) or defenses against any Art Claimant or Claimant with respect to their Art Claims or Claims.  The failure to list any potential or existing claims or Causes of Action is not intended to and shall not limit the rights of the Liquidation Trustee to pursue any claims or Causes of Action not listed or identified.  The Confirmation Order shall not bar the Liquidation Trustee, on behalf of the SOG Liquidation Trust, by res judicata, collateral estoppel, or otherwise from collecting, prosecuting, or defending any matter or Cause(s) of Action.

Unless a claim or Cause of Action against a person is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order, the Liquidation Trustee, on behalf of the SOG Liquidation Trust, expressly reserves such claim or Cause of Action for later adjudication (including without limitation, claims and Causes of Action not specifically identified, or which the Liquidation Trustee or the Plan Proponents may presently be unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Liquidation Trustee or the Plan Proponents at this time, or facts or circumstances which may change or be different from those which the Plan Proponents and the Liquidation Trustee now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches shall apply to such claims or Causes of Action upon, or after, the Confirmation or consummation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except where such claims or Causes of Action have been released in the Plan or other Final Order.

**THE LIQUIDATION TRUSTEE, SUBJECT TO THE APPROVAL OF THE OVERSIGHT COMMITTEE, WILL MAKE THE DECISION OF WHETHER OR NOT**

3

**TO PURSUE THE CAUSES OF ACTION AND TO SETTLE OR NOT SETTLE CAUSES OF ACTION.   THIS DECISION WILL BE BASED UPON THE LIQUIDATION TRUSTEE'S REVIEW OF THE MERITS OF THE VARIOUS CAUSES OF ACTION AS WELL AS THE COSTS REQUIRED TO PROSECUTE SUCH CAUSES OF ACTION IN LIGHT OF THE LIMITED RESOURCES AVAILABLE FOR THE DISTRIBUTION TO CREDITORS.   THE LIQUIDATION TRUSTEE MAY SEEK TO RETAIN COUNSEL ON A CONTINGENCY BASIS TO PROSECUTE SOME OR ALL OF SUCH CAUSES OF ACTION, MAY SEEK TO FINANCE ANY COSTS RELATING TO THE PROSECUTION OF SUCH LITIGATION OR MAY DECIDE NOT TO PURSUE SUCH CAUSES OF ACTION AT ALL.   THE LIQUIDATION TRUSTEE, THE OVERSIGHT COMMITTEE, AND THEIR RESPECTIVE COMPANIES, FIRMS, PARTNERS, MEMBERS,    OFFICERS,    DIRECTORS,    EMPLOYEES,    PROFESSIONALS, SUCCESSORS AND ASSIGNS SHALL NOT HAVE ANY LIABILITY ARISING OUT OF THE GOOD FAITH DETERMINATIONS OF THE LIQUIDATION TRUSTEE AND THE   OVERSIGHT   COMMITTEE   OF   WHETHER   OR   NOT   TO   PURSUE PROSECUTION OF AND/OR SETTLE THE FOREGOING CAUSES OF ACTION.**

**D.** **Exculpation and Release.**

      **1.** **Limitation of Liability in Connection with the Chapter 11 Case, the Plan, Disclosure Statement and Related Documents.**

Pursuant to section 1125(e) of the Bankruptcy Code, the Committee, the members of the Committee (in their capacities as such), the Debtor, the CRO, the Bank, the Liquidation Trustee, the Oversight Committee, the members of the Oversight Committee (in their capacity as such), and their respective Related Parties (collectively, the "Plan Participants") will neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with or related to the Chapter 11 Case, including, but not limited to the formulation, preparation, dissemination, negotiation, implementation, confirmation or consummation of the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement, pleading or document created or entered into, the pursuit of Causes of Action, or any other act taken or omitted to be taken in connection with the Plan, the Disclosure Statement, or the Confirmation Order, including solicitation of acceptances of the Plan ("Exculpated Conduct"); provided, however, that any Plan Participant could incur liability as a result of any such act or omission to the extent that such act or omission constitutes fraud, gross negligence or willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code.  For the avoidance of doubt, nothing herein shall be deemed or construed to release any Officer or Director's liability to the Estate, except that any party so liable shall be barred from seeking contribution or indemnification from any of the Plan Participants or their respective property; provided further, however, that Related Parties of Committee Members shall only be entitled to the exculpations and releases provided in Article IX of the Plan if and to the extent such Related Parties took any action or omitted to take any action solely in connection with such Committee Member's capacity as such; provided further, however, that Related Parties of Oversight Committee Members shall only be entitled to the exculpations and releases provided in Article IX the Plan if and to the extent such Related Parties took any action or omitted to take any action solely in connection with such Oversight Committee Member's capacity as such.

56

All Persons are permanently enjoined from commencing, or continuing in any manner, any action or proceeding against any Plan Participant, whether directly, derivatively, on account of or respecting any claim, debt, right, or cause of action based in whole or in part upon any Exculpated Conduct. Any Plan Participant injured by any willful violation of the injunctions provided in the Plan shall recover from the willful violator actual damages (including costs and attorneys' fees) and, in appropriate circumstances, punitive damages.

2. **Release of Claims Against the Bank, the Creditors' Committee and Members of the Committee.**

   a. **Debtor's Release**

On the Effective Date, the Debtor and the Liquidating Trustee on behalf of the SOG Liquidation Trust and the Estate shall release and be permanently enjoined from any prosecution or attempted prosecution of any and all causes of action or potential cause of action which the Debtor or its Estate had or may have against the Bank, the Committee or any member of the Committee (in their capacity as such) and any of their respective Related Parties (collectively, the "Debtor Released Parties") from any and all Claims (including Causes of Action) and Liability Claims known or unknown that the Debtor, the Estate or the Liquidating Trustee may assert against the Debtor Released Parties.

