UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| | : |
| In re: | : Chapter 11 Case |
| | : |
| SALANDER-O'REILLY GALLERIES, LLC, | : Case No. 07-30005 (CGM) |
| | : |
| Debtor. | : |

**MEMORANDUM OF LAW (A) IN SUPPORT OF CONFIRMATION OF
THE THIRD AMENDED JOINT PLAN OF LIQUIDATION PROPOSED
BY SALANDER-O'REILLY GALLERIES, LLC, THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS AND FIRST REPUBLIC
BANK AND (B) IN RESPONSE TO OBJECTIONS TO SETTLEMENT
<u>WITH RENAISSANCE ART INVESTORS, LLC</u>**

PACHULSKI STANG ZIEHL & JONES LLP

Robert J. Feinstein, Esq.
Ilan D. Scharf, Esq.

780 Third Avenue, 36th Floor
New York, New York 10017
(212) 561-7700

Counsel for the Official Committee of
Unsecured Creditors

Dated: New York, New York
January 13, 2010

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................. 1

    A.    The Court Should Confirm the Plan................................... 3

    B.    The Court Should Approve the RAI Settlement Agreemetn ................................ 6

II.   THE PLAN SATISFIES EACH OF THE REQUIREMENTS FOR
    CONFIRMATION UNDER THE BANKRUPTCY CODE............................................. 8

    A.    The Plan fully complies with the applicable provisions  of the Bankruptcy
        Code (Section 1129(a)(1)). ...................................................... 9

        1.    The Plan satisfies the classification requirements of section 1122
            of the Bankruptcy Code by placing only substantially similar
            Claims or Equity Interests in each Class..................................... 9

        2.    The Plan meets the requirements set forth in section 1123(a) of the
            Bankruptcy Code. ................................................................ 10

        3.    The Release Provisions in The Plan Comply with  Bankruptcy
            Code Section 1123(b)........................................................... 13

        Debtor's Release ................................................................... 13

        Third Party Release ................................................................ 14

    Releases and Injunction Pursuant to the RAI Settlement Agreement ............................ 14

    B.    The Debtor has fully complied with the applicable provisions of the
        Bankruptcy Code (Section 1129(a)(2)). ......................................... 21

        1.    The Plan complies with the procedures for solicitation under
            section 1125 of the Bankruptcy Code..................................... 21

        2.    The Plan complies with the requirements for acceptance of a plan
            under section 1126 of the Bankruptcy Code. .......................... 23

    C.    The Debtor has proposed the Plan in good faith (Section 1129(a)(3)) ............... 24

    D.    The Plan provides for Bankruptcy Court approval of certain administrative
        payments (Section 1129(a)(4))................................................... 25

    E.    The identity of the Responsible Officer who will hold a position post-
        confirmation has been disclosed (Section 1129(a)(5))...................... 27

    F.    No governmental regulatory commission has jurisdiction over the Debtor
        (Section 1129(a)(6)) ............................................................. 28

    G.    The Plan is in the best interests of creditors and interest holders (Section
        1129(a)(7))....................................................................... 28

i

H.  The Plan has been accepted by all Classes entitled to vote (Section 1129(a)(8)) and satisfies the "Cram down" Requirements (Section 1129(b)) for Dissenting Subclasses and non-voting Classes Deemed to have Rejected the Plan by Operation of Law ........................................ 30

I.  The Plan provides for the statutorily mandated treatment of Administrative Claims, Priority Tax Claims and Priority Claims (Section 1129(a)(9)). .............. 33

J.  At least one impaired class of claims has accepted the Plan, excluding the acceptances of insiders (Section 1129(a)(10)) .................................................... 33

K.  The Plan is feasible (Section 1129(a)(11)) ........................................................ 34

L.  The Plan provides for the payment of all fees under 28 U.S.C. § 1930 (Section 1129(a)(12)) ........................................................................................ 36

M.  The Plan complies with section 1129(a)(13) of the Bankruptcy Code ............... 36

N.  No domestic support obligations (Section 1129(a)(14)) .................................... 36

O.  The Debtor is not and individual (Section 1129(a)(15)) .................................... 36

P.  No applicable nonbankruptcy law regarding transfers (Section 1129(a)(16)) ........................................................................................ 36

Q.  The principal purpose of the Plan is not avoidance of taxes (Section 1129(d)) ............................................................................................... 37

R.  The Court Should Overrule Objections to the Plan ............................................ 37

III.  THE COURT SHOULD APPROVE THE RAI SETTLEMENT AGREEMENT .......... 38

A.  Only Four Parties Filed Objections to the RAI Settlement Agreement .............. 39

B.  Transfer of All Bucket 1 Art to RAI is Appropriate Under the Circumstances ...................................................................................................... 41

C.  The Settlement May Provide that RAI Can Share in the Proceeds of Consigned Renaissance Art and Participate in Settlement Negotiations. ........... 43

D.  The Debtor and RAI Will Only Share in the Estate's Interest in Buckets 2 and 3 Art and Consigned Renaissance Art ......................................................... 46

IV.  CONCLUSION ................................................................................................................ 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Buffalo Savings Bank v. Marston Enterprises, Inc. (In re Marston Enterprises, Inc.)*,
   13 B.R. 514, 518-19 (Bankr. E.D.N.Y. 1981) .................................................. 33

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II)*,
   994 F.2d 1160 (5th Cir. 1993) ........................................................................ 34

*Idaho Dep't of Lands v. Arnold (In re Arnold)*,
   806 F.2d 937, 940 (9th Cir. 1986) .................................................................. 30

*In re 222 Liberty Assoc.*,
   108 B.R. 971 (Bankr. E.D. Pa. 1990) ............................................................ 32

*In re Arnold*,
   806 F.2d at 940 n.2 ........................................................................................ 33

*In re Butler*,
   42 B.R. 777 (Bankr. E.D. Ark. 1984) ............................................................ 21

*In re Calvanese*,
   169 B.R. 104 (E.D. Pa. 1994) ........................................................................ 34

*In re Century Glove, Inc.*, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993) ............................ 24

*In re Eagle Bus. Mfg., Inc.*,
   134 B.R. 584 (Bankr. S.D. Tex. 1991) .......................................................... 34

*In re Elsinore Shore Assocs.*,
   91 B.R. 238 (Bankr. D. N.J. 1988) ................................................................ 26

*In re Future Energy Corp.*,
   83 B.R. 470 (Bankr. S.D. Ohio 1988) ............................................................ 26

*In re Jasik*,
   727 F.2d 1379 (5th Cir. 1984) ........................................................................ 24

*In re Johns-Manville Corp.*,
   68 B.R. 618, 630 (S.D.N.Y. 1986),
   *aff'd sub nom*, 843 F.2d 636 (2d Cir. 1988); ................................................ 21

*In re Johns-Manville Corp.*,
   843 F.2d 636 (2d Cir. 1988) ...................................................................... 9, 31

DOCS_NY:19729.2

*In re Johns-Manville Corp.*, 68 B.R. 618, 630 (S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987) .................................................................................................................... 21

In re Kovich,
    4 B.R. 403 (Bankr. W.D. Mich. 1980) ............................................................................ 9

*In re Landing Assoc., Ltd.,*
    157 B.R. 791 (Bankr. W.D. Tex. 1993) ......................................................................... 34

*In re Prudential Energy Co.,*
    58 B.R. 857 (Bankr. S.D.N.Y. 1986) ............................................................................ 21

*In re PWS Holding Corp.,*
    228 F.3d 224 (3d Cir. 2000) ................................................................................... 21, 24

*In re River Village Assocs.,*
    161 B.R. 127 (Bankr. E.D. Pa. 1993) ........................................................................... 25

*In re Ruti Sweetwater,*
    836 F.2d 1263 (10th Cir. 1988) .................................................................................... 30

*In re S&W Enterprise,*
    37 B.R. 153 (Bankr. N.D. Ill. 1984) ............................................................................... 9

*In re Sea Garden Motel and Apartments,*
    195 B.R. 294 (Bankr. D. N.J. 1996) ............................................................................. 34

*In re Texaco, Inc.,*
    84 B.R. 893 (Bankr. S.D.N.Y. 1988) ............................................................................ 21

*In re T-H New Orleans Ltd. Partnership,*
    116 F.3d 790 (5th Cir. 1997) ........................................................................................ 34

*In re Toy & Sports Warehouse, Inc.,*
    37 B.R. 141 (Bankr. S.D.N.Y. 1984) ............................................................................ 21

*New York Life Ins. Co. v. Chase Manhattan Bank, N.A. (In re Texaco Inc.),*
    85 F.R. 934, 939 (Bankr. S.D.N.Y. 1988) .................................................................... 25

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.),*
    800 F.2d 581 (6th Cir. 1986) ........................................................................................... 9

*The Mutual Life Ins. Co. of New York v. Patrician St. Joseph Partners (In re Patrician St. Joseph Partners),*
    169 B.R. 669 (Bankr. D. Ariz. 1994) ............................................................................ 35

*Travelers Ins. Co. v. Pikes Peak Water Co., (In re Pikes Peak Water Co.),*
779 F.2d 1456 (10th Cir. 1985) .................................................................... 35

**Statutes**

11 U.S.C. § 1122 ........................................................................................... 9

11 U.S.C. § 1123 ......................................................................................... 10

11 U.S.C. § 1126 ......................................................................................... 30

**Other Authorities**

H.R. Rep. No. 595, 95th Cong., lst Sess. 412 (1977) ............................................ 8, 21

S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978) .......................................... 8, 21, 30

**Rules**

Bankruptcy Rule 3017 .................................................................................... 21

Bankruptcy Rule 3018 .................................................................................... 21

Bankruptcy Rule 3019 .................................................................................... 21

## I.    INTRODUCTION

The Official Committee of Unsecured Creditors (the "Committee") of Salander-O'Reilly Galleries, LLC, the debtor and debtor in possession (the "Debtor") in the above-captioned case (the "Chapter 11 Case") under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") respectfully submits this memorandum of law (the "Memorandum") (I) in support of confirmation of the *Third Amended Joint Plan of Liquidation Proposed by Salander-O'Reilly Galleries, LLC, the Official Committee of Unsecured Creditors and First Republic Bank* ("FRB," and collectively, with the Debtor and the Committee, the "Plan Proponents") (as it has been modified as of January 13, 2010, the "Plan")[1] and in response to objections to the Plan and (II) in response to objections to the Settlement Agreement (the "RAI Settlement Agreement") between and among the Debtor, the Committee, Renaissance Art Investors, LLC ("RAI"), Old Master Properties, LLC, the Schupak Group, Inc. and Triple S Management, LLC.[2]

The Plan is the culmination of a chapter 11 process that involved significant negotiations and cooperation between and among the Debtor, the Committee, FRB and certain of the Debtor's major creditors.  In addition, as described in the RAI Agreement Motion, the

---

[1]  Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.  As of January 13, 2010, the Plan Proponents have modified the Plan to address a number of issues raised by parties informal and informal objection to the Plan.