In addition, on the Effective Date, the Debtor and the Liquidation Trustee on behalf of the Liquidating Trust, the Committee and each of its past or current members (in their capacities as such), and the Bank, and their respective Related Parties and property, shall be released from any and all Claims (including Causes of Action), potential Claims and Liability Claims, which the Debtor, the Estate or the SOG Liquidation Trust may be entitled to assert, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, whether known or unknown, foreseen or unforeseen, existing or thereafter arising, based in whole or in part upon any act or omission, transaction, or other occurrence taking place on or before the Confirmation, in any way relating to the Chapter 11 Case or the Plan, including, but no limited to, the negotiation, solicitation, Confirmation and Consummation of the Plan; provided, however, that nothing shall release any person from any claims, obligations, rights, causes of action, or liabilities based upon any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Consummation of the Plan, the administration of the Plan, or the Property to be distributed under the Plan arising out of such person's gross negligence or willful misconduct. No attorney shall seek a release in contravention of N.Y. Comp. Codes R. & Regs. Tit. 22 s 1200.8 Rule 1.8(h)(1) (2009), as amended.

   b. **Third Party Release**

Each Person who (i) is entitled to receive a Distribution under the Plan or pursuant to the Plan (whether or not a Distribution has been made) or (ii) is a member of a Class that votes to accept this Plan (or is deemed to accept this Plan), whether or not such member has voted to accept the Plan, shall be deemed a "Releasing Party." By virtue of Bankruptcy Code sections 1126(c) and 1141(a), each Releasing Party shall be deemed to have released for itself and its respective Related Parties, in each case in their capacity as such, any and all Claims and Causes

3

of Action against (A) the Debtor, the CRO, the Liquidation Trustee or the SOG Liquidation Trust, and their respective Related Parties and their respective property (collectively, the "Third Party Released Parties"), (B) FRB, in its capacity as prepetition lender to the Debtor and in its capacity as the lender under the DIP Facility and its respective Related Parties and their respective property, and (C) the members of the Committee (in their capacity as such), and their respective Related Parties and their respective property, arising prior to the Effective Date and related to the Debtor or the Chapter 11 Case.  Nothing in the previous sentence shall be deemed to release the Debtor and SOG Liquidation Trust from liability for (i) Claims property and timely filed before the Administrative Claims Bar Date, the Claims Bar Date, the Art Claims Bar Date and the Governmental Bar Date (as the case may be), and (ii) Claims scheduled by the Debtor that are not contingent, disputed or unliquidated; provided, however, that, notwithstanding clause (i) above, the Debtor or Liquidating Trustee, as appropriate, may object to the allowance of any Claim on any ground.

Each party to which this section of the Plan applies shall be deemed to have granted the releases set forth herein notwithstanding that it may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such party expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those Claims or causes of action actually known or suspected to exist at the time of Confirmation.  Notwithstanding anything herein, nothing in the Plan shall prevent or prohibit an Art Claimant (as defined in the Art Claims Protocol) or the Sotheby's Entities from asserting, on any basis, that the Bank's liens with respect to any Artwork claimed by such Art Claimant pursuant to the Art Claims Protocol or the Sotheby's Entities are not enforceable, valid or perfected.

####       c.       Injunction

In implementation of the Plan, except as otherwise expressly provided in the Confirmation Order or the Plan, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtor, the SOG Liquidation Trust or the Estate that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtor, the SOG Liquidation Trust, the Estate, the Bank or any of their respective Related Parties or any of their respective property with respect to any such Claim or Interest; (b) the enforcement, attachment, collection or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtor, the SOG Liquidation Trust, the Estate, the Bank or any of their respective Related Parties or any of their respective property with respect to any such Claim or Interest; (c) creating, perfecting or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Debtor, the SOG Liquidation Trust, the Estate, or the Bank or any of their respective Related Parties or any of their respective property with respect to any such Claim or Interest; (d) asserting, directly or indirectly, any setoff, right of subrogation, or recoupment of any kind against any obligation due the Debtor, the SOG Liquidation Trust, the Estate, or the Bank or any of their respective Related Parties or any of their property with respect to any such Claim or Interest; and (e) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with

3

respect to such Claim or Interest. Nothing contained in this section shall prohibit the Holder of a timely-filed Proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of this Plan, or enjoin or prohibit the interpretation or enforcement by the Claimant of any of the obligations of the Debtor or the SOG Liquidation Trust under this Plan. For the avoidance of doubt, and notwithstanding any other provision contained in the Plan or the Confirmation Order, nothing in the Plan or the Confirmation Order shall release any claims and/or causes of action, or enjoin any person (including without limitation the SOG Liquidation Trust and/or the Liquidation Trustee) from commencing or continuing the prosecution of any claims and/or causes of action against the Debtor's officers, directors, shareholders, employees, professionals, representatives, successors or assigns and/or any other person or entity other than the Plan Participants. Notwithstanding anything to the contrary herein, Art Claimants shall not be enjoined by the Plan from litigating any Art Claims in accordance with the Art Claims Protocol.