[2]  The RAI Settlement Agreement and all exhibits thereto were attached to the Plan.  In addition, the Debtor and the Committee filed their *Joint Motion of the Official Committee of Unsecured Creditors of Salander-O'Reilly Galleries, LLC and Salander-O'Reilly Galleries, LLC for Entry of an Order, Pursuant to Bankruptcy Rule 9019, Approving a Settlement Between (I) Salander-O'Reilly Galleries, LLC, (II) The Official Committee of Unsecured Creditors, (III) Renaissance Art Investors, LLC, (IV) Old Master Properties, LLC, (V) The Schupak Group, Inc. and (VI) Triple S Management LLC* (the "RAI Settlement Agreement Motion") on December 2, 2009 [Docket No. 735].  The RAI Agreement Motion is incorporated herein by reference for all purposes.

settlement is the culmination of months of arms'-length negotiations between and among the Debtor, the Committee, FRB and RAI. The RAI Settlement Agreement resolves the Art Claims and unsecured claims asserted by RAI, the Debtor's largest Art Claimant and creditor, as well as the unsecured claim asserted by The Schupak Group, Inc., an affiliate of RAI. Significantly, the RAI Settlement Agreement clears the way to (a) confirming the Plan, (b) selling the Debtor's renaissance and old master artwork, (c) resolving third parties' art claims, and (d) distributing cash to creditors.

At the commencement of this Chapter 11 Case, the Debtor's management had been ousted, the Debtor held approximately 4,000 works of art to which there were unknown claims, the Debtor and its management were under investigation by the New York County District Attorney, and FRB asserted a lien in substantially all of the Debtor's assets. At the outset of the case, the Committee, FRB and the Debtor, among other things, negotiated the terms of the Protocol with each other and with various parties that asserted an ownership interest in works of art in the Debtor's possession, custody or control. The Art Claims filed pursuant to the Protocol gave parties in interest an opportunity to examine the extent and nature of claims of ownership to artwork in the Debtor's possession, custody or control. The Debtor, the Committee and FRB also began to resolve disputed art claims and return art that was clearly Art Claimants' property. The RAI Settlement Agreement settles the most complex of these Art Claims. Notably, the parties objecting to the RAI Settlement Agreement assert claims to approximately 30 works of art. Thus, when viewed under the totality of the circumstances of the case, the objections relate to a relatively small number of works to which the Debtor has disavowed any claim.

2

In addition, the Committee and FRB negotiated a Plan that embodied a settlement between the Committee and FRB, wherein unsecured creditors will share in the proceeds of sales of artwork that is subject to FRB's asserted liens. This settlement is embodied in the "waterfall" described in the Plan, which provides, among other things, that the first $2.5 million of sales proceeds will be distributed to holders of allowed priority and unsecured claims ahead of any distribution made to FRB on account of its secured claims and professionals on account of accrued and unpaid professional fees.

The Plan and the RAI Settlement Agreement are intertwined, since each is conditioned on approval of the other. As such, the Committee respectfully requests that the Court enter an order confirming the Plan and approving the RAI Settlement Agreement.

A.    **The Court Should Confirm the Plan**

The Court should confirm the Plan for the following compelling reasons:

*First*, the Committee believes that the Plan provides creditors with the best return possible on account of their respective Allowed Claims in light of the facts and circumstances of this Chapter 11 Case. Under the Plan, unsecured creditors will share in a distribution of the Debtor's assets according to the "waterfall" established under the Plan. If the Plan were not confirmed, there is substantial risk that any funds received by the sale of the Debtor's collection of artwork would be paid to FRB in order to repay its DIP Facility loan and prepetition claim, since FRB asserts a first priority lien on substantially all of the Debtor's assets. If that were the case, there is substantial risk that unsecured creditors would not have any recovery in this case.

The Committee submits that any recovery to unsecured creditors is the result of hard work by the Plan Proponents, and their respective professionals, and the negotiations that

3

occurred between and among the Plan Proponents and certain of the Debtor's major creditors. As described in the Disclosure Statement,[3] the Committee believes that the anticipated distributions under the Plan are superior to any distributions outcome that could be expected under any other plan or under a chapter 7 liquidation.

*Second*, as set forth in detail below and in the Voting Declaration (defined below), the Plan is overwhelmingly supported by almost all of the Classes of Claims entitled to vote on the Plan. Classes 1 (FRB Secured Claims), 2 (Other Secured Claims), 3 (Priority Claims), and 4 (General Unsecured Claims) were entitled to vote on the Plan. Creditors in these Classes overwhelmingly accepted the Plan, both in terms of the numbers of votes and the amount of the claims voted. The Plan was accepted by Classes 1, 2, 3, and 4 as follows:

| Class | % Amount Accepting | % Voters Accepting |
|-------|--------------------|--------------------|
| Class 1 | 100 | 100 |
| Class 2 | 89.46 | 88.88 |
| Class 3 | 100 | 100 |
| Class 4 | 91.46 | 84 |

With respect to Class 2, the Plan, as modified, provides that each Holder of a Class 2 Claim constitutes a separate subclass under the Plan. With respect to Class 2, all but one subclass have accepted the Plan.

*Third*, the Plan complies with all applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). As demonstrated in Section II herein, the Plan satisfies all of the requirements of sections 1122, 1123 and 1129 of the Bankruptcy Code.

---

[3]  The term "Disclosure Statement" refers to the Disclosure Statement dated November 18, 2009 filed in support of the Plan [Docket No. 734]. The Disclosure Statement is incorporated herein by reference for all purposes.

*Finally*, only three objections to confirmation of the Plan were filed by creditors. Two of these objections, although styled as objections to the Plan, in fact are objections to the RAI Settlement Agreement. Only one objection to the Plan - by Sotheby's, Inc. and Sotheby's Financial Services, Inc. (collectively, "Sotheby's") - specifically focused on issues unique to treatment of its claim under the Plan, rather than the RAI Settlement Agreement. Notably, no party objected to the fairness of the Plan or the treatment of Claims under the Plan.

Sotheby's raised four issues in its objection to the Plan: (a) the Plan may provide disparate treatment to each Holder of a Class 2 Claim because the Liquidation Trustee may select one of five treatments for such Claimants; (b) the Plan sets no time limit for the Liquidation Trustee to object to Claims; (c) the Plan does not provide for payment of interest to holders of Allowed Secured Claims pursuant to section 506(b) of the Bankruptcy Code; and (d) the Plan does not preserve rights of Class 2 Claimants under section 1129(b) of the Bankruptcy Code.

The Plan Proponents believe that the issues raised by Sotheby's objection were already preserved for Sotheby's benefit in the Plan. Nevertheless, as discussed below, the Plan Proponents modified the Plan to clarify that the issues raised by Sotheby's are provided in the Plan. Thus, the Plan, as modified, renders Sotheby's objection moot.

In addition, the United States Trustee's Objection to Proposed Disclosure Statement (the "U.S.Trustee Objection") [Docket No. 663] raised certain objections to confirmation of the Plan. As it pertains to confirmation, the U.S. Trustee Objection sought (a) certain disclosures and procedural changes to the Plan prior to approval of the Disclosure Statement and (b) additional disclosure regarding the basis for certain non-debtor releases in the Plan. The Plan Proponents addressed the disclosure and procedural issues raised by the United

5

States Trustee prior to approval of the Disclosure Statement, and address the basis for the releases in the Plan in Section II.A.3 below.

As such, this Memorandum, the Plan, the Disclosure Statement, the motion to approve the RAI Settlement Agreement, and the *Declaration of Ilan D. Scharf Regarding the Methodology for the Tabulation of and Results of Voting With Respect to the Plan of Liquidation Under Chapter 11 of the Bankruptcy Code* (the "Voting Declaration") [Docket No. 768], filed in support of confirmation of the Plan present a comprehensive analysis and record of the issues before the Court regarding confirmation of the Plan. These documents demonstrate that the Plan complies with the applicable provisions of chapter 11 of the Bankruptcy Code and the Bankruptcy Rules, and provides the legal and evidentiary bases necessary for this Court to confirm the Plan pursuant to sections 1129(a) and (b) of the Bankruptcy Code.

The Committee submits that the Plan provides the maximum value for creditors under the circumstances of this Chapter 11 Case. The Plan is the result of extensive bargaining, negotiation and compromise among the Plan Proponents and certain major creditor constituencies, and has been overwhelmingly accepted by the Debtor's creditors, as demonstrated by the high percentage of votes in favor of the Plan.

Accordingly, the Committee respectfully requests that the Court enter an order confirming the Plan and authorize the Plan Proponents to take any and all actions necessary to implement the provisions thereof.

B.      **The Court Should Approve the RAI Settlement Agreemetn**

The Committee also respectfully requests that the Court enter an order approving the RAI Settlement Agreement.

6

The RAI Settlement Agreement is the culmination of extensive negotiations between and among the Debtor, the Committee, FRB and RAI and its affiliates. The RAI Settlement Agreement settles the largest Art Claim and unsecured claim filed in this case, and allows the Debtor's estate to move forward with the sale of a substantial portion of its art collection (the renaissance and old masters art), which was subject to RAI's Art Claim.

The RAI Settlement Agreement and the Plan are inextricably intertwined, since the effectiveness of each is conditioned on the Court's approval of the other. This is because the Plan contains releases that are vital to the effectiveness of the RAI Settlement Agreement, and the RAI Settlement Agreement provides the economic terms that will allow the Debtor's estate to sell assets and finalize an orderly wind-down of the Debtor's affairs.

Four parties objected to the RAI Settlement Agreement. These objections generally fall into three categories: (a) objections to the estate releasing certain Bucket 1 Art (as defined in the RAI Settlement Agreement) to RAI; (b) an objection by Kraken Investments Ltd. ("Kraken") regarding treatment of artwork it claims to own; and (c) requests for clarification of the terms of the RAI Settlement Agreement.

The Court should overrule the objections for the following reasons:

- Granting possession of Bucket 1 Art to RAI is an integral part of the RAI Settlement Agreement. The Debtor is abandoning any interest it may have in Bucket 1 Art, and therefore the estate should not be burdened with the cost of storing and insuring such artwork. Moreover, all Art Claimants' rights to Bucket 1 Art are preserved, and may be adjudicated in a court of competent jurisdiction.

- The issue regarding possession of Bucket 1 Art appears to involve two works of art: one of which is claimed by Sotheby's and RAI and the second of which is claimed by three parties in addition to RAI. The disputes over those paintings are complex and the Debtor's estate should not be forced to hold artwork in which it has no interest, and where litigation may drag on for years.