The foregoing releases are justified as an integral part of the Debtor's overall restructuring and liquidation efforts. Specifically, the Debtor Released Parties and Third Party Released Parties (the "Released Parties") have all made substantial contributions to the Debtor's estate; indeed, without such contributions the Debtor could not have proposed a confirmable Plan. Put simply, the proposed Plan represents demonstrably unique circumstances. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases, and further, will constitute its finding that the releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of the claims released by the releases; (2) in the best interests of the Debtor and all Holders of Claims; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Holders of Claims and Interests asserting any claim released by the releases against any of the Released Parties. Nothing in the Confirmation Order or the Plan shall affect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including any claim arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States Government or any of its agencies or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties for any liability whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any of its agencies or any state and local authority against the Released Parties.

1.    **Releases and Injunction Pursuant to the RAI Settlement Agreement**

Upon the effective date of the RAI Settlement Agreement, each member of the RAI Group (as defined in the RAI Settlement) and each of their respective Related Parties (as defined in the RAI Settlement) shall be deemed to release (i) the Bank and each of its Related Parties

3

~~from any and all claims and causes of action, known or unknown, including but not limited to any right to seek subordination, avoidance or recharacterization of the Bank's claims against and loans to the Debtor, the RAI Group, Lawrence or Julie Salander and any liens granted to the Bank in connection therewith, (ii)~~ the Debtor, the bankruptcy estate and the Committee in respect of the RAI ~~Claim, the Schupak Group Claim,~~Claims and RAI Art Claims and ~~is hereby~~will be deemed to ~~withdraw~~have withdrawn such RAI Art Claims and RAI ~~Claim, and the Schupak Group Claim~~Claims upon the ~~effective date of the RAI Settlement Agreement~~Notice Date; provided, however, that Donald Schupak shall not be required to withdraw proof of claim number 368 pursuant to this Agreement ~~(the "Schupak Claim")~~.

Upon the effective date of the RAI Settlement Agreement, ~~the Bank and each of its Related Parties shall be deemed to release each member of the RAI Group and each of their respective Related Parties from any and all claims and causes of action, known or unknown, including without limitation any obligation of any member of the RAI Group and their respective Related Parties to the Bank arising in connection with the RAI Indebtedness or the RAI Transaction (each,~~ in exchange for the conversion of the RAI Indebtedness (as defined in the RAI Settlement Agreement)~~.~~

~~Upon the effective date of the RAI Settlement Agreement, the Debtor and the Bank shall release and shall be deemed to have relinquished, renounced, surrendered, abandoned, divested and otherwise relinquished any membership or other interests in RAI or its Related Parties and shall not be entitled to any distribution to such members or to any disbursement of sales proceeds contemplated in Section 4 above. Upon the effective date of the RAI Settlement Agreement,~~ the FRH Equity Interest and the Debtor's membership interests in RAI into Class C Membership interests in RAI, the Debtor and the Committee and their respective Related Parties and successors in interest, including the Liquidation Trustee and the SOG Liquidation Trust, shall be deemed to release each member of the RAI Group and its Related Parties from any and all claims or causes of actions, known or unknown, ~~related to the RAI Transaction or the Renaissance Art,~~ including without limitation all claims, liens or interests as assignee under the Plan of the RAI Loan Documents and the FRH Equity Interest; provided, however, that the Committee, the Debtor or the Liquidation Trustee, as the case may be, shall not release any ~~claims or~~ defenses it or they have with respect to the Schupak Claim~~.~~, and provided further, however, that the Debtor's and Liquidation Trustee's rights under the Operating Agreement, as amended, shall be preserved.

None of the releases granted pursuant to ~~this Section VIII.D.2~~Article IX.C of the Plan shall apply to any matter that is not related to (a) Lawrence Salander, Julie Salander, L. Salander, LLC, the Debtor, their Related Parties, or their respective cases under the Bankruptcy Code, (b) the ~~Renaissance Art~~RAI Claimed Art (as defined in the RAI Settlement Agreement), (c) the RAI Group, (d) the ~~RAI Transaction~~OMP Sale (as defined in the RAI Settlement Agreement), (e) the RAI Transaction Documents(as defined in the RAI Settlement Agreement) or (f) the RAI Indebtedness (as defined in the RAI Settlement Agreement).

The effectiveness of the RAI Settlement Agreement is conditioned upon RAI and each of its Related Parties releasing any and all claims and causes of action, known or unknown, including but not limited to any right to seek subordination, avoidance or recharacterization of FRB's claims against and loans to the Debtor, the RAI Group, Lawrence or Julie Salander and

3

any liens granted to FRB in connection therewith. The effectiveness of the RAI Settlement Agreement is further conditioned upon FRB and each of its Related Parties releasing any and all claims and causes of action, known or unknown, including without limitation any obligation of any member of the RAI Group and their respective Related Parties to FRB arising in connection with the RAI Indebtedness (as defined in the RAI Settlement Agreement), the OMP Sale (as defined in the RAI Settlement Agreement) or the RAI Transaction Documents (as defined in the RAI Settlement Agreement).

The Plan Participants will neither have nor incur any liability to any Bucket 1 Competing Claimant for any act taken or omitted to be taken in connection with or related to the release of Bucket 1 Art by the Debtor or the SOG Liquidation Trust to RAI (the "Bucket 1 Exculpated Conduct"). Notwithstanding anything herein, nothing in the Plan shall prevent or prohibit a Bucket 1 Competing Claimant from asserting, on any basis, that the Bank's liens with respect to any Artwork claimed by such Art Claimant pursuant to the Art Claims Protocol are not enforceable, valid or perfected. Notwithstanding anything herein, nothing in the Plan shall prevent or prohibit a Bucket 1 Competing Claimant from asserting, on any basis, any claim or defense against the any member of the RAI Group or their Related Parties with respect to any dispute regarding Bucket 1 Art; provided, however, that Donald Schupak in his capacity as a member of the Committee and his Related Parties, with respect to any actions taken or not taken concerning Donald Schupak in his capacity as a member of the Committee or the Oversight Committee, shall be subject to the provisions of the releases and exculpations described in Sections VIII.D.a and VIII.D.b hereof.