7

- Kraken consigned a painting by Botticelli (the "Botticelli") to the Debtor prior to the Petition Date. Based on Kraken's failure to perfect its interest in the Botticelli, the Working Group under the Protocol determined that the Botticelli as an asset of the Debtor's estate. Kraken disputes that conclusion, and the estate and Kraken will have to adjudicate that issue. The RAI Settlement Agreement provides that if and to the extent the Botticelli is an asset of the estate, RAI and the estate will each be entitled to a portion of the proceeds of the Botticelli. Kraken argues that RAI has no right to the artwork and that RAI should not be entitled to participate in settlement discussions regarding the Botticelli. First, the Botticelli is already subject to RAI's Art Claim and thus RAI already may participate in settlement discussions regarding the painting. *See Supplement to Art Claim of Renaissance Art Investors LLC, Exhibit A* [Docket No. 485]. Second, because RAI made a claim to the Botticelli, RAI has a right to participate in settlement discussion. Finally, under its agreement with the Debtor, RAI has a colorable claim to the Debtor's share proceeds of any renaissance art consigned to the Debtor. Thus, because the Botticelli was consigned to the Debtor, RAI has a colorable claim to the proceeds received by the Debtor for any sale of the Botticelli.

- Various parties also requested clarification of the terms of the RAI Settlement Agreement and, as described in greater detail below, the Committee has agreed to clarify that (a) the rights of parties asserting claims to Bucket 1 Art are preserved and (b) the estate and RAI will share only in the proceeds of Buckets 2 and 3 Art and Consigned Renaissance Art to the extent of the estate's interest in such art.

Finally, the settlement is reasonable under the circumstances, especially when viewed in light of the global settlement of RAI's Art Claim and unsecured claim. Thus, the Court should approve the RAI Settlement Agreement.

## II.    THE PLAN SATISFIES EACH OF THE REQUIREMENTS FOR CONFIRMATION UNDER THE BANKRUPTCY CODE

The Plan complies with all relevant sections of the Bankruptcy Code and the Bankruptcy Rules relating to confirmation of the Plan. In particular, the Plan fully complies with all of the requirements of sections 1123 and 1129 of the Bankruptcy Code. This Memorandum addresses each requirement in seriatim.

DOCS_NY:19729.2

**A.** **The Plan fully complies with the applicable provisions
of the Bankruptcy Code (Section 1129(a)(1)).**

Section 1129(a)(1) of the Bankruptcy Code requires that a plan of reorganization

comply with the applicable provisions of chapter 11. The legislative history of section

1129(a)(1) of the Bankruptcy Code indicates that a principle objective of this provision is to

assure compliance with the sections of the Bankruptcy Code governing classification of claims

and interests and the contents of a plan. *See* S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978);

H.R. Rep. No. 595, 95th Cong., lst Sess. 412 (1977); *In re Johns-Manville Corp.*, 843 F.2d 636,

648 (2d Cir. 1988); *In re S&W Enterprise*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984). The Plan

complies with these provisions in all respects.

**1.** **The Plan satisfies the classification requirements of section 1122
of the Bankruptcy Code by placing only substantially similar
Claims or Equity Interests in each Class.**

"Absent agreement to the contrary, a plan may place a claim or interest in a

particular class only if such claim or interest is substantially similar to the other claims or

interests of such class." 11 U.S.C. § 1122(a). Section 1122(a) of the Bankruptcy Code,

however, does not require that similar claims be classified together, only that claims grouped

together in a class should be similar. *See Teamsters Nat'l Freight Indus. Negotiating Comm. v.*

*U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.)*, 800 F.2d 581, 585 (6th Cir. 1986); *see also In re*

*Kovich*, 4 B.R. 403, 405 (Bankr. W.D. Mich. 1980) ("There is no requirement that all claims

which are 'substantially similar' be placed in the same class").

The classification of Claims and Interests under the Plan is proper under the

Bankruptcy Code. There are a total of five Classes of Claims and Interests under the Plan. The

classification of Claims and Equity Interests against the Debtor pursuant to the Plan, is as follows:

| Class | Status | Voting Rights |
|---|---|---|
| Class 1 – FRB Secured Claims | Impaired | Entitled to Vote |
| Class 2 - Other Secured Claims | Impaired | Entitled to Vote |
| Class 3 – Other Priority Claims | Impaired | Entitled to Vote |
| Class 4 – General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 – Membership Interests | Impaired | Deemed to Reject |

Unless otherwise agreed to by the Holder, a Claim or Interest is placed in a Class or subclass only if that Claim or Interest is substantially similar to other Claims or Interests within the Class or subclass. Accordingly, the classification of Claims and Interests under the Plan satisfies the requirements of section 1122 of the Bankruptcy Code. Moreover, the Plan Proponents have modified the Plan to provide that each party asserting a Class 2 Claim is deemed a separate subclass under the Plan. Thus the Plan complies with Section 1122 of the Bankruptcy Code.

2.      **The Plan meets the requirements set forth in section 1123(a) of the Bankruptcy Code.**

Section 1123(a) of the Bankruptcy Code sets forth seven requirements with which every chapter 11 plan must comply. *See* 11 U.S.C. § 1123(a). The Plan fully complies with each requirement. First, paragraph (1) of section 1123(a) requires that a plan designate classes of claims, other than claims of a priority specified in subparagraphs 1, 2 and 8 of section 507(a) of the Bankruptcy Code. The Plan designates classes of Claims and Interests as required by section 1123(a)(1) of the Bankruptcy Code. *See* Article V of the Plan.

Second, paragraph (2) of section 1123(a) requires that a plan specify those classes or interests that are not impaired. As set forth in the Plan, none of the Classes under the Plan are unimpaired. Section 1123(a)(2), therefore, is not applicable.

Third, paragraph (3) of section 1123(a) requires that a plan specify those classes of claims or interests that are impaired. Article V of the Plan specifies the treatment of each impaired class of Claims and Interests as required by section 1123(a)(3) of the Bankruptcy Code. In particular, Article V of the Plan provides that the following Classes are impaired and then sets forth their treatment: Class 1 (FRB Secured Claim); Class 2 (Other Secured Claims); Class 3 (Other Priority Claims); Class 4 (General Unsecured Claims); and Class 5 (Membership Interests).

Fourth, paragraph (4) of section 1123(a) requires that a plan provide the same treatment for each claim in a particular class, unless the holder of a claim in that class agrees to less favorable treatment for such claim. All of the Holders of Claims or Interests within each of the Classes[4] are treated identically under the Plan as required by section 1123(a)(4) of the Bankruptcy Code.

Fifth, paragraph (5) of section 1123(a) requires that a plan provide adequate means for its implementation. Here, Article VI (Means for Implementation of the Plan), and other provisions of the Plan set forth the means for its implementation. The Plan provides for: (i) the appointment of a Liquidation Trustee who shall act as the trustee of the SOG Liquidation

---

[4] As discussed below, Sotheby's objected to the Plan in part on the basis that it did not provide identical treatment to all members of Class 2, since under the Plan the Liquidation Trustee may elect various forms of treatment for each Class 2 Claimant. However, since the Plan has been modified to provide that each member of Class 2 will form its own subclass, Sotheby's objection is moot.

11

Trust; (ii) the establishment of a post-confirmation Oversight Committee (that shall be comprised of five members), which shall oversee the operations of the SOG Liquidation Trust and the Liquidation Trustee on those matters provided for by the Plan; (iii) the establishment of Plan Reserve Accounts from which payments and distributions shall be made by the Liquidation Trustee in accordance with the Plan; (iv) distributions to creditors in accordance with the terms of the Plan; and (v) the ultimate liquidation and dissolution of the SOG Liquidation Trust in accordance with the Plan and the Liquidation Trust Agreement.

Sixth, paragraph (6) of section 1123(a) requires that a plan impose certain restrictions on a corporate debtor's equity securities. This provision is not applicable here, because this is a liquidating Plan which, among other things, requires the cancellation of all Interests in the Debtor. Moreover, on the Effective Date, the Trust Assets, and any other property of the Estate, shall vest in the SOG Liquidation Trust and be held in trust for holders of Allowed Claims and shall be distributed only in accordance with the Plan. *See* Article VII of the Plan.

Finally, paragraph (7) of section 1123(a) requires that a plan contain only provisions that are consistent with the interests of creditors, equity security holders and public policy with respect to the manner of selection of any officer, director or trustee under a plan and any successor thereto. *See* 11 U.S.C. § 1123(a)(7). Article VII of the Plan provides for the appointment of a Liquidation Trustee on the Effective Date to oversee the SOG Liquidation Trust, in consultation with the Oversight Committee as provided by the Plan. The Liquidation Trustee is charged with carrying out the terms of the Plan and, among other things, shall be responsible for ensuring that the SOG Liquidation Trust complies with its obligation to pay

12

statutory fees under 28 U.S.C. § 1930(a)(6), files all post-Confirmation reports required by the

Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Court, the Local Bankruptcy Rules, or

any applicable Guidelines of the United States Trustee. The Plan Proponents have selected Alan

M. Jacobs as the Liquidation Trustee and believe that he is a highly capable bankruptcy and

reorganization professional who is well qualified to fulfill the duties of the Liquidation Trustee

under the Plan and has the overwhelming support of creditors, as evidenced by the Voting

Declaration and Claimants' general acceptance of the Plan.

### 3.  The Release Provisions in The Plan Comply with Bankruptcy Code Section 1123(b).

The Plan provides the following releases:

#### <u>Debtor's Release</u>

On the Effective Date, the Debtor and the Liquidating Trustee on behalf of the
SOG Liquidation Trust and the Estate shall release and be permanently enjoined
from any prosecution or attempted prosecution of any and all causes of action or
potential cause of action which the Debtor or its Estate had or may have against
the Bank, the Committee or any member of the Committee (in their capacity as
such) and any of their respective Related Parties (collectively, the "Debtor
Released Parties") from any and all Claims (including Causes of Action) and
Liability Claims known or unknown that the Debtor, the Estate or the Liquidating
Trustee may assert against the Debtor Released Parties.

In addition, on the Effective Date, the Debtor and the Liquidation Trustee on
behalf of the Liquidating Trust, the Committee and each of its past or current
members (in their capacities as such), and the Bank, and their respective Related
Parties and property, shall be released from any and all Claims (including Causes
of Action), potential Claims and Liability Claims, which the Debtor, the Estate or
the SOG Liquidation Trust may be entitled to assert, whether for tort, fraud,
contract, violations of federal or state securities laws, or otherwise, whether
known or unknown, foreseen or unforeseen, existing or thereafter arising, based in
whole or in part upon any act or omission, transaction, or other occurrence taking
place on or before the Confirmation, in any way relating to the Chapter 11 Case or
the Plan, including, but no limited to, the negotiation, solicitation, Confirmation
and Consummation of the Plan; provided, however, that nothing shall release any
person from any claims, obligations, rights, causes of action, or liabilities based
upon any act or omission in connection with, relating to, or arising out of, the
Chapter 11 Case, the solicitation of acceptances of the Plan, the pursuit of

Confirmation of the Plan, the Consummation of the Plan, the administration of the Plan, or the Property to be distributed under the Plan arising out of such person's gross negligence or willful misconduct. No attorney shall seek a release in contravention of N.Y. Comp. Codes R. & Regs. Tit. 22 s 1200.8 Rule 1.8(h)(1) (2009), as amended.