All Persons are permanently enjoined from commencing, or continuing in any manner, any action or proceeding against any of the Plan Participants, whether directly, derivatively, on account of or respecting any claim, debt, right, or cause of action based in whole or in part upon any Bucket 1 Exculpated Conduct. Any Plan Participant injured by any willful violation of this injunction shall recover from the willful violator actual damages (including costs and attorneys' fees) and, in appropriate circumstances, punitive damages.

Each Bucket 1 Competing Claimant shall be deemed a "Releasing Party." By virtue of Bankruptcy Code sections 1126(c) and 1141(a), each Releasing Party shall be deemed to have released for itself and its respective Related Parties, in each case in their capacity as such, any and all Claims and Causes of Action against the Plan Participants on account of the release of Bucket 1 Art to RAI.

## E.     **Other Plan Provisions.**

### 1.     **The Effective Date.**

The Plan will not be consummated or become binding unless and until the Effective Date occurs. The Effective Date will be the first Business Day after the following conditions have been satisfied:

(1)     Ten (10) days have passed since the Confirmation Date;

3

(2)     The Confirmation Order is not stayed;

(3)     The Liquidation Trustee and Plan Proponents shall have signed the SOG
Liquidation Trust Agreement.;

(4)     No material adverse effect has occurred in respect of the Assets; ~~and~~

(5)     The RAI Settlement Agreement is executed by the parties thereto;

(6)     The RAI Settlement Agreement is approved pursuant to a Final Order of
the Bankruptcy Court; and

(7)     All documents to be executed and delivered pursuant to the terms of the
RAI Settlement Agreement have been executed and delivered.


Subject to further order of the Court, in the event that the Effective Date does not occur within ninety (90) days of entry of a Final Order confirming the Plan, the Plan shall become null and void.  A statement shall be filed with the Court within three (3) business days after either the Effective Date or the occurrence of any event that renders the Plan null and void.

**2.     Termination of Committee.**

On the Effective Date, the Committee shall cease to exist and its members, designated representatives and/or agents (including, without limitation, attorneys, investment bankers, financial advisors, accountants and other professionals) shall, subject to those matters set forth below, be released and discharged from any further authority, duties, responsibilities and obligations relating to, arising from, or in connection with the Committee.  The Committee shall continue to exist after such date (i) solely with respect to all the applications filed pursuant to section 330 and 331 of the Bankruptcy Code seeking payment of fees and expenses incurred by any professional, (ii) any post-confirmation modifications to, or motions seeking the enforcement of, the provisions of the Plan or the Confirmation Order, (iii) any matters pending as of the Effective Date in the Case, until such matters are finally resolved, and (iv) providing such information, books and records as may be reasonably requested by the Liquidation Trustee on behalf of the SOG Liquidation Trust.

**3.     Executory Contracts and Unexpired Leases.**

**a.     Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, any and all agreements executed by the Debtor before the Effective Date, other than agreements that were previously either assumed and assigned or rejected either by a Final Order or under Bankruptcy Code section 365, to the extent that these agreements constitute executory contracts or unexpired leases under Bankruptcy Code section

3

365, shall be rejected.  The Confirmation Order shall constitute a Final Order approving this rejection.

      **b.**      **Bar Date for Rejection Damage Claims**

      Any Rejection Damage Claims arising from rejection under the Plan of an executory contract or unexpired lease must be filed with the Bankruptcy Court and served on the Liquidation Trustee and his counsel within thirty (30) days after the Effective Date.  Any Rejection Damage Claims that are not timely filed and served will be forever barred and unenforceable against the Debtor, the Estate, the SOG Liquidation Trust and the Liquidation Trustee, and their property, and the entities holding these Claims will be barred from receiving any distributions under the Plan on account of their Rejection Damage Claims.  The Liquidation Trustee shall have the right to object to any such Rejection Damage Claims; provided, however, that the any such objections must be served and filed not later than 120 days after the Effective Date.

      **4.**      <u>**Entry of a Final Decree.**</u>

      Promptly following the completion of all distributions contemplated by this Plan, the Liquidation Trustee will file a motion with the Bankruptcy Court to obtain the entry of a final decree.

      **5.**      <u>**United States Trustee Fees and Reports.**</u>

      Pursuant to section 1129(a)(12) of the Bankruptcy Code, any outstanding quarterly fees due and owing to the U.S. Trustee under 28 U.S.C. §1930(a)(6) shall be paid from Cash on hand in the Estate.  After the Effective Date, the Liquidation Trustee shall (a) file monthly post-Confirmation reports and quarterly disbursement reports in the format acceptable to the United States Trustee and (b) pay from cash on hand or a designated Plan Reserve Account all quarterly fees to the U.S. Trustee which are required by applicable law.  The Liquidation Trustee shall include in the reserve created for Post-Effective Date Expenses reasonably sufficient monies to cover the quarterly fees of the U.S. Trustee incurred, or to be incurred, after the Effective Date.

      **6.**      <u>**Post-Effective Date Effect of Evidences of Claims.**</u>

      Commencing on the Effective Date, notes and other evidences of Claims will represent only the right to receive the Distributions contemplated under the Plan.