**Third Party Release**

Each Person who (i) is entitled to receive a Distribution under the Plan or pursuant to the Plan (whether or not a Distribution has been made) or (ii) is a member of a Class that votes to accept this Plan (or is deemed to accept this Plan), whether or not such member has voted to accept the Plan, shall be deemed a "Releasing Party." By virtue of Bankruptcy Code sections 1126(c) and 1141(a), each Releasing Party shall be deemed to have released for itself and its respective Related Parties, in each case in their capacity as such, any and all Claims and Causes of Action against (A) the Debtor, the CRO, the Liquidation Trustee or the SOG Liquidation Trust, and their respective Related Parties and their respective property (collectively, the "Third Party Released Parties"), (B) FRB, in its capacity as prepetition lender to the Debtor and in its capacity as the lender under the DIP Facility and its respective Related Parties and their respective property, and (C) the members of the Committee (in their capacity as such), and their respective Related Parties and their respective property, arising prior to the Effective Date and related to the Debtor or the Chapter 11 Case. Nothing in the previous sentence shall be deemed to release the Debtor and SOG Liquidation Trust from liability for (i) Claims property and timely filed before the Administrative Claims Bar Date, the Claims Bar Date, the Art Claims Bar Date and the Governmental Bar Date (as the case may be), and (ii) Claims scheduled by the Debtor that are not contingent, disputed or unliquidated; provided, however, that, notwithstanding clause (i) above, the Debtor or Liquidating Trustee, as appropriate, may object to the allowance of any Claim on any ground.

Each party to which this section of the Plan applies shall be deemed to have granted the releases set forth herein notwithstanding that it may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such party expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those Claims or causes of action actually known or suspected to exist at the time of Confirmation. Notwithstanding anything herein, nothing in the Plan shall prevent or prohibit an Art Claimant (as defined in the Art Claims Protocol) or the Sotheby's Entities from asserting, on any basis, that the Bank's liens with respect to any Artwork claimed by such Art Claimant pursuant to the Art Claims Protocol or the Sotheby's Entities are not enforceable, valid or perfected.

Plan, Article IX.B.

**Releases and Injunction Pursuant to the RAI Settlement Agreement**

Upon the effective date of the RAI Settlement Agreement, each member of the RAI Group and each of their respective Related Parties shall be deemed to release the Debtor, the bankruptcy estate and the Committee in respect of the RAI Claims and RAI Art Claims and will be deemed to have withdrawn such RAI Art Claims and RAI Claims upon the Notice Date; provided, however, that Donald Schupak shall not be required to withdraw proof of claim number 368 pursuant to this Agreement.

Upon the effective date of the RAI Settlement Agreement, in exchange for the conversion of the RAI Indebtedness (as defined in the RAI Settlement Agreement), the FRH Equity Interest and the Debtor's membership interests in RAI into Class C Membership interests in RAI, the Debtor and the Committee and their respective Related Parties and successors in interest, including the Liquidation Trustee and the SOG Liquidation Trust, shall be deemed to release each member of the RAI Group and its Related Parties from any and all claims or causes of actions, known or unknown including without limitation all claims, liens or interests as assignee under the Plan of the RAI Loan Documents and the FRH Equity Interest; provided, however, that the Committee, the Debtor or the Liquidation Trustee, as the case may be, shall not release any defenses it or they have with respect to the Schupak Claim, and provided further, however, that the Debtor's and Liquidation Trustee's rights under the Operating Agreement, as amended, shall be preserved.

None of the releases granted pursuant to this Article IX.C shall apply to any matter that is not related to (a) Lawrence Salander, Julie Salander, L. Salander, LLC, the Debtor, their Related Parties, or their respective cases under the Bankruptcy Code, (b) the RAI Claimed Art (as defined in the RAI Settlement Agreement), (c) the RAI Group, (d) the OMP Sale(as defined in the RAI Settlement Agreement), (e) the RAI Transaction Documents(as defined in the RAI Settlement Agreement) or (f) the RAI Indebtedness (as defined in the RAI Settlement Agreement).

The Plan Participants will neither have nor incur any liability to any Bucket 1 Competing Claimant for any act taken or omitted to be taken in connection with or related to the release of Bucket 1 Art by the Debtor or the SOG Liquidation Trust to RAI (the "Bucket 1 Exculpated Conduct"). Notwithstanding anything herein, nothing in the Plan shall prevent or prohibit a Bucket 1 Competing Claimant from asserting, on any basis, that the Bank's liens with respect to any Artwork claimed by such Art Claimant pursuant to the Art Claims Protocol are not enforceable, valid or perfected. Notwithstanding anything herein, nothing in the Plan shall prevent or prohibit a Bucket 1 Competing Claimant from asserting, on any basis, any claim or defense against the any member of the RAI Group or their Related Parties with respect to any dispute regarding Bucket 1 Art; provided, however, that Donald Schupak in his capacity as a member of the Committee and his Related Parties, with respect to any actions taken or not taken concerning Donald Schupak in his capacity as a member of the Committee or the Oversight

Committee, shall be subject to the provisions of the releases and exculpations described in Articles IX.A and IX.B of the Plan.

All Persons are permanently enjoined from commencing, or continuing in any manner, any action or proceeding against any of the Plan Participants, whether directly, derivatively, on account of or respecting any claim, debt, right, or cause of action based in whole or in part upon any Bucket 1 Exculpated Conduct. Any Plan Participant injured by any willful violation of this injunction shall recover from the willful violator actual damages (including costs and attorneys' fees) and, in appropriate circumstances, punitive damages.

Each Bucket 1 Competing Claimant shall be deemed a "Releasing Party." By virtue of Bankruptcy Code sections 1126(c) and 1141(a), each Releasing Party shall be deemed to have released for itself and its respective Related Parties, in each case in their capacity as such, any and all Claims and Causes of Action against the Plan Participants on account of the release of Bucket 1 Art to RAI.

Plan Article IX.C.

The Plan also contains the following injunction:

In implementation of the Plan, except as otherwise expressly provided in the Confirmation Order or the Plan, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtor, the SOG Liquidation Trust or the Estate that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtor, the SOG Liquidation Trust, the Estate, the Bank or any of their respective Related Parties or any of their respective property with respect to any such Claim or Interest; (b) the enforcement, attachment, collection or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtor, the SOG Liquidation Trust, the Estate, the Bank or any of their respective Related Parties or any of their respective property with respect to any such Claim or Interest; (c) creating, perfecting or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Debtor, the SOG Liquidation Trust, the Estate, or the Bank or any of their respective Related Parties or any of their respective property with respect to any such Claim or Interest; (d) asserting, directly or indirectly, any setoff, right of subrogation, or recoupment of any kind against any obligation due the Debtor, the SOG Liquidation Trust, the Estate, or the Bank or any of their respective Related Parties or any of their property with respect to any such Claim or Interest; and (e) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest. Nothing contained in this section shall prohibit the Holder of a timely-filed Proof of Claim from litigating its right to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of this Plan, or enjoin or

prohibit the interpretation or enforcement by the Claimant of any of the obligations of the Debtor or the SOG Liquidation Trust under this Plan. For the avoidance of doubt, and notwithstanding any other provision contained in the Plan or the Confirmation Order, nothing in the Plan or the Confirmation Order shall release any claims and/or causes of action, or enjoin any person (including without limitation the SOG Liquidation Trust and/or the Liquidation Trustee) from commencing or continuing the prosecution of any claims and/or causes of action against the Debtor's officers, directors, shareholders, employees, professionals, representatives, successors or assigns and/or any other person or entity other than the Plan Participants. Notwithstanding anything to the contrary herein, Art Claimants shall not be enjoined by the Plan from litigating any Art Claims in accordance with the Art Claims Protocol.

The foregoing releases are justified as an integral part of the Debtor's overall restructuring and liquidation efforts. Specifically, the Debtor Released Parties and Third Party Released Parties (the "Released Parties") have all made substantial contributions to the Debtor's estate; indeed, without such contributions the Debtor could not have proposed a confirmable Plan. Put simply, the proposed Plan represents demonstrably unique circumstances. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases, and further, will constitute its finding that the releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of the claims released by the releases; (2) in the best interests of the Debtor and all Holders of Claims; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Holders of Claims and Interests asserting any claim released by the releases against any of the Released Parties. Nothing in the Confirmation Order or the Plan shall affect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including any claim arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States Government or any of its agencies or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties for any liability whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state and local authority against the Released Parties.

Plan, Article IX.B.

DOCS_NY:19729.2

The Court should approve the releases, injunctions and limitations of liability in the Plan, including the non-debtor releases provided for in the Plan. It is well settled that "[i]n bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization Plan." *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.2d 136, 141 (2d Cir. 2005) (quoting *SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),* 960 F.2d 285, 293 (2d Cir. 1992)). Nevertheless, in the Second Circuit cautioned that "such a release is proper only in rare cases." *Metromedia*, *id*. (internal citations omitted). This Chapter 11 Case is one of those rare cases where the non-debtor releases in the Plan are appropriate.

The Second Circuit has not established a set of factors or prongs to guide the Court in determining whether non-debtor releases are proper. Nevertheless, the Second Circuit has noted that non-debtor releases are appropriate where the estate receives substantial consideration from the released parties and if the affected creditors consent. *See Metromedia, id*. Courts in the Second Circuit, in the wake of the <u>*Metromedia*</u> decision, have confirmed plans containing non-debtor releases under the following circumstances:

    a.    Where the released parties agreed to make a substantial financial contribution to fund the Plan only on condition that the releases would be granted, and there are unique circumstances present. *See In re Karta Corp.,* 342 B.R. 45, 55-57 (S.D.N.Y. 2006).

    b.    Where (i) the released parties are already indemnified by the estate, (ii) the released parties are involved in unique transactions, such as making a financial contribution to the estate that makes the plan possible or (iii) affected parties consent to the releases. *See In re Adelphia Commin Corp.,* 368 B.R. 140, 268 (Bankr. S.D.N.Y. 2007); and

c.      Where the releases are a "critical component" of a settlement embodied in a Plan. *See In re Spiegel Inc.,* Case No. 03-11540 (BRL) 2006 WL 2577825*7-8 (Bankr. S.D.N.Y. Aug. 16, 2006).

Here, the Plan provides releases for (a) the Debtor, the CRO, the Liquidation Trustee, the SOG Liquidation Trust and their respective counsel (the "Debtor Released Parties"), (b) FRB in its capacity as the prepetition lender to the Debtor and as lender under the DIP Facility, and its Related Parties (the "FRB Released Parties"), and (c) Committee members (in their capacity as such) and their Related Parties (the "Committee Released Parties").

In the case of the Debtor Released Parties and the Committee Released Parties, such parties are already indemnified by the estate or would be entitled to seek reimbursement from the estate on account of any action against them by operation of law, contract or court order. Thus, releases for the Debtor Released Parties and the Committee Released Parties are appropriate under the circumstances.