      **7.**      <u>**Cancellation of Interests.**</u>

      On the Effective Date, all Interests will be cancelled, annulled, and extinguished, and any issued and outstanding shares of common stock, preferred stock, stock options, warrants, membership interests, or other evidence of Interests in securities of the Debtor will be deemed to be cancelled and of no further force or effect without any further action by the Debtor or any other entity.  Persons holding Interests will retain no rights and receive no consideration on account of these Interests, and entities holding any evidence of Interests in securities of the

3

Debtor will have no rights arising from or relating to such evidence of their Interests or their cancellation.

### 8.    Nondischarge of the Debtor.

In accordance with Bankruptcy Code section 1141(d)(3), the Confirmation Order will not discharge Claims.  However, no Person holding a Claim may receive any payment from, or seek recourse against, any Assets that are to be distributed under this Plan other than assets required to be distributed to that Person under the Plan.  As of the Confirmation Date, all Persons are precluded from asserting against any property that is to be distributed under this Plan any Claims, rights, causes of action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in this Plan or the Confirmation Order.

### 9.    No Recourse.

No Person entitled to receive a payment or distribution under the Plan will have any recourse against the SOG Liquidation Trust, the Debtor, the CRO, the Committee, the members of the Committee (in their capacity as such), the Liquidation Trustee, the Oversight Committee or the members of the Oversight Committee, and their respective Related Parties other than the right to receive distributions in accordance with the terms of the Plan.

### 10.   No Admissions.

Notwithstanding anything to the contrary in the Plan, if the Plan is not confirmed, is revoked or otherwise the Effective Date does not occur, the Plan will be null and void, and nothing contained in the Plan or the Disclosure Statement will: (a) be deemed to be an admission by the Plan Proponents with respect to any matter discussed in the Plan, including liability on any Claim or the propriety of any Claim's classification; (b) constitute a waiver, acknowledgement, or release of any Claims, Interests, or any claims held by the Plan Proponents; or (c) prejudice in any manner the rights of the Plan Proponents or any other Party in any further proceedings.

### 11.   Modification.

Subject to the restrictions set forth in Bankruptcy Code section 1127, the Plan Proponents reserve the right to alter, amend, or modify the Plan before it is substantially consummated.

### 12.   Revocation of the Plan.

The Plan Proponents reserve the right to withdraw the Plan before the Confirmation Date.

### 13.   Severability of Plan Provisions.

If, before confirmation, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision.  That term or provision will then be applicable as

3

altered or interpreted, except if such term or provision is inconsistent with the intent of any of the Plan Proponents, in which case the Plan may be unilaterally withdrawn by such Plan Proponent. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated.  The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with this Article, is valid and enforceable under its terms.

### 14.    <u>Governing Law.</u>

The rights and obligations arising under the Plan and any agreements, contracts, documents, or instruments executed in connection with the Plan will be governed by, and construed and enforced in accordance with, New York law without giving effect to New York law's conflicts of law principles, unless a rule of law or procedure is supplied by: (a) federal law (including the Bankruptcy Code and the Bankruptcy Rules); or (b) an enforceable, express choice-of-law provision in any document provided for, or executed under or in connection with, the Plan terms.

### 15.    <u>Retention of Jurisdiction.</u>

The Bankruptcy Court will retain and have exclusive jurisdiction:

(1) to hear and determine objections to Claims; (2) to hear and determine any dispute arising under the Plan, its implementation and execution of any necessary documents thereunder, and any requests to amend, modify, or correct the Plan, provided such matters are brought before the Bankruptcy Court prior to the point of substantial consummation; (3) to grant extensions of any deadlines set forth in the Confirmation Order as may be appropriate; (4) to enforce all discharge, release and injunction provisions under the Plan; (5) to consider and rule upon requests for final compensation; (6) to hear and determine all motions, adversary proceedings, applications, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Liquidation Trustee, the Oversight Committee or the SOG Liquidation Trust after the Effective Date, including without limitation all Causes of Action; (7) to hear and determine applications for the assumption or rejection of executory contracts or unexpired leases pending on the Confirmation Date, and the allowance of Claims resulting therefrom; (8) to determine any other applications, adversary proceedings, and contested matters pending on the Effective Date; (9) to ensure that distributions to holders of Allowed Claims are accomplished as provided herein; (10) to resolve disputes as to the ownership of any Claim; (11) to hear and determine timely objections to Administrative Claims and Claims; (12) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated; (13) to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code; (14) to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including, without limitation, the Confirmation Order; (15) to hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code; (16) to hear and determine any issue for which the Plan requires a Final Order of the Court; (17) to hear and determine matters concerning state, local, and federal taxes in

3

accordance with sections 346, 505 and 1146 of the Bankruptcy Code; (18) to hear and determine any Causes of Action preserved under the Plan under sections 544, 547, 548, 549, 550, 551, 553, and 1123(b)(3) of the Bankruptcy Code; (19) to hear and determine any matter regarding the existence, nature and scope of the Debtors' discharge; (20) to hear and determine any matter regarding the existence, nature, and scope of the releases and exculpation provided in Article IX of the Plan; (21) to adjudicate any disputes arising under the RAI Settlement Agreement and (22) to enter a final decree closing the Chapter 11 Case.

If the Bankruptcy Court abstains from exercising jurisdiction, or is without jurisdiction, over any matter, this Article shall not effect, control, prohibit, or limit the exercise of jurisdiction by any other court that has jurisdiction over that matter.