The releases are also appropriate for the FRB Released Parties. Here, FRB asserts a lien on substantially all of the Debtor's assets, on account of its DIP Facility loan in the amount of approximately $7 million (including interest and fees) and its prepetition claim of approximately $30 million. Thus, if FRB's loan is enforceable, it would hold a security interest in substantially all of the Debtor's assets. There is substantial risk that a sale of the Debtor's assets will not yield sufficient proceeds to repay FRB's $37 million claims in full. Thus, there is substantial likelihood that absent a settlement with FRB, FRB would realize all of the proceeds of the sale of the Debtor's assets and unsecured creditors would be left with nothing.

DOCS_NY:19729.2

Under the Plan, FRB is in part relinquishing its rights as a secured creditor by, among other things, (a) allowing the first $2.5 million of net proceeds received by the estate to be paid to unsecured creditors, (b) allowing administrative expenses to paid *pari pasu* with repayment of its DIP Facility loan and (c) sharing 40% of other net proceeds with general unsecured creditors. This is a substantial financial contribution to the Plan and will assure that unsecured creditors receive a recovery in this case.

As discussed in the Disclosure Statement and at prior hearings before this Court, the Plan embodies a settlement between FRB and the Committee that will result in a "waterfall" of distributions under the Plan. The settlement between the Committee and FRB was the result of a significant investigation by the Committee of FRB's action related to the Debtor. Moreover, the settlement embodied in the Plan was reached at a time when the Debtor had moved to convert the chapter 11 Case to chapter 7 and the Court was contemplating dismissal. *See Consent of the Debtor and Debtor in Possession to Conversion of Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code Pursuant to 11 U.S.C. § 1112(a)* [Docket No. 599]. The Plan, along with the RAI Settlement Agreement, resolves significant claims between and among the Estate, the Bank and various creditors, including RAI. Absent the settlement with FRB and FRB's substantial contribution to the Plan, there would be no Plan and creditors would be unlikely to realize and recovery. FRB has consistently stated that the releases are an integral condition to FRB's substantial contribution to the Plan. As such, the Court should approve the non-debtor releases as they relate to the FRB Released Parties.

In addition, each Ballot provided that the voting creditors has "reviewed and accept[ed] the exculpation and release provisions in Article IX of the Plan." *See* Solicitation

Procedures Order, Exhibit B. Moreover, no party other than the U.S. Trustee objected to the release provisions. Thus, parties with an economic interest have consented to the non-debtor releases in the Plan.

      **B.**     **The Debtor has fully complied with the applicable provisions of the Bankruptcy Code (Section 1129(a)(2)).**

      Section 1129(a)(2) of the Bankruptcy Code provides that a court may confirm a plan only if "[t]he proponent of the plan complies with the applicable provisions of this title." *See* 11 U.S.C. § 1129(a)(2). The principal purpose of section 1129(a)(2) is to assure that the plan proponent has complied with the disclosure and solicitation requirements of sections 1125 and 1126 of the Bankruptcy Code. *See In re PWS Holding Corp.,* 228 F.3d 224, 248 (3d Cir. 2000); *In re Texaco, Inc.*, 84 B.R. 893 (Bankr. S.D.N.Y. 1988); *In re Johns-Manville Corp.*, 68 B.R. 618, 630 (S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom*, 843 F.2d 636 (2d Cir. 1988); *In re Prudential Energy Co.*, 58 B.R. 857 (Bankr. S.D.N.Y. 1986); *In re Butler*, 42 B.R. 777 (Bankr. E.D. Ark. 1984); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984); S. Rep. No. 989, 95th Cong., 2d Sess. 126; H.R. Rep. No. 595, 95th Cong., 1st Sess. 412. The Debtor has complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018 and 3019.

      **1.**     **The Plan complies with the procedures for solicitation under section 1125 of the Bankruptcy Code.**

      On November 19, 2009, the Court entered that certain *Order (A) Approving Disclosure Statement in Support of Third Amended Joint Plan of Liquidation, (B) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan and (C) Fixing the*

*Administrative Expense Bar Date [Docket No. 725]* (the "Solicitation Procedures Order"). The

Solicitation Procedures Order, among other things, approved the Disclosure Statement as

containing "adequate information" of a kind and in sufficient detail to enable hypothetical,

reasonable investors typical of the Debtor's creditors to make an informed judgment whether to

accept or reject the Plan. Pursuant to the Solicitation Procedures Order, the Court required the

Committee, on behalf of the Plan Proponents, to distribute Solicitation Packages to: (a) counsel

to the Debtor; (b) counsel to the Committee; (c) counsel to FRB; (d) the office of the United

States Trustee; (e) all persons or entities that filed proofs of claim before December 2, 2009; (f)

all persons or entities listed in the Debtor's schedules of assets and liabilities or any amendments

thereof, as holding liquidated, noncontingent and undisputed claims in an amount greater than

zero; (g) all parties to executory contracts listed in the schedules; (h) the Internal Revenue

Service; (i) any entity that has filed with the Court a notice of transfer of a claim under

Bankruptcy Rule 3001(e) prior to December 2, 2009; (j) any other known holders of claims

against the Debtor; and (k) state and local taxing authorities. The Solicitation Packages

consisted of: (1) the Disclosure Statement (together with the Plan annexed thereto as "Exhibit

A") and all exhibits to the Disclosure Statement and the Plan); (2) a copy of the Solicitation

Procedures Order; (3) appropriate Ballot(s) and voting instructions; (4) the Notice of Disclosure

Statement Approval and Confirmation Hearing (as defined in the Solicitation Procedures

Orders); and (5) a pre-addressed and postage prepaid return envelope.

The Committee and its professionals, acting on behalf of the Plan Proponents,

followed the procedures set forth in the Solicitation Procedures Order for soliciting acceptances

of the Plan, as evidenced by the Voting Declaration and the affidavit of service for the

Solicitation Packages filed of record with the Court [Docket No. 744]. The Plan Proponents did not solicit acceptances or rejection of the Plan from any Claim or Interest Holder before the transmission of the Disclosure Statement. Therefore, the Plan Proponents have complied with section 1125 of the Bankruptcy Code.

2. **The Plan complies with the requirements for acceptance of a plan under section 1126 of the Bankruptcy Code.**

Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan -- only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan. As set forth in the Plan, the Disclosure Statement and the Voting Declaration, in accordance with section 1126 of the Bankruptcy Code, the Committee solicited acceptances and rejections of the Plan from the Holders of all Allowed Claims in each Impaired Class that are to receive distributions under the Plan. Class 5 is impaired but will not receive any distribution under the Plan. As a result, pursuant to Bankruptcy Code section 1126(g), Holders of Membership Interests in that Class are deemed to have rejected the Plan. Classes 1, 2, 3 and 4 are impaired and may receive distributions under the Plan. Accordingly, pursuant to section 1126(a) of the Bankruptcy Code, the Holders of Claims in these Classes are the only Claimants entitled to vote.

Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of [section 1126], that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under

23

> subsection (e) of [section 1126], that have accepted or rejected the
> plan.

11 U.S.C. § 1126(c). As set forth in the Voting Declaration, the Plan has been overwhelmingly

accepted by Creditors holding in excess of two-thirds in amount and one-half in number of the

Allowed Claims voted in Classes 1, 2, 3 and 4. With respect to Class 2 , after modification of the

Plan, as described above, each Holder of a Claim in this Class constitutes a separate subclass

under the Plan. At this time, only one Class 2 claimant who voted to reject the Plan: Sotheby's

which asserts a secured claim in the amount of $1,126,971.50.

C. **The Debtor has proposed the Plan in good faith (Section 1129(a)(3)).**

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in

good faith and not by any means forbidden by law." The Plan complies with this requirement.

Although the term "good faith" is not defined in the Bankruptcy Code, the courts have

determined that "[f]or purposes of determining good faith under section 1129(a)(3) . . . the

important point of inquiry is the plan itself and whether such a plan will fairly achieve a result

consistent with the objectives of the Bankruptcy Code." *In re PWS Holding Corp.*, 228 F.3d at

242. Moreover, the requirement of good faith must be viewed in light of the totality of the

circumstances surrounding the proposal of a chapter 11 plan. *See In re Jasik*, 727 F.2d 1379,

1383 (5th Cir. 1984) (citation omitted); *In re Century Glove, Inc.*, 1993 WL 239489, at *4 (D.

Del. Feb. 10, 1993).

Here, the proposed Plan accomplishes a result consistent with the objectives and

purposes of the Bankruptcy Code. Specifically, the Plan enables Holders of Claims to realize the

highest possible recoveries on their Allowed Claims under the circumstances of this Chapter 11

Case.  Indeed, the Plan Proponents believes that the Plan provides Unsecured Creditors with the greatest distribution possible, and is in full accordance with the priority scheme of the Bankruptcy Code, as supplemented by the terms of the Plan.  If the Plan is not confirmed, the Plan Proponents do not believe that renegotiation of a different plan or liquidation under chapter 7 will result in any better recovery for any Class.  In fact, the recovery will deteriorate because (a) the Debtor does not have sufficient cash to continue in chapter 11 and (b) FRB would likely be entitled to all of the Debtor's assets because of its asserted liens and security interest. Moreover, the Plan is the result of extensive good faith, arms'length negotiations among the Debtor, the Committee, FRB and certain of the Debtor's major creditors.  The support of the Plan by each of these key constituencies with divergent interests reflects their acknowledgement that the Plan provides fundamental fairness to creditors.  Thus, the Debtor submits that the good faith requirement of section 1129(a)(3) of the Bankruptcy Code has been satisfied.

### D.      The Plan provides for Bankruptcy Court approval of certain administrative payments (Section 1129(a)(4)).

Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, by the debtor, or by a person issuing securities or acquiring property under the Plan be subject to approval of the court as reasonable.  Section 1129(a)(4) has been construed to require that all payments of professional fees that are made from estate assets be subject to full disclosure, review and approval by the Court as to their reasonableness.  *See, e.g., In re River Village Assocs.*, 161 B.R. 127, 141 (Bankr. E.D. Pa. 1993); *New York Life Ins. Co. v. Chase Manhattan Bank, N.A. (In re Texaco Inc.)*, 85 F.R. 934, 939 (Bankr. S.D.N.Y. 1988).

DOCS_NY:19729.2

All fees and expenses incurred by the Debtor's and the Committee's professionals remain subject to final review for reasonableness by the Court under section 330 of the Bankruptcy Code.

In addition, Article V.B.1 of the Plan provides that professionals retained with approval by order of the Court or requesting compensation in the Chapter 11 Case pursuant to sections 330 or 503(b) of the Bankruptcy Code shall be required to file an application for an allowance of final compensation and reimbursement of expenses incurred through the Effective Date. The payment of such Professional Fee Claims is subject to review and approval of the Court. Article X.N of the Plan also provides that the Court will retain jurisdiction after the Effective Date to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses incurred on or before the Effective Date.

The foregoing procedures for the Court's review and ultimate determination of the fees and expenses to be paid by the Debtor satisfies the objectives of section 1129(a)(4) of the Bankruptcy Code. *See In re Elsinore Shore Assocs.*, 91 B.R. 238, 268 (Bankr. D. N.J. 1988) (requirements of section 1129(a)(4) satisfied where plan provided for payment of only "allowed" administrative expenses); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988) ("Court approval of payments for services and expenses is governed by various Code provisions - *e.g.*, §§ 328, 329, 330, 331, and 503(b) - and need not be explicitly provided for in a Chapter 11 plan").