### 16.    Successors and Assigns.

Unless otherwise specified in the Plan, the rights, benefits, and obligations of any entity referred to in this Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor, or assign of that entity.

### 17.    Saturday, Sunday, or Legal Holiday.

If any payment or act under the Plan should be required to be made or performed on a day that is not a Business Day, then the payment or act may be completed on the next succeeding day that is a Business Day, in which event the payment or act will be deemed to have been completed on the required day.

## IX.

## CONFIRMATION AND CONSUMMATION PROCEDURES

### A.    Overview.

A chapter 11 plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the debtor's assets. In either event, upon confirmation of the plan, it becomes binding on the debtor and all of its creditors and equity holders, and the obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of Claims against the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Plan Proponents' solicitation of votes on the Plan.**

If all classes of claims and equity interests accept a chapter 11 plan, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. Section 1129(a) sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the

3

"best interests of creditors" test and be "feasible."  The "best interests" test generally requires that the value of the consideration to be distributed to the holders of claims or equity interests under a plan may not be less than those parties would receive if the debtor were liquidated pursuant to a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code.  Under the "feasibility" requirement, the bankruptcy court generally must find that there is a reasonable probability that the debtor will be able to meet its obligations under its plan without the need for further financial reorganization.  **The Plan Proponents believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code, including, in particular, the best interests of creditors' test and the feasibility requirement.**

The Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a plan of reorganization for the bankruptcy court to determine that the class has accepted the plan.  Rather, a class of creditors will be determined to have accepted the plan if the bankruptcy court determines that the plan has been accepted by a majority in number and two-thirds in amount of those claims actually voting in such class.  Similarly, a class of equity security holders will have accepted the plan if the bankruptcy court determines that the plan has been accepted by holders of two-thirds of the number of shares actually voting in such class.

In addition, classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote.  Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan.  Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class.  A class is "impaired" if the legal, equitable, or contractual rights associated with the claims or equity interests of that class are modified in any way under the plan.  Modification for purposes of determining impairment, however, does not include curing defaults and reinstating maturity on the effective date of the plan.  **All classes of Claims are impaired under the Plan and entitled to vote on the Plan.**

The bankruptcy court also may confirm a chapter 11 plan even though fewer than all the classes of impaired claims and equity interests accept such plan.  For a chapter 11 plan to be confirmed despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive or retain on account of such junior claim or equity interest any property from the estate, unless the senior class receives property having a value equal to the full amount of its allowed claim.

3

A plan does not "discriminate unfairly" against a rejecting class of claims or equity interests if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims or equity interests, and (b) no senior class of claims or equity interests is to receive more than 100% of the amount of the claims or equity interest in such class.

The Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting class of Claims or Equity Interests, and can therefore be confirmed, if necessary, over the objection of any (but not all) classes of Claims or Equity Interests.

**B.    Confirmation of the Plan.**

**1.    Elements of Section 1129 of the Bankruptcy Code.**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the conditions to confirmation under section 1129 of the Bankruptcy Code are satisfied.

Such conditions include the following:

a.    The Plan complies with the applicable provisions of the Bankruptcy Code.

b.    The Debtor has complied with the applicable provisions of the Bankruptcy Code.

c.    The Plan has been proposed in good faith and not by any means proscribed by law.

d.    Any payment made or promised by the Debtor or by an entity issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court; and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

e.    The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtor or a successor to the Debtor under the Plan and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtor has disclosed the identity of any insider that will be employed or retained by such Debtor, and the nature of any compensation for such insider.

f.    With respect to each impaired class of Claims or Equity Interests, each holder of an impaired Claim or impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Equity Interests held by such entity, property of a value, as of the applicable consummation date under the Plan,

3

that is not less than the amount that such entity would receive or retain if the Debtor were liquidated on such date under chapter 7 of the Bankruptcy Code.

       g.      In the event that the Debtor does not move to confirm the Plan nonconsensually, each class of Claims or Equity Interests entitled to vote has either accepted the Plan or is not impaired under the Plan.

       h.      Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Priority Claims will be paid in full on the applicable consummation date and that Tax Claims will be paid in full, in cash, on the applicable consummation date or as soon as practicable thereafter; however, the Debtor shall have the right to make deferred cash payments on account of such Tax Claims over a period not exceeding six (6) years after the date of assessment of such Claims, having a value, as of the applicable consummation date, equal to the allowed amount of such Claims.

       i.      At least one impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

       j.      Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any other successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan. See "Financial Projections and Assumptions."

       k.      All fees payable under section 1930 of Bankruptcy Code, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

       l.      The Plan provides for the continuation after the consummation of the Plan of payment of all retiree benefits at the level established under section 1114(e)(1)(B) or (g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtor has obligated itself to provide such benefits.

**The Plan Proponents believe that the Plan will satisfy all the statutory provisions of chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the provisions of the Bankruptcy Code, and that the Plan is being proposed and will be submitted to the Bankruptcy Court in good faith.**

     **2.**      **Acceptance.**

A class of Claims will have accepted the Plan if the Plan is accepted, with reference to a class of Claims, by at least two-thirds in amount and more than one-half in number of the Allowed Claims of each such class of Claims. Each class of Equity Interests will have accepted the Plan if the Plan is accepted with reference to a class of Equity Interests, by at least two-thirds in amount of the Allowed Equity Interests of each class of Equity Interests.

3

If any impaired Class of Claims fails to accept this Plan, and the Committee therefore cannot confirm the Plan in accordance with Bankruptcy Code section 1129(a)(8), the Committee reserves the right to: (a) request that the Bankruptcy Court confirm this Plan under Bankruptcy Code section 1129(b); or (b) modify this Plan in accordance with Bankruptcy Code section 1127(a).