DOCS_NY:19729.2

### E.  The identity of the Liquidation Trustee has been disclosed (Section 1129(a)(5)).

Section 1129(a)(5)(A)(i) of the Bankruptcy Code provides that a court may confirm a plan only if the plan proponent discloses "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan."  Section 1129(a)(5)(ii) requires that the appointment to or continuance in such office of such party be "consistent with the interests of creditors and equity security holders and with public policy."  Similarly, section 1129(a)(5)(B) of the Bankruptcy Code requires that a plan disclose the identity of any "insider" to be employed or retained by the reorganized debtor and the "nature of any compensation" for such insider.

Pursuant to Section VIII.B.3 of the Disclosure Statement, the Plan Proponents have selected Alan M. Jacobs, or any validly selected successor, to be retained as of the Effective Date, as the Liquidation Trustee to oversee the wind down and dissolution of the SOG Liquidation Trust pursuant to the terms of the Plan.  Moreover, the Plan also provides, with respect to successors, that upon the removal of the Liquidation Trustee for cause, the Oversight Committee shall select a replacement Liquidation Trustee.

The Debtor submits that the selection of Mr. Jacobs by the Plan Proponents, and the collaborative effort required under the Plan with respect to the selection of any successor Liquidation Trustee (by the Oversight Committee), ensures that any successor Liquidation Trustee(s) chosen for the SOG Liquidation Trust will serve the interests of Creditors, and public policy.  Thus, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

**F.** **No governmental regulatory commission has jurisdiction over the Debtor (Section 1129(a)(6))**

Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that will have jurisdiction over the debtor after confirmation has approved any rate change provided for in the plan. 11 U.S.C. § 1129(a)(6). This provision is inapplicable in this case, since this is a liquidating Plan and even when the Debtor was an active company, no governmental regulatory commission had jurisdiction over the rates that it charged in the operation of its business.

**G.** **The Plan is in the best interests of creditors and interest holders (Section 1129(a)(7))**

Section 1129(a)(7) of the Bankruptcy Code provides that a court may confirm a plan only if the plan meets the "best interests of creditors" test (the "Best Interest Test"). The Best Interest Test requires that, with respect to each impaired class of claims or interests, each holder of a claim or interest of such class–

(i)   has accepted the plan; or

(ii)  will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. §§ 1129(a)(7)(A)(i)-(ii).

As section 1129(a)(7) of the Bankruptcy Code makes clear, the liquidation analysis applies only to non-accepting impaired claims or equity interests. If a class of claims or equity interests unanimously accepts the plan, the best interests test is deemed satisfied for all

members of that class.  Therefore, the best interest test is deemed satisfied with respect to Class 1, all but one of the Class 2 subclasses that accepted the Plan and Class 3.[5]

With respect to Class 4, all but four of the Class 4 Claimant voted to accept the Plan.  With respect to these four creditors and the Class 2 Claimant voted to reject the Plan, the Debtor believes that the Best Interest Test is satisfied because each of these Creditors would not receive a greater distribution a chapter 7 case than under the Plan.  This is because, under the Plan, Holders of Class 4 claims that did not vote to accept the Plan will receive distributions on account of such claims after satisfaction of the FRB Secured Claim, whereas in a chapter 7 case, such creditors would likely receive nothing because FRB's asserted liens would prevent any distribution to unsecured creditors.  Moreover, in a chapter 7 case, the recovery for the Holders of General Unsecured Claims would be eroded by the additional commissions, fees and expenses that would be incurred if this case was converted to chapter 7.

With respect to the subclass of Class 2 that voted to reject the Plan, and all other Creditors who voted against the Plan, the Best Interest Test is satisfied because each  rejecting Creditor will receive under the Plan in payment of its Allowed Claim an amount that is equal to or greater than the amount that such Creditor would receive under a hypothetical chapter 7 liquidation.  As set forth in the analysis provided in the Disclosure Statement, the Plan will provide each Creditor with as much or more than the amount that such Creditor would receive in a chapter 7 liquidation.  *See* Article X(D) of the Disclosure Statement.  In particular, the Holders of Allowed Other Secured Claims are paid in full or will receive the full value of their collateral

---

[5]  All but two of the Class 2(A) subclasses have now voted to accept the Plan, which means that twenty of twenty-two subclasses have accepted the Plan.

and, as to the Holders of Allowed Unsecured Claims, the liquidation analysis in the Disclosure Statement demonstrates that the Plan provides a greater recovery to the Holders of Allowed Unsecured Claims than such Holders would receive under a liquidation under chapter 7. This is because the Plan provides Creditors with the benefit of (a) the settlement with FRB and (b) receiving distributions now, or in the near future, without having to pay trustee commissions and/or incur other administrative fees and expenses that would otherwise be due and owing if this Chapter 11 Case was converted to a chapter 7 case.

Holders of Class 5 (Membership Interests) will receive no distributions under the Plan. Because the Debtor is insolvent, Holders of Class 5 Interests will receive "not less than the amount" they would receive in chapter 7.[6]

Accordingly, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

**H.      The Plan satisfies the "Cram down" Requirements (Section 1129(b)) for Dissenting Subclasses and non-voting Classes deemed to have rejected the Plan by operation of law.**

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan. *See* 11 U.S.C. § 1129(a)(8); *Idaho Dep't of Lands v. Arnold (In re Arnold)*, 806 F.2d 937, 940 (9th Cir. 1986). Pursuant to section 1126(c) of the Bankruptcy Code, a class of impaired claims accepts a plan if holders of at least two-thirds in dollar amount of the claims that actually vote in such class and more than one-half in number of the claims that actually vote in such class vote to accept the plan. A class that

---

[6] In a chapter 7 case, Bankruptcy Code section 726(a)(4) subordinates Claims of the type in Class 5 to the Claims of creditors who are claiming debts that are not fines, penalties, forfeitures or for multiple, exemplary or punitive damages. Thus, in a chapter 7 case, holders of claims would receive nothing.

is unimpaired under a plan, and each holder of a claim of such class, is conclusively presumed to have accepted the plan. *See* 11 U.S.C. § 1126(f); *see also* S. Rep. No. 989, 95th Cong. 2d Sess. 123 (1978) (section 1126(f) of the Bankruptcy Code "provides that no acceptances are required from any class whose claims or interests are unimpaired under the Plan or in the order confirming the Plan"); *In re Ruti Sweetwater*, 836 F.2d 1263, 1267 (10th Cir. 1988) ("For purposes of acceptance of a Plan, section 1126(f) provides that a class that is not impaired under the Plan is 'conclusively presumed' to have accepted the Plan"). On the other hand, a class is deemed to have rejected a plan if the plan provides that the claims or interests of that class do not receive or retain any property under the plan on account of such claims or interests. *See* 11 U.S.C. § 1126(g).

Classes 1 (FRB Secured Claim), 2 (Other Claims Secured), 3 (Other Priority Claims), and 4 (General Unsecured Claims), were entitled to vote on the Plan. As set forth in the Voting Declaration, and as discussed above, each of these Classes overwhelmingly accepted the Plan, with the limited exception that one subclass out of nine subclasses who voted in Class 2 voted against the Plan.[7]

Class 5 (Membership Interests) will receive no distributions and retain no property under the Plan, and are therefore conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

---

[7] Of course, this means that eight out of nine votes in Class 2 voted in favor of the Plan.

The Plan satisfies the "cram down" requirements of section 1129(b) of the

Bankruptcy Code with respect to the rejecting subclass in Class 2 and with respect to Class 5.

Specifically, section 1129(b) of the Bankruptcy Code provides:

> Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b).

Courts have interpreted the requirement that a plan of reorganization not

"discriminate unfairly" to mean that a dissenting class must be treated equally with respect to

other classes of the same rank and that no class receives more than it is legally entitled to receive

for its claims. *See In re Johns Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *rev'd*

*on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987); *In re 222 Liberty Assoc.*, 108 B.R. 971, 990-91

(Bankr. E.D. Pa. 1990). The Debtors submit that the Plan does not "discriminate unfairly" with

respect to any of the rejecting Classes. With respect to the rejecting Sotheby's subclass under

Class 2, its Allowed Claims will be satisfied either by (a) conveying any collateral to Sotheby's,

(b) payment from net proceeds received under a sale, (c) payment in cash, (d) a distribution or

treatment sufficient to leave Sotheby's right unimpaired or (e) given such other and less

favorable treatment that Sotheby's consents to. Such treatment will be accorded to all holders of

Allowed Class 2 Claims.

The requirement against unfair discrimination is also satisfied with respect to

Class 5. The Membership Interests in that Class are being treated under the Plan in accordance

with the absolute priority rule. The Debtor is insolvent, so holders of Membership Interests in Class 5 are "out of the money" regardless of what happens in this Chapter 11 Case. Consequently, the Plan does not single out the Holders of Class 5 Interests for unfair or disparate treatment, nor are any senior Classes being paid more than in full. Based upon the foregoing, the Holders of Interests in Class 5 are not entitled to any distribution under the Bankruptcy Code. Of note, there are no objections to confirmation from any member of this Class.

**I. The Plan provides for the statutorily mandated treatment of Administrative Claims, Priority Tax Claims and Priority Claims (Section 1129(a)(9)).**

Section 1129(a)(9) of the Bankruptcy Code requires that, except to the extent that the holder of a particular claim has agreed to a different treatment, a plan must provide for all holders of allowed administrative expense claims to be paid in full in cash on the effective date, and for all holders of allowed priority claims to be paid in full in cash either on the effective date of a plan or over time with interest, depending on the specific type of claim.

Article V of the Plan provides for payment of Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims and Allowed Priority Claims as and when such funds become available to the SOG Liquidation Trust. The Holders of such claims have either expressly consented to the treatment provided in the Plan or been deemed to have consented to such treatment by virtue of their failure to object to the Plan.

**J. At least one impaired class of claims has accepted the Plan, excluding the acceptances of insiders (Section 1129(a)(10)).**

Section 1129(a)(10) of the Bankruptcy Code provides that at least one impaired class of claims or equity interests must accept a plan, without including the acceptance of the plan by any insider. *See In re Arnold*, 806 F.2d at 940 n.2 (at least one class of impaired

claimants must accept plan); *Buffalo Savings Bank v. Marston Enterprises, Inc. (In re Marston Enterprises, Inc.)*, 13 B.R. 514, 518-19 (Bankr. E.D.N.Y. 1981) (insider claim ineligible to satisfy § 1129(a)(10)). All Classes of Claims are impaired under the Plan. As reflected in the Voting Declaration, the Plan was accepted by each impaired voting Class, with the exception of one subclass of Class 2, without including the acceptances of insiders.