### 3.    Best Interests Test.

With respect to each impaired class of holders of Claims and Equity Interests, confirmation of the Plan requires that each such holder either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the applicable consummation date under the Plan, that is not less than the value such holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

To determine what holders of Claims and Equity Interests of each impaired class would receive if the Debtor were liquidated under chapter 7, the Bankruptcy Court must determine the proceeds that would be generated from the liquidation of the properties and interests in property of the Debtor in a chapter 7 liquidation case. The proceeds that would be available for satisfaction of Claims against and Equity Interests in the Debtor would consist of the proceeds generated by disposition of the unencumbered equity in the properties and interests in property of the Debtor and the cash held by the Debtor at the time of the commencement of the liquidation case. Such proceeds would be reduced by the costs and expenses of the liquidation and by such additional administration and priority claims that may result from the termination of the business of the Debtor and the use of chapter 7 for the purposes of liquidation.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a trustee in bankruptcy, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtor during the Chapter 11 Case, such as compensation for attorneys, financial advisors, accountants and costs that are allowed in the chapter 7 case. In addition, Claims would arise by reason of the breach or rejection of obligations incurred and executory contracts entered into or assumed by the Debtor during the pendency of the Chapter 11 Case.

The foregoing types of Claims and such other Claims which may arise in the liquidation cases or result from the pending Chapter 11 Case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay unsecured Claims arising on or before the Petition Date.

To determine if the Plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of the liquidation of the properties and interests in property of the Debtor (net of the amounts attributable to the aforesaid claims) is then compared with the present value offered to such classes of Claims and Equity Interests under the Plan.

In applying the "best interests" test, it is possible that Claims and Equity Interests in the chapter 7 case may not be classified according to the seniority of such Claims and Equity Interests as provided in the Plan. In the absence of a contrary determination by the Bankruptcy Court, all unsecured Claims arising on or before the Petition Date which have the same rights

70

3

upon liquidation would be treated as one class for the purposes of determining the potential distribution of the liquidation proceeds resulting from the chapter 7 cases of the Debtor. The distributions from the liquidation proceeds would be calculated ratably according to the amount of the Claim held by each creditor. Therefore, creditors who claim to be third-party beneficiaries of any contractual subordination provisions might have to seek to enforce such contractual subordination provisions in the Bankruptcy Court or otherwise. The Plan Proponents believe that the most likely outcome of liquidation proceedings under chapter 7 would be the application of the rule of absolute priority of distributions. Under that rule, no junior creditor receives any distribution until all senior creditors are paid in full with interest, and no stockholder receives any distribution until all creditors are paid in full with interest.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Case, including: (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee; (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" environment in which such a liquidation would likely occur; and (iii) the substantial increases in claims which would be satisfied on a priority basis or on parity with creditors in the Chapter 11 case, the Plan Proponents have determined that confirmation of the Plan will provide each holder of a Claim or Equity Interest with a greater recovery than it would receive pursuant to liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

The liquidation analysis is attached hereto as **Exhibit D** (the "Liquidation Analysis").

### 4.    **Feasibility.**

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. Because distributions will be made only to the extent of existing assets or future recoveries, the Plan Proponents believe the Plan is feasible.

## C.    **Cramdown.**

In the event that any impaired class does not accept the Plan, the Debtor nevertheless may move for confirmation of the Plan. To obtain such confirmation, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such classes and any other classes of Claims that vote to reject the Plan.

### 1.    **No Unfair Discrimination.**

A chapter 11 plan "does not discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to the legal rights of the nonaccepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its Claims or Equity Interests. The Plan Proponents believe that under the Plan all impaired classes of Claims and Equity Interests are treated in a manner that is consistent with the treatment of other classes of Claims and Equity Interests that are similarly situated, if any, and no class of Claims or Equity

Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims and Allowed Equity Interests in such class.  Accordingly, the Plan Proponents believe the Plan does not discriminate unfairly as to any impaired class of Claims or Equity Interests.

> ## 2. <u>Fair and Equitable Test.</u>

The Bankruptcy Code establishes different "fair and equitable" tests for secured creditors, unsecured creditors and holders of equity interest as follows:

> **a.** ***Secured Creditors.***  Either (i) each impaired secured creditor retains its liens securing its secured claim and it receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the indubitable equivalent of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

> **b.** ***Unsecured Creditors.***  Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan of reorganization, subject to the applicability of the judicial doctrine of contributing new value.

> **c.** ***Holders of Equity Interests.***  Either (i) each holder of an equity interest will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock or (b) the value of the stock or (ii) the holders of interests that are junior to the stock will not receive any property under the plan of reorganization, subject to the applicability of the judicial doctrine of contributing new value.

THE PLAN PROPONENTS MAY MOVE FOR CONFIRMATION OF THE PLAN IF LESS THAN THE REQUISITE HOLDERS OF CLAIMS OR EQUITY INTERESTS IN ANY CLASS VOTE TO ACCEPT THE PLAN.

## D. <u>Effect of Confirmation.</u>

Under Section 1141 of the Bankruptcy Code, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor or equity security holder, whether or not the claim or interest of such creditor or equity security holder is impaired under the plan and whether or not such creditor or equity security holder voted to accept the plan.  Further, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors and equity security holders, except as otherwise provided in the plan or the confirmation order.