K.    **The Plan is feasible (Section 1129(a)(11))**

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find that the plan is feasible as a condition precedent to confirmation. Specifically, the Bankruptcy Court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11). Generally the feasibility standard of section 1129 is inapplicable in a chapter 11 liquidation case. *See In re Eagle Bus. Mfg., Inc.*, 134 B.R. 584 (Bankr. S.D. Tex. 1991); *but see In re Calvanese*, 169 B.R. 104 (E.D. Pa. 1994) (Section 1129(a)(11) recognizes the possibility of liquidating plans and a planned liquidation does not create an exception to the feasibility requirement).

To the extent that a finding of feasibility is a requirement of confirmation of a plan, then a Plan Proponent must prove a chapter 11 plan's feasibility by the preponderance of evidence. *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) (rejecting "clear and convincing" as the applicable standard). The threshold of proof necessary to satisfy the requirement is relatively

low.  *In re Sea Garden Motel and Apartments*, 195 B.R. 294, 304 (Bankr. D. N.J. 1996)

(quotations omitted).  Under section 1129(a)(11) of the Bankruptcy Code, courts are merely

required to determine whether a plan "offers a reasonable probability of success."  *In re Landing*

*Assoc., Ltd.*, 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993) (no plan can offer absolute certainty);

*In re T-H New Orleans Ltd. Partnership*, 116 F.3d 790, 801 (5th Cir. 1997) ("only a reasonable

assurance of commercial viability is required").  The Tenth Circuit has held that:

> The purpose of Section 1129(a)(11) is to prevent confirmation of
> visionary schemes that promise creditors and equity security
> holders more under a proposed plan than the Debtor can possibly
> obtain after confirmation.  In determining whether a plan meets the
> requirements of 1129(a)(11)…the Bankruptcy Court has the
> obligation to scrutinize the plan carefully to determine whether it
> offers a reasonable prospect of success and is workable.

*Travelers Ins. Co. v. Pikes Peak Water Co., (In re Pikes Peak Water Co.)*, 779 F.2d 1456, 1460

(10th Cir. 1985); *Heartland Fed. Sav. & Loan*, 994 F.2d at 1163 ("Only a reasonable assurance

of commercial viability is required"); *The Mutual Life Ins. Co. of New York v. Patrician St.*

*Joseph Partners (In re Patrician St. Joseph Partners)*, 169 B.R. 669, 674 (Bankr. D. Ariz. 1994)

(plan meets feasibility standard if the plan offers a reasonable prospect of success and is

workable).

  The Plan is feasible because it provides for an orderly sale of the Debtor's assets

and the distribution of cash pursuant to the waterfall described in the Plan.  Since the Plan is a

"waterfall" plan the Liquidation Trust will simply sell assets, and after paying trust expenses,

will distribute cash under the waterfall.  Thus, the Plan is feasible, because it does not

contemplate ongoing business other than as necessary to liquidate assets and distribute proceeds

to creditors.

**L. The Plan provides for the payment of all fees under 28 U.S.C. § 1930 (Section 1129(a)(12)).**

Section 1129(a)(12) provides that a court may confirm a plan only if "[a]ll fees payable under § 1930 of title 28, as determined by the court at the hearing on confirmation of a plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan." The Plan satisfies this requirement, since it provides that all fees payable pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date of the Plan to the extent required by applicable law. *See* Article X.F of the Plan.

**M. The Plan complies with section 1129(a)(13) of the Bankruptcy Code**

Section 1129(a)(13) of the Bankruptcy Code sets forth certain provisions for continuation of retiree benefits post-confirmation. *See* 11 U.S.C. § 1129(a)(13). The Debtor did not maintain any retirement plans providing "retiree benefits" within the meaning of Bankruptcy Code section 1114. Therefore, section 1129(a)(13) is inapplicable to the Plan.

**N. No domestic support obligations (Section 1129(a)(14))**

The Debtor is not required by a judicial or administrative order, or by statute, to pay domestic support obligations. Accordingly, section 1129(d)(14) of the Bankruptcy Code is inapplicable to this Chapter 11 Case.

**O. The Debtor is not and individual (Section 1129(a)(15))**

The Debtor is not an individual, and accordingly, section 1129(a)(15) of the Bankruptcy Code is inapplicable to this Chapter 11 Case.

**P. No applicable nonbankruptcy law regarding transfers (Section 1129(a)(16))**

The Debtor is a moneyed, business or commercial corporation, and accordingly, section 1129(a)(16) of the Bankruptcy Code is inapplicable in this Chapter 11 Case.

36

**Q.** **The principal purpose of the Plan is not avoidance of taxes (Section 1129(d))**

No party that is a governmental unit has requested that the Court not confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933. The principal purpose of the Plan is not such avoidance. In fact taxing authorities receive a greater distribution under the Plan than they would likely realize without the Plan. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**R.** **The Court Should Overrule Objections to the Plan**

Kraken, Richard A. Lippe ("Lippe") and Sotheby's each objected to the Plan. The U.S. Trustee also sought clarification regarding the basis for the release provisions of the Plan. The issues raised in the U.S. Trustee Objection regarding the release provisions are addressed in Section II.A.3 (pp. 10-13) above.

Although styled as objections to the Plan, the Kraken and Lippe objection appear, in fact, to be objections to the terms of the RAI Settlement Agreement. Those objections are addressed below in Section III below.

Sotheby's asserts a Class 2 Other Secured Claim against the Debtor. Sotheby's raised four objections to the Plan: (a) the Plan may provide disparate treatment to each holder of a Class 2 Claim because the Liquidation Trustee may select one of five treatments for such Claimants; (b) the Plan sets no time limit for the Liquidation Trustee to object to Claims; (c) the Plan does not provide for payment of interest to holders of Allowed Secured Claims pursuant to section 506(b) of the Bankruptcy Code; and (d) the Plan does not preserve rights of Class 2 Claimants under section 1129(b) of the Bankruptcy Code.

The Plan Proponents believe that these issues were not limited by the Plan. Nevertheless, the Plan Proponents modified the Plan to address each of Sotheby's concerns by expressly providing that:

a.    each holder of a Class 2 Claim has been classified as a member of a subclass. Thus, such Claimants are not subject to potentially different treatment within the same class;

b.    the Liquidation Trustee shall have 120 days, subject to further order of the Court, to object to the Allowance of Class 2 Claims;

c.    the rights of Holders of Class 2 Claims under section 506(b) of the Bankruptcy Code are preserved;

d.    the rights of Holders of Class 2 Claims under section 1129(b)(2)(A) of the Bankruptcy Code shall not be limited by the terms of the Plan; and

e.    Valid liens of Class 2 Claimants shall not be stripped by operation of the Plan and shall attach to the proceeds of such collateral upon any sale thereof.

Thus, the Court should overrule all objections to confirmation of the Plan.

## III.    THE COURT SHOULD APPROVE THE RAI SETTLEMENT AGREEMENT

As of the commencement of this Chapter 11 Case, there were in excess of 4,000 works of art in the Debtor's possession, custody or control. The Chapter 11 Case was commenced in the midst of competing claims of ownership between and among the estate and various creditors and consignors. In other words, the Debtor was unable to determine if and to what extent parties claimed an interest in artwork held by the Debtor. Thus, the Debtor, the Committee and FRB negotiated the terms of the Protocol in order to (a) flush out claims of competing ownership of artwork and (b) resolve such claims.

38

The Debtor and the Committee, and FRB have diligently worked to settle Art Claims asserted in this case. *See* Disclosure Statement at Section VII.B.7. The Working Group has also agreed to return hundreds of pieces of art in which the Debtor has no interest. *See Order Authorizing Release of Artwork Pursuant to Protocol for the Assertion and Resolution of Claims of Ownership to Artwork in the Possession, Custody or Control of the Debtor* [Docket No. 549]; *Second Order Authorizing Release Of Artwork Pursuant To Protocol For The Assertion And Resolution Of Claims Of Ownership To Artwork In The Possession, Custody Or Control Of The Debtor* [Docket No. 726]; and *Notice of Presentment of Proposed Third Order Authorizing the Release of Artwork Pursuant to Protocol for the Assertion and Resolution of Claims of Ownership to Artwork in the Possession, Custody or Control of the Debtor* [Docket No. 727].

The RAI Settlement Agreement resolves the largest Art Claim and general unsecured claim filed in this case. Among other things, the RAI Settlement Agreement provides that (a) the Debtor will abandon its interest, if any, in Bucket 1 Art and transfer possession of Bucket 1 Art to RAI and (b) the Debtor and RAI will share in the **estate's portion** of Buckets 2 and 3 Art and Consigned Renaissance Art.

Tellingly, only four objections have been filed to the Settlement Agreement. The objecting parties collectively assert claims to approximately 30 works of art out of the approximately 4,000 originally held by the Debtor.

A. **Only Four Parties Filed Objections to the RAI Settlement Agreement**

Sotheby's, Stanley Moss & Co., Inc. ("Moss"), Kraken and Lippe each filed an objection to the RAI Settlement Agreement. The objecting parties have asserted claims against works of art that are Bucket 1 Art, Buckets 2 and 3 Art and Consigned Renaissance Art (each

39

term as defined in the RAI Settlement Agreement).  Significantly, the objections focus on treatment of art subject to the objecting parties' claims, and do not object to the fairness of the overall economic terms of the settlement.

Each of the objecting parties (except Sotheby's, which was excused from doing so pursuant to, and to the extent of, the Court's order approving the Protocol) filed an Art Claim pursuant to the Protocol for Assertion and Resolution of Artwork in the Possession, Custody or Control of the Debtor.  Briefly, the objecting parties' claims are as follows:

- Kraken's Art Claim is to a painting by Botticelli, which Kraken consigned to the Debtor prior to the Petition Date.  The Botticelli is categorized as Consigned Renaissance Art under the RAI Settlement Agreement.  Kraken did not perfect its interest in the Botticelli and thus the estate asserts that it is an asset of the estate. The parties will have to adjudicate their dispute pursuant to the Protocol.  Kraken objects to (a) the Debtor and RAI sharing the proceeds of the Botticelli if and to the extent it is an estate asset and (b) RAI participating in settlement negotiations for the Botticelli.

- Lippe's Art Claim is to various works of art that fall into Bucket 1 Art and Buckets 2 and 3 Art.  To date, Lippe has not been able to identify all works that may be subject to his Art Claim.  Lippe objects to the transfer of Bucket 1 Art to RAI and seeks clarification regarding the terms of the settlement.

- Moss' Art Claim is to three works, one of which is Bucket 1 Art and two of which are Bucket 2 and 3 Art.  Moss objects to the transfer of Bucket 1 Art to RAI and seeks clarification regarding the terms of the settlement.

- Sotheby's Art Claim is to one piece of Bucket 1 Art and various pieces of Buckets 2 and 3 Art.  Sotheby's claim is based on an alleged security interest in certain works of art as well as an alleged ownership interest in other works of art.  Most, if not all, of the works of art subject to Sotheby's claim are in Sotheby's possession.  Sotheby's objects to the transfer of Bucket 1 Art to RAI and seeks clarification regarding the terms of the settlement.