In order to implement the terms and intention of an important piece of the Plan, the Confirmation Order will contain a permanent injunction provision that enforces and further implements the Global Settlement by enjoining all Persons who have been, are, or may be

3

holders of Claims against or Equity Interests in the Debtor from seeking disgorgement of the Global Settlement Amount and any interest and/or legal fees and costs paid to the parties pursuant to the Global Settlement to the Debtor and/or the Estate after payment thereof to the parties in accordance with the Plan on the Effective Date notwithstanding the pendency of any appeal from the Confirmation Order which has not been stayed.

## X.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan Proponents have evaluated numerous alternatives to the Plan, including, without limitation, the sale of the Debtor as a going concern, either as an entirety or on limited bases and the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code and subsequent liquidation of the Debtor by a chapter 7 trustee.  After studying these alternatives, the Plan Proponents have concluded that the Plan is the best alternative and will maximize recoveries of holders of Claims and Equity Interests.  The following discussion provides a summary of the analysis of the Plan Proponents supporting their conclusion that a chapter 7 liquidation of the Debtor or an alternative chapter 11 plan for the Debtor will not provide higher value to holders of Claims and Equity Interests.

### E.    Liquidation Under Chapter 7 of the Bankruptcy Code.

If no chapter 11 plan can be confirmed, the Chapter 11 Case of the Debtor may be converted to a case under chapter 7, in which event a trustee would be elected or appointed to liquidate the properties and interests in property of the Debtor for distribution to its creditors in accordance with the priorities established by the Bankruptcy Code.  The Plan Proponents believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because of (1) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee for bankruptcy and professional advisors to such trustee; (2) the erosion in value of assets in the context of the expeditious liquidation required under chapter 7 and the "forced sale" environment in which such a liquidation would likely occur; (3) the adverse effects on the salability of business segments as a result of the likely departure of key employees and the loss of customers; and (4) the substantial increases in claims which would have to be satisfied on a priority basis or on parity with creditors in the Chapter 11 Case.  Accordingly, the Plan Proponents have determined that confirmation of the Plan will provide each holder of a Claim or Equity Interest with a greater recovery than it would receive pursuant to liquidation of the Debtor under chapter 7.

A discussion of the effects that a chapter 7 liquidation would have on the holders of Claims and Equity Interests is set out in the Liquidation Analysis, attached as **Exhibit D** hereto.

### F.    Alternative Chapter 11 Plans.

If the Plan is not confirmed, any other party in interest could undertake to formulate a different chapter 11 plan.  Such a chapter 11 plan might involve either a reorganization and continuation of the business of the Debtor, the sale of the Debtor as a going concern or an

3

orderly liquidation of the properties and interests in property of the Debtor.  With respect to an alternative chapter 11 plan, the Plan Proponents have examined various other alternatives in connection with the process involved in the formulation and development of the Plan.  The Plan Proponents believe that the Plan, as described herein, enables holders of Claims to realize the best recoveries under the present circumstances.

## XI.

### CONCLUSION

The Plan Proponents believe that the Plan is in the best interest of all holders of Claims and urge all holders of impaired Claims against the Debtor to vote to accept the Plan and to evidence such acceptance by returning their ballots in accordance with the instructions accompanying the Disclosure Statement.

Dated: November ~~11,~~18, 2009

Respectfully submitted,

**Salander-O'Reilly Galleries, LLC, the Official Committee of Salander-O'Reilly Galleries, LLC, and First Republic Bank, a division of ~~Merrill Lynch~~ Bank ~~& Trust, FSB~~of America, N.A.**

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF SALANDER-O'REILLY GALLERIES, LLC

By: */s/ Sarah S. Lerchs*
    Sarah Lerchs, Chairperson

PACHULSKI STANG ZIEHL & JONES LLP

By: */s/ Robert J. Feinstein*
    Robert J. Feinstein (RF 2836)
    Ilan D. Scharf (IS 3469)
    780 Third Avenue, 36th Floor
    New York, New York 10017
    Telephone:   (212) 561-7700
    Facsimile:   (212) 561-7777

    Counsel for Official Committee
    of Unsecured Creditors

3

FIRST REPUBLIC BANK, a division of
BANK OF AMERICA, N.A.


By: */s/ Katherine Auguste de Wilde*
Its: President




WHITE & CASE LLP


By:    */s/ Avi Goldenberg*
      Alan Gover
      J. Christopher Shore
      Avi Goldenberg
      1155 Avenue of the Americas
      New York, New York 10036-2787
      Telephone:  (212) 819-8200

      Counsel for First Republic Bank


SALANDER-O'REILLY GALLERIES, LLC


By:    */s/ Joseph E. Sarachek*
      Joseph Sarachek
      Its Chief Restructuring Officer



HALPERIN BATTAGLIA RAICHT, LLP


By:    */s/ Robert D. Raicht*
      Alan Halperin
      Robert D. Raicht
      Walter Benzija
      555 Madison Avenue, 9th Floor
      New York, New York 10022
      Telephone:  (212) 765-9100

      Counsel for Salander-O'Reilly Galleries, LLC

NY/~~18972~~19346

3

3

Document comparison by Workshare Professional on Wednesday, November 18, 2009
5:51:08 PM

| Input: | |
|---|---|
| Document 1 ID | pcdocs://docs_ny/18972/4 |
| Description | #18972 v4 - SOG-DS Backup 10.2.09 |
| Document 2 ID | pcdocs://docs_ny/19346/6 |
| Description | #19346 v6 - Salander - Disclosure Statement for Third Amended Plan |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 196 |
| Deletions | 169 |
| Moved from | 13 |
| Moved to | 13 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 391 |