The objecting parties collectively, make the following arguments against approval of the RAI Settlement Agreement:

<table>
<tr><td>(a)</td><td>the Court cannot authorize the Debtor to abandon Bucket 1 Art subject to third party claims to RAI's possession or transfer such artwork to RAI (Moss Obj. at ¶¶ 32-37; Sotheby's Obj. at ¶¶5-6; Lippe Obj.);</td></tr>
<tr><td>(b)</td><td>the Court does not have jurisdiction over property once it has been abandoned by the Debtor (Moss Obj. at ¶¶38-40);</td></tr>
<tr><td>(c)</td><td>the Court should clarify that the RAI Settlement Agreement does not affect third party claimants' rights regarding Bucket 1 Art (Moss Obj. at ¶¶ 42-44; Lippe Obj.);</td></tr>
<tr><td>(d)</td><td>the Court should not grant RAI the right to participate in settlement discussions for Consigned Renaissance Art (Kraken Obj. at ¶20-23); and</td></tr>
<tr><td>(e)</td><td>the Court should clarify the terms under which RAI and the estate will share "Net Proceeds" of artwork (Moss Obj. at ¶¶45-48; Sotheby's Obj. at ¶ 7; Kraken Obj. at ¶¶8-12; Lippe Obj.).</td></tr>
</table>

These objections are without merit. To the extent the parties seek clarification of the terms of the RAI Settlement Agreement, the Committee believes that the terms of the settlement do not need clarification. However, the Committee proposes that the order approving the settlement expressly provide that (a) the objecting parties' rights with respect to their alleged interests in Bucket 1 Art are preserved notwithstanding the transfer of the art to RAI and (b) the estate and RAI will only share in the Debtor's share of any proceeds of Buckets 2 and 3 Art and Consigned Renaissance Art.

**B.     Transfer of All Bucket 1 Art to RAI is Appropriate Under the Circumstances**

The Court should authorize the transfer of all Bucket 1 Art to RAI pursuant to the RAI Settlement Agreement.

First, under the RAI Settlement Agreement, third parties' claims are preserved. Thus, the RAI Settlement Agreement does not limit third parties' claims to any Bucket 1 Art, even though the Debtor will transfer Bucket 1 Art to RAI.

Second, the Debtor does not have an interest in Bucket 1 Art.  The Debtor is abandoning its interest, if any, in Bucket 1 Art.  Because the Debtor sold all such art to RAI prior to the Petition Date for fair consideration, such abandonment is reasonable.  The objecting parties may object to the effectiveness of that sale with respect to a handful of pieces.  Those objections will properly be before another court of competent jurisdiction.  However, leaving such artwork in the Debtor's possession would be burdensome to the estate because the Debtor would be forced to continue to incur costs for storage and insurance of such pieces.  For all intents and purposes, the Debtor does not exist.  The Debtor closed and vacated its Gallery.  The Debtor has no employees, other than a CRO who will be discharged on confirmation.  Moreover, the Debtor and its principal are under indictment.  The Debtor, under the Plan, will liquidate its assets and will no longer continue in business.  Thus, the Debtor and its creditors should not continue to hold artwork in which the Debtor has no interest.

Lippe and Moss argue that the Debtor cannot transfer Bucket 1 Art because a state court order (attached as Exhibit B to the Moss Obj.) purportedly precludes the transfer of art subject to competing claims.  The state court order was entered before commencement of the Chapter 11 Case, and, among other things, provides that (a) the Gallery's locks should be changed and the keys maintained by the Debtor's counsel; (b) parties seeking to enter the Gallery must apply to the state court for authorization; (c) parties seeking to enter the Gallery must provide reasonable notice to counsel for RAI, Roy Lennox and the Debtor; (d) a forensic expert must be retained to identify and catalogue certain of the Debtor's artwork; (e) the Debtor shall submit an opinion by an art expert addressing whether the Gallery is a safe place to store artwork.  Clearly the terms of the state court order have been surpassed by the chapter 11 case.

42

The purpose of the state court order appears to be designed in large part to prevent artwork from leaving the Gallery without providing notice to all parties in interest. Here, the RAI Settlement Agreement provides notice to all parties that Bucket 1 Art will be transferred to the RAI and that (a) all competing claimants rights and claims are preserved and (b) that a court of competent jurisdiction shall adjudicate any disputes regarding ownership of Bucket 1 Art. Moreover, interpretation of the state court order and its applicability to Bucket 1 Art should be left to the State Court.

Moss further argues that the Debtor cannot transfer Bucket 1 Art to RAI because the Debtor is abandoning Bucket 1 Art, and the Debtor cannot abandon property to a particular party. However, the Court should not simply view the abandonment in a vacuum. Here, abandonment to RAI is appropriate because (a) the Debtor clearly transferred ownership of the artwork to RAI prior to the Petition Date and (b) the Debtor -- and its creditors -- should not be saddled with the costs of storing and insuring such art while complex ownership claims are adjudicated by a different court.

Finally, the transfer of all Bucket 1 Art to RAI is an integral part of the RAI Settlement Agreement, and thus – when read in the context of the settlement as a whole – is fair and reasonable under the circumstances.

### C. The Settlement May Provide that RAI Can Share in the Proceeds of Consigned Renaissance Art and Participate in Settlement Negotiations.

Kraken argues that the RAI Settlement Agreement (a) impermissibly permits RAI to share in the proceeds of Consigned Renaissance Art and (b) impermissibly permits RAI to participate in settlement discussions regarding Consigned Renaissance Art.

Kraken submitted an Art Claim for the Botticelli. The Debtor and the Committee assert that the Botticelli is an asset of the Bankruptcy Estate because, among other reasons, it was a work of art consigned to the Debtor prior to the Petition Date for which Kraken, as the consignor, did not file a UCC-1 Financing Statement.

Under section 9-319(a) of New York's Uniform Commercial Code, while consigned artwork is in the hands of the consignee, "the consignee is deemed to have rights and title to the goods identical to those the consignor had or had power to transfer." Section 9-319(b) of the UCC provides an exception for a consignor that perfects its security interest in the consigned goods. In other words, if a party consigned artwork without perfecting its security interest, then a debtor's creditors may attach the artwork consigned to the debtor. In a bankruptcy case, the debtor in possession, as a hypothetical lien creditor under section 544 of the Bankruptcy Code, has rights to consigned property that are superior to an unperfected consignee's interest in such property. *See, e.g., In re Valley Media, Inc.,* 279 B.R. 105, 132 (Bankr. D. Del. 2002) (citing *In re BRI Corp.,* 88 B.R. 71, 73-74 (Bankr. E.D. Pa.1988)).

Kraken consigned the Botticelli to the Debtor prior to the Petition Date, but did not perfect its interest. Therefore, the Debtor as a hypothetical lien creditor has superior rights to the Botticelli. Kraken asserts various legal and factual defenses to the Debtor's and the Committee's assertions, and that matter will be submitted to the mediator under the Protocol shortly after confirmation of the Plan.

RAI submitted an Art Claim for, among other things, the Botticelli. *See Supplement to Art Claim of Renaissance Art Investors LLC, Exhibit A* [Docket No. 485]. RAI asserts that, under the terms of its agreement(s) with the Debtor, RAI had an interest in all

44

Renaissance Art in the Debtor's possession, custody or control, as well as the right to a distribution from the Debtor's share of proceeds from the sale of Consigned Renaissance Art. Kraken argues that RAI has no ownership interest in the Botticelli, and thus has no right to share in the proceeds thereof. However, RAI asserted a right to proceeds that the Debtor received from any sale of the Botticelli, in the Debtor's capacity as consignee.

Under the RAI Settlement Agreement, RAI and the Committee both acknowledged that this claim was distinct from RAI's claims to Buckets 2 and 3 Art, and therefore adjusted RAI's economic rights accordingly. Under the Settlement Agreement, the Debtor and RAI are each entitled to 50% of the Net Proceeds of Buckets 2 and 3 Art, but RAI is only entitled to 10% of the first $8.5 of net proceeds that the estate may realize on account of the Botticelli, and 75% of net proceeds in excess of $8.5 million. Thus, RAI's claims and rights are recognized and accounted for under the RAI Settlement Agreement and a sharing of the proceeds of the Botticelli between the Debtor and the Committee is appropriate.

Under the RAI Settlement Agreement, RAI will have the responsibility of addressing the claims asserted by the objecting parties to any artwork that is Bucket 1 Art. The Debtor's estate, or the SOG Liquidation Trust, as the case may be will have the responsibility to address claims asserted by the objecting parties to Buckets 2 and 3 Art can Consigned Renaissance Art, and RAI will have the right to participate in settlement discussions for such artwork. RAI filed an Art Claim for the Botticelli and thus has asserted an interest in the work or the proceeds thereof. As such, RAI already has standing to appear at settlement discussions and litigation over the Botticelli. Moreover, RAI will have an economic interest in any settlement

45

regarding the Botticelli, and thus it is reasonable for RAI to have a seat at the table during settlement discussions.

As such, under the circumstances of this case, the terms of the RAI Settlement Agreement as they relate to the proceeds of the Botticelli are fair and reasonable.

**D.** **The Debtor and RAI Will Only Share in the Estate's Interest in Buckets 2 and 3 Art and Consigned Renaissance Art**

The terms of the RAI Settlement Agreement are clear: RAI and the Debtor will share in the Debtor's interest in Buckets 2 and 3 Art and Consigned Renaissance Art. In order to clarify that term of the settlement, the Committee proposes that the following paragraph be included in the Confirmation and Settlement Approval Order:

> ORDERED that the term Net Proceeds, as defined in paragraph 2 of the RAI Settlement Agreement, shall include only proceeds of the Debtor's interest in Buckets 2 and 3 Art and Consigned Renaissance Art, and shall not include proceeds of any other party in Buckets 2 and 3 Art and Consigned Renaissance Art.

Based on the foregoing, the Court should approve the RAI Settlement Agreement.

## IV.    CONCLUSION

Based on the foregoing, the Plan meets each and every requirement for

Confirmation provided by section 1129 of the Bankruptcy Code.  Accordingly, the Plan

Proponents request that the Court enter an order (i) confirming the Plan; (ii) authorizing the Plan

Proponents to take any and all actions necessary to implement the provisions of the Plan; and

(iii) granting such other and further relief as is just and proper under the circumstances.

In addition, based on the foregoing, the RAI Settlement should be approved

pursuant to Bankruptcy Rule 9019, and the Committee respectfully requests that the Court enter

an order (i) approving the RAI Settlement Agreement and (ii) granting such other and further

relief as is just and proper under the circumstances.

Dated: New York, New York
         January 13, 2010

                                          Respectfully submitted,


                                          PACHULSKI STANG ZIEHL & JONES LLP


                                          By:  *Ilan D. Scharf*
                                                Robert J. Feinstein (RF 2836)
                                                Ilan D. Scharf (IS 3469)
                                                780 Third Avenue, 36th Floor
                                                New York, New York 10017
                                                Telephone:   (212) 561-7700
                                                Facsimile:    (212) 561-7777

                                                Counsel for Official Committee
                                                of  Unsecured  Creditors  of  Salander-
                                                O'Reilly Galleries, LLC

47

48