UNITED STATES BANKRUPTCY COURT                    *FOR PUBLICATION*
SOUTHERN DISTRICT OF NEW YORK
POUGHKEEPSIE DIVISION

--------------------------------------------------X
                                                   Case No. 07-30005
In re Salander O'Reilly Galleries,                 Chapter 11

                    Debtor.

--------------------------------------------------X

## OPINION DENYING MOTION FOR RELIEF FROM STAY

Appearances:

Ilan Scharf
Pachulski Stang Ziehl & Jones, LLP
780 Third Ave., 36th Floor
New York, New York
*Attorneys for Alan M. Jacobs, Liquidation Trustee, SOG Liquidation Trust*

Petra von Ziegesar and David Faust
Faust Oppenheim, LLP
488 Madison Ave., 17th Floor
New York, New York
*Attorneys for Kraken Investment, Ltd.*

**CECELIA G. MORRIS**
**UNITED STATES BANKRUPTCY JUDGE**

Kraken Investment, Ltd. ("Kraken") moves for relief from the automatic stay, and for an order of this Court stating that Jersey (Channel Islands) law controls the determination of whether a work of art, "Madonna and Child, by Sandro Botticelli (the "Botticelli") is part of the Debtor's estate, and that such

determination shall be made in arbitration in Jersey (Channel Islands).[1] Kraken seeks to enforce an arbitration clause in a pre-petition consignment contract entered with Debtor's former principal, which states that all disputes between the parties shall be determined by arbitration in Jersey under the law of Jersey, and that the agreement shall be governed by Jersey law. Kraken's motion is denied. The Trust's rights were created through chapter 5 of the Bankruptcy Code, which governs creditors, the debtor and the estate, and were assigned to the Trust by Debtor's prepetition secured lender. The Court does not find that cause exists to lift the stay, where a party seeks to enforce an arbitration clause against an entity that asserts rights derived from the Bankruptcy Code and as assignee of a third-party creditor. The presumption of enforceability of arbitration clauses must yield to the policies of the Bankruptcy Code, where the matter to be arbitrated is substantively core. Kraken has not made a persuasive argument that the arbitration and choice of law clause is valid in light of N.Y. U.C.C. § 105(2), which states that N.Y. U.C.C. §§ 9-301 through 9-307 specify the law governing perfection, the effect of non-perfection, and the priority of security interests, which are at the heart of determining whether the Trust may liquidate the work of art for the benefit of creditors.

---

[1] Hereafter, Jersey (Channel Islands) shall be referred to as "Jersey."

## BACKGROUND

Before the bankruptcy case was commenced, the Debtor was an art gallery in Manhattan. It obtained financing from the predecessor-in-interest of Bank of America, N.A. (the "Bank"), which allegedly was secured by a blanket lien on all the Debtor's assets.[2] At the time the bankruptcy case was commenced, the aggregate outstanding principal balance owed to the Bank was $25.317 million. *See* Final Order Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 105 and Fed. R. Bankr. P. 4001 and 6004 Granting Final Approval of Debtor in Possession Financing and Use of Cash Collateral, entered Jan. 3, 2008 ("Final DIP Order"); Disclosure Statement with respect to Third Amended Plan of Liquidation for Salander O'Reilly Galleries, LLC, p. 12.[3] A blanket lien on the artwork in favor of the Bank was referenced in the Final DIP Order, in which the Court approved debtor-in-possession financing.

On May 3, 2006, about a year and a half before the bankruptcy case was commenced, Kraken and the Debtor entered into an agreement characterized as a consignment agreement, which provided for the consignment of a painting called "Madonna and Child," by Botticelli. The sale price was set at $9.5 million. The

---

[2] Ownership of this loan changed repeatedly over the course of this case. During the greater part of the bankruptcy, the secured creditor was First Republic Bank, and the parties refer to First Republic Bank in their motion papers. The alleged lien on the Botticelli was assigned to the Trust by Bank of America.

[3] The Court takes judicial notice of the documents filed in this case, and cites to these documents for the uncontroverted factual history of the case.

agreement contained a clause that states:

> 11. Any disputes between the parties, including any disputes regarding this agreement, will be referred to arbitration. The sole arbitrator to be appointed will be a former Judge of the Royal Court of Jersey, Channel Islands, or another suitably qualified person. Arbitration will take place in Jersey, Channel Islands, with the only competent Court to be the Royal Court of Jersey, Channel Islands. Jersey, Channel Islands law will apply to this agreement, including the Arbitration (Jersey) Law 1998.

(the "Jersey Law Clause"). According to the Trust, the consignment agreement expired in June 2007.

Before the bankruptcy was commenced, a creditor, Lennox, obtained a state-court injunction barring the transfer of any artwork. Six days before the bankruptcy was filed, Kraken commenced its own lawsuit in the New York Supreme Court to recover the Botticelli; the lawsuit was stayed by the bankruptcy filing.

### *Procedural history of the bankruptcy case*

On November 1, 2007 (the "Petition Date"), three creditors of the Debtor commenced an involuntary case against the Debtor under chapter 7 the Bankruptcy Code. On November 9, 2007, the Debtor's involuntary case was converted to a voluntary case under chapter 11 of the Bankruptcy Code. After conversion of the case, the Debtor's business was managed by a chief restructuring officer appointed by the Court.

On November 20, 2007, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee"). By stipulation entered

February 4, 2008, the Debtor and the Committee agreed that the Debtor would assign certain responsibilities with respect to the investigation and prosecution of certain estate claims to the Committee (the "Stipulation"). Pursuant to the Stipulation, the Committee was authorized to prosecute certain claims on behalf of the Debtor's estate, including any claims pursuant to sections 544 through 552 of the Bankruptcy Code, and section 541 of the Bankruptcy Code.

By order entered March 11, 2008, the Court approved the Art Claims Protocol, a procedure designed to streamline the resolution of competing claims to the artwork (the "Protocol"). Pursuant to the Protocol, art claimants would file claims of ownership with respect to the artwork, and engage in mediation regarding disputed claims. *Disclosure Statement*, pp. 21-22.

Kraken filed an art claim pursuant to the Art Protocol on or about May 28, 2008, asserting claims to the Botticelli, among other artwork, and engaged in an unsuccessful mediation regarding the Botticelli pursuant to the Art Protocol. Kraken filed a proof of claim on July 17, 2008, for $9.5 million for "consigned artwork," and annexed a copy of the art claim, apparently as supporting documents.

On January 20, 2010, the Court entered its Order (A) confirming the third amended joint plan of liquidation proposed by Debtor, the Committee and the Bank (the "Plan") and (B) approving a settlement between Debtor, the Committee,

and four other entities (the "Settlement") (together, the "Confirmation Order"). Pursuant to the confirmed plan, a liquidation trust was established (the "Trust"), and the rights and powers under sections 544 through 552 of the Bankruptcy Code passed from the Committee to the Trust. *Disclosure Statement*, p. 47. The Bank assigned its interest in the Botticelli to the Trust. *Objection of the Liquidation Trustee to Motion of Kraken Investments Limited for Relief from the Automatic Stay*, Exhibit D, Docket No. 951.

### *The lift-stay motion*

On January 19, 2011, Kraken filed a motion for relief from stay, with supporting affidavits and memorandum of law. Case No. 07-30005, Docket Nos. 937-943. The Trust filed an objection to the motion on February 22, 2011. Docket Nos. 951-952. A hearing was held to consider the motion on March 1, 2011. The Court held a subsequent hearing in May 9, 2011, and assigned additional briefing. Kraken and the Trust filed the supplemental briefs and corresponding replies.

Kraken seeks relief from the stay, to enforce the Jersey Law Clause and pursue arbitration against the Liquidation Trustee of the Trust in Jersey. Kraken's request in pursuing arbitration is to determine whether the Botticelli was property of the Debtor prior to the commencement of the bankruptcy proceeding and whether, the Botticelli is now part of the bankruptcy estate. Kraken asks that Jersey law control that determination.

Kraken argues that the question is whether the Botticelli is part of the bankruptcy estate, and such question turns on state law — the Uniform Commercial Code. The Uniform Commercial Code controls two important questions: whether the arbitration clause should be enforced, and the effect of Kraken's failure to file a financing statement. At oral argument, counsel to Kraken framed the issues as: 1. whether the Botticelli was property of the Debtor before the bankruptcy case was commenced; and 2. where the first question should be decided. According to Kraken, N.Y. U.C.C. 1-105(1) provides that choice of law provisions must be respected where the choice is of a jurisdiction that bears a "reasonable relation" to the transaction. Kraken argues that the Court should enforce the provision in the consignment agreement that sets Jersey law as the law that should control whether the Botticelli is part of the estate. Kraken does not address the effect of N.Y. U.C.C. § 1-105(2), other than as an exception allegedly not relevant to the matter at bar. As discussed herein, N.Y. U.C.C. § 1-105(2) appears on its face to suggest that the Uniform Commercial Code pre-empts the Jersey Law Clause with respect to the effect of non-perfection of a security interest, and is highly relevant to deciding whether Kraken may be granted relief from the stay.

The Trust opposes the lift-stay motion, pointing out that a U.C.C. financing statement was not filed with respect to the artwork and arguing that Kraken must

prove that the consignment was a "true consignment." The Trust alleges the consignment agreement expired before the chapter 11 bankruptcy was commenced, and Kraken consented to a continued consignment. As proof that the Debtor continued in possession of the Botticelli after the consignment agreement expired, counsel to the Trust proffers an excerpt of a catalogue featuring the Botticelli in an exhibition scheduled to run from October 17, 2007, to February 1, 2008. The Trust alleges that the Bank's lien survived Kraken's attempt to terminate the consignment agreement before the commencement of the bankruptcy, resulting in a valid transfer of the Bank's interest to the Trust.

The Trust argues that the proceeding is a core proceeding: 1. Kraken filed a proof of claim, the allowance of which will require a conclusive determination of the Trust's interest pursuant to 11 U.S.C. § 544 and 28 U.S.C. § 157(b)(2)(B); 2. the Trust acquired the Bank's lien, and the determination of the validity, extent or priority of the Bank and Kraken's competing liens is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K); and 3. the determination of the Trust's interest in the Botticelli affects the liquidation of the assets of the Debtor's estate and the debtor-creditor relationship between the Debtor and Kraken, rendering the matter core pursuant to 28 U.S.C. § 157(b)(2)(O).

The Trust argues that its rights are superior to Kraken's under two theories: 1. as successor-in-interest to the Debtor as debtor-in-possession, it holds the rights

of a hypothetical judicial lien creditor under Bankruptcy Code §§ 544(a) and

1107(a), which may have priority over creditors with unperfected security

interests; and 2. it has a superior right as the assignee of the Bank. The Trust

alleges that its rights arise by operation of Bankruptcy Code § 544 or assignment

by the Bank under the U.C.C.; it is not a party to the Consignment Agreement and

is not bound by the choice of law clause. According to the Trust, its rights are not

actually derivative of the Debtor, and the Trust does not stand in the shoes of the

Debtor with respect to this matter.

The Trust argues that the Court acknowledged the Bank's perfected liens on

all the Debtor's goods in an order entered January 3, 2008. *See Final Order*

*Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 105 and Fed. R. Bankr. P. 4001*

*and 6004 Granting Final Approval of Debtor In Possession Financing and Use of*

*Cash Collateral* Docket No. 22 . The Bank's lien on the Botticelli was transferred

to the Trust pursuant to the confirmed chapter 11 plan, which was approved by

order entered January 20, 2010. *See Objection of the Liquidation Trustee to Motion*

*of Kraken Investments Limited for Relief from the Automatic Stay*, Exhibit D,

Docket No. 951 ("Pursuant to Article IV.D of the Plan or any other applicable

authority, the Bank hereby assigns, transfers and conveys outright and

unconditionally to the Liquidation Trustee on behalf of the Trust, and their

respective successors and assigns, all of the Bank's rights, title and interest in or to

the Painting, including without limitation the Bank's lien against or in the Painting

…").

The Trust argues that a determination that a proceeding is non-core shall not

be made solely on the basis that its resolution may be affected by state law, as

stated in 28 U.S.C. § 157(b)(3).[4]

---

[4] In its opposition to Kraken's motion for relief from the stay, the Trust offers a substantive argument in support of the priority of its liens on the Botticelli. The Trust argues that the transactions between Kraken and the Debtor fit the definition of a consignment pursuant to § 9-102(a)(20) of the Uniform Commercial Code. Allegedly, Kraken failed to perfect its interest by failing to file a financing statement, allegedly required by N.Y. U.C.C. § 9-102(a)(20). The Trust argues that, pursuant to N.Y. U.C.C. § 9-319 and Bankruptcy Code § 544, it may attach the consigned goods (the Botticelli) as if the consignee (the Debtor) actually had title to the goods. The Trust argues that since Kraken did not file a U.C.C. financing statement, it will have to prove that a majority of the Debtor's creditors were aware that the Debtor was substantially engaged in selling the goods of others, a burden that allegedly is impossibly for Kraken to meet. The Court notes the statutes cited by the Trust, and does not reach the merits of whether they may support the Trust having a superior interest in the Botticelli — the question before the Court is whether Kraken has demonstrated cause for relief from the stay so that it may pursue arbitration pursuant to the Jersey Law Clause, not whether the Trust has a superior interest in the Botticelli.

N.Y. U.C.C. § 9-102(a)(20) states:

[A "consignment" is defined as] a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:

(A) the merchant:

(i) deals in goods of that kind under a name other than the name of the person making delivery;

(ii) is not an auctioneer; and

(iii) is not generally known by its creditors to be substantially engaged in selling the goods of others;

(B) with respect to each delivery, the aggregate value of the goods is $1,000 or more at the time of delivery;

(C) the goods are not consumer goods immediately before delivery; and

(D) the transaction does not create a security interest that secures an obligation.

# STATEMENT OF JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a) and (e), 28 U.S.C. § 157(a), and the Standing Order of Reference signed by Acting Chief Judge Robert J. Ward dated July 10, 1984 (the "Order of Reference"). Determination of the lift-stay motion is a core proceeding. 28 U.S.C. § 157(b)(2)(G). As discussed herein, the relief Kraken seeks in its motion directly implicates the allowance of its claims against the estate and the determination of the validity of liens, which are core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(B) and (K), respectively.

By virtue of the Order of Reference, the bankruptcy court has exclusive jurisdiction of all bankruptcy cases, as well as original but not exclusive jurisdiction of all civil proceedings *arising under* the Bankruptcy Code, *or arising in* or *related to* cases under the Bankruptcy Code. *See* 28 U.S.C. §§ 157(a) and (b), and 1334(a) and (b). The Court has exclusive jurisdiction over all property of the

---

N.Y. U.C.C. § 9-319 states:

> a. Consignee has consignor's rights. Except as otherwise provided in subsection (b), for purposes of determining the rights of creditors of, and purchasers for value of goods from, a consignee, while the goods are in the possession of the consignee, the consignee is deemed to have rights and title to the goods identical to those the consignor had or had power to transfer.

> b. Applicability of other law. For purposes of determining the rights of a creditor of a consignee, law other than this article determines the rights and title of a consignee while goods are in the consignee's possession if, under this part, a perfected security interest held by the consignor would have priority over the rights of the creditor.

debtor as of the commencement of the case, as well as property of the estate, regardless of where the property is located. *See* 28 U.S.C. § 1334(e).

"Matters that '*arise under*' the Bankruptcy Code are those that come before the court by virtue of a provision of the Bankruptcy Code." Alan N. Resnick, *The Enforceability of Arbitration Clauses in Bankruptcy*, 15 Am. Bankr. Inst. L. Rev. 183, 193 (2007) (emphasis added). "Matters that '*arise in*' a case under the Bankruptcy Code are those based on a right created by the Bankruptcy Code and that, by their nature, can only be brought in a case under the Bankruptcy Code." *Id.*

"Bankruptcy judges may *hear and determine* all cases under title 11 and all *core* proceedings *arising under* title 11, or *arising in* a case under title 11, referred [to the bankruptcy court by the district court]." 28 U.S.C. § 157(b)(1) (emphasis added). "Core" proceedings are those that directly relate to a bankruptcy court's central functions. If a proceeding is core, the bankruptcy judge may determine the matter. *See In re McLean Industries, Inc.*, 76 B.R. 328, 337-338 (Bankr. S.D.N.Y. 1987) (denying motion for relief from stay where creditor wished to seek relief in admiralty court; noting the validity of liens is a core matter within the jurisdiction of bankruptcy courts); *e.g.*, 28 U.S.C. §§ 157(b)(2)(B) (allowance of claims), (K) (determination of validity and priority of liens) and (O) (other proceedings affecting liquidation of assets).

"[M]atters that are only '*related to*' the bankruptcy do not have their roots in

the Bankruptcy Code, and would be brought in an alternative forum were the debtor not before the bankruptcy court." Resnick, *supra* at 193. A *related to* matter is one that could conceivably have any effect on the estate being administered in bankruptcy. *Id.* A *related to* matter is a "non-core" proceeding, and the bankruptcy judge may preside over the matter to the extent of submitting proposed findings of fact and conclusions of law to the district court. *Id.* at 194.

"The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11." 28 U.S.C. § 157(b)(3). *"A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law." Id.* (emphasis added).

A claim is a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. 11 U.S.C. § 101(5)(a). If proof of a claim is filed, the claim is deemed allowed, unless a party in interest objects. 11 U.S.C. § 502(a). As discussed herein, whether a proof of claim may be allowed is an important part of the analysis of whether the bankruptcy court has jurisdiction to decide a matter.

Kraken filed a proof of claim, and an art claim pursuant to the Art Protocol

specially adopted in this case. The Liquidating Trustee has expressed its intent to seek to avoid Kraken's interest as consignor in the Botticelli pursuant to 11 U.S.C. § 544(a), on account of Kraken's failure to file a financing statement, and to assert a superior interest as assignee of the Bank's lien. The matter that Kraken seeks to arbitrate in Jersey — whether the Botticelli was property of the debtor at the time the case was commenced — is an essential and inseparable element of an action under Bankruptcy Code § 544(a). Resolution of the § 544 matter will go to the heart of whether Kraken's claim will be allowed. Kraken's requested relief is inextricably bound up with the resolution of the art claim and proof of claim it filed in this case, and falls squarely within the jurisdiction of the bankruptcy court.

In *Stern v. Marshall*, 2011 WL 2472792 (June 23, 2011), the United States Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at *27. The thrust of *Stern* is that Congress' designation of all counterclaims as "core" cannot supersede the Constitution's designation of judicial power in Article III courts, whose judges are protected from improper influence of the other branches by life tenure and established salaries. In *Stern*, the Court considered a compulsory counterclaim in which the debtor asserted a claim of tortious interference with a gift and requested punitive damages. The creditor had filed a claim for defamation, and the

bankruptcy court would have had to make determinations regarding whether debtor

could prevail on the counterclaim and demand for punitive damages —

determinations that are beyond what would have been required to determine

whether to allow the claim for defamation.[5] *See id.* at *23. "There thus was never

reason to believe that the process of ruling on Pierce's proof of claim would

necessarily result in the resolution of Vickie's counterclaim." *Id.*

      *Stern* is replete with language emphasizing that the ruling should be limited

to the unique circumstances of that case, and the ruling does not remove from the

bankruptcy court its jurisdiction over matters directly related to the estate that can

be finally decided in connection with restructuring debtor and creditor relations:

> [T]he debtors' claims in the cases on which [Vickie Marshall] relies
> were themselves federal claims under bankruptcy law, *which would be
> completely resolved in the bankruptcy process of allowing or
> disallowing claims*. Here Vickie's claim is a state law action
> independent of the federal bankruptcy law and not necessarily
> resolvable by a ruling on the creditor's proof of claim in bankruptcy.

*Id.* at *16 (emphasis added); *e.g.*, at *20 ("The 'experts' in the federal system at

resolving common law counterclaims *such as Vickie's* are the Article III courts")

(emphasis added); *id.* at *21 ("Given the extent to which this case is so markedly

distinct from the agency cases discussing the public rights exception in the context

of [a substantive regulatory scheme], however, we do not in this opinion express

---

[5] It appears that the creditor filed a proof of claim for defamation, and an adversary proceeding to
except the debt from discharge. It appears that the debtor filed the counterclaim in response to
the complaint in the adversary proceeding.

any view on how the doctrine might apply in that different context"); *id.* at *22 ("There was no question [in *Katchen*] that the bankruptcy referee could decide whether there had been a voidable preference in determining whether and to what extent to allow the creditor's claim"); *id.* at *22 (a preferential transfer claim can be heard in bankruptcy when the allegedly favored creditor has filed a claim, because *then* 'the ensuing preference action by the trustee become[s] integral to the restructuring of the debtor-creditor relationship) (discussing *Langenkamp*); *id.* at *23 (citing brief for the United States as *amicus curiae*) ("[In *Stern*,] the question presented concerns authority of a bankruptcy court to enter final judgment on a compulsory counterclaim 'when adjudication of the counterclaim requires resolution of issues that are not implicated by the claim against the estate'"); *id.* at *24 ("Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case; *the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process*") (emphasis added); *id.* at *26 ("We do not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree with the United States that the question presented here is a 'narrow' one"); *id.* at *27 ("We conclude today that Congress, *in one isolated respect*, exceeded [the limitations of Article III] in the Bankruptcy Act of 1984").

In finding that the bankruptcy court could not constitutionally determine the state-law counterclaim, the *Stern* majority relied in part upon the plurality opinion in *N. Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) ("*Marathon*"). In that case, the debtor sued a company for purely state-law causes of action, which existed independent of the bankruptcy: breaches of contract and warranty, as well as for alleged misrepresentation, coercion and duress. *Id.* at 56. The only relationship these legal claims had to the bankruptcy was the potential that they would yield damages that would add value to the bankruptcy estate. The causes of action themselves were not at all derived from the Bankruptcy Code, and did not implicate a proof of claim. In a plurality opinion, Justice Brennan noted, "[T]he restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case." *Id.* at 71. Similarly, in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), the Court considered whether a defendant had a right to a jury trial in an action by a trustee to recover an allegedly fraudulent transfer, from a party that had not filed a proof of claim. *Id.* at 36. The Court held that such a person is entitled to a jury trial, notwithstanding Congress' designation of fraudulent conveyance actions as "core proceedings." *Id.*

Nowhere in *Marathon*, *Granfinanciera*, or *Stern* does the Supreme Court

rule that the bankruptcy court may not rule with respect to state law when determining a proof of claim in the bankruptcy, or when deciding a matter directly and conclusively related to the bankruptcy. As noted, *Stern* repeatedly emphasizes that it addresses only the constitutionality of the bankruptcy court making a final ruling on a state-law counterclaim that would not be finally resolved in the process of allowing or disallowing a proof of claim. The *Granfinanciera* Court interpreted previous cases as holding that the creditor's right to a jury trial turned on whether it submitted a claim against the estate. *Granfinanciera*, 492 U.S. at 59. The *Marathon* plurality emphasized the difference between restructuring of debtor-creditor relations and enforcement of a purely private right. *Marathon*, 458 U.S. at 71. The thread that binds these cases is the concept that when the jurisdiction of the bankruptcy court is at issue, the adjudication of a proof of claim — a request for payment from the estate — is of paramount concern.

"[The Congress shall have Power] To establish an uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4. Congress created the Bankruptcy Code that governs today with the Bankruptcy Reform Act of 1978. Pub. L. No. 95-598, 92 State. 2549 (1978). This law creates an estate, made up of all the debtor's interests in property at the time the case is commenced. 11 U.S.C. § 541(a). It creates a trustee, the representative of the estate. 11 U.S.C. §§ 321-323. Chapter 11

of the Bankruptcy Code creates the debtor-in-possession, a legal entity distinct from the debtor, which may exercise many of the powers of the trustee. 11 U.S.C. §§ 1101, 1107. The Bankruptcy Code establishes a system of priorities to determine the order in which creditors are paid. 11 U.S.C. § 507. The Bankruptcy Code creates an automatic stay, which prevents collection of most debts from property of the estate while the debtor reorganizes. 11 U.S.C. § 362. The Bankruptcy Code creates a discharge, which may prevent the collection of a debt forever. *See* 11 U.S.C. § 1141(d) (confirmation of a plan discharges the debtor from any debt that arose before the date of such confirmation).

The automatic stay, the estate and the discharge were created by Congress pursuant to its Article I power to enact a bankruptcy law. Together, they prevent the creditor from collecting the debt, no matter where it would like to sue — state court, district court, or bankruptcy court. As a result, in most circumstances, the right of the unsecured creditor to be paid from the bankruptcy estate depends upon the claims allowance process. In a chapter 11 case, an unsecured creditor should file a proof of claim if its claim is not scheduled by the debtor, or if it is scheduled as disputed, contingent, or unliquidated, or if the creditor disagrees with the debtor's characterization of the amount or status of the claim. Fed. R. Bankr. P. 3003(c); 9 Collier on Bankruptcy ¶ 3003.03[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). In the case of the chapter 11 debtor, the claims allowance

process may affect how the creditor influences the debtor's reorganization. *See* 11 U.S.C. § 1126(c) (class accepts plan if at least two-thirds in amount and more than one-half in number of the allowed, voting claims of the class accept the plan).

It is clear from the foregoing that the Bankruptcy Court is empowered to apply state law when so doing would finally resolve a claim. In the matter at bar, Kraken nominally seeks relief from the automatic stay, but the substance of its requested relief will have a dramatic effect on the resolution of its proof of claim. Kraken characterizes its motion as one for relief from the stay, seeking to enforce an arbitration clause and a choice of law clause in a pre-petition consignment agreement with the Debtor, which might constitute a private right if not for the bankruptcy filing. Kraken seeks this relief after filing two proofs of claim. If the Court were to grant Kraken relief from the stay, and allow arbitration to proceed in Jersey and the law of Jersey to apply, then Kraken's claim would be decided by an adjudicator other than the Bankruptcy Court. This may not be done — allowance of claims is indisputably the realm of the bankruptcy court. *Cf.* 28 U.S.C. § 1334(e)(1) (district court shall have exclusive jurisdiction of all the property, wherever located, of the debtor as of the commencement of a bankruptcy case, and of property of the estate).

In the matter at bar, upon the papers filed and authority cited by the parties with respect to this matter, there are two foreseeable outcomes with respect to the

art claim and proof of claim filed by Kraken: The Trust will avoid Kraken's interest as consignor pursuant to Bankruptcy Code § 544 or as assignee of the Bank and liquidate the Botticelli for the benefit of creditors, paying Kraken its dividend as a general unsecured creditor; or Kraken will recover the Botticelli and exit this case with its painting in hand. In either scenario, the Bankruptcy Court's ruling will finally determine Kraken's art claim and proof of claim. The present motion for relief from the stay, which implicates the adjudication of the proof of claim, is within the jurisdiction of this Court.

## DISCUSSION

In seeking relief from the automatic stay, Kraken prays for the following relief:

1.  that the stay be terminated;

2.  that the issue of whether the Botticelli was part of the estate of the debtor be determined under Jersey law, including the Arbitration (Jersey) Law 1998; by a retired judge of the Royal Court of Jersey; in an arbitration in Jersey; and

3.  that Kraken be permitted to commence arbitration under Jersey Law, including the Arbitration (Jersey) Law 1998, by a retired judge of the Royal Court of Jersey, in an arbitration against the Trustee.

11 U.S.C. § 362(a)(1) provides that a bankruptcy petition operates as a stay,

applicable to all entities, of the commencement or continuation, including the

issuance or employment of process, of a judicial, administrative, or other action or

proceeding against the debtor that was or could have been commenced before the

commencement of the bankruptcy case, or to recover a claim against the debtor

that arose before the commencement of the bankruptcy case. The stay prevents any

act to obtain possession of property of the estate or of property from the estate or to

exercise control over property of the estate. 11 U.S.C. § 362(a)(3). The stay

prevents any act to create, perfect or enforce any lien against property of the estate,

and any act to create, perfect or enforce against property of the debtor any lien to

the extent that the lien secures a claim that arose before the commencement of the

bankruptcy case. 11 U.S.C. § 362(a)(3).

> On request of a party in interest and after notice and a hearing, the
> court shall grant relief from the stay …
> (1) for cause, including the lack of adequate protection of an interest
> in property of such party in interest;
> (2) with respect to a stay of an act against property under subsection
> (a) of this section, if –
> (A) the debtor does not have equity in such property; and
> (B) such property is not necessary to an effective reorganization.

Bankruptcy Code § 362(d). When a bankruptcy court lifts the stay, it must find

cause. *See* 11 U.S.C. § 362(d); *In re Sonnax Indus.*, 907 F.2d 1280 (2d Cir. 1990)

(describing twelve factors for court to consider when deciding whether cause exists

to lift the stay, including lack of any connection with or interference with the

bankruptcy case; whether litigation in another forum would prejudice the interests

of other creditors; the interests of judicial economy and the expeditious and

economical resolution of litigation; and the impact of the stay on the parties and

the balance of harms). The movant must make an initial showing of cause for relief

from the stay. *See Sonnax*, 907 F.2d at 1285. "If the movant fails to make an initial

showing of cause, however, the court should deny relief without requiring any

showing from the debtor that it is entitled to continued protection." *Id.*

In seeking arbitration with the Trustee, it appears that Kraken seeks to

determine whether its interest in the Botticelli may be avoided by the Trustee. 11

U.S.C. § 544(a) states that the trustee has the avoidance powers of a hypothetical

judicial lien creditor.[6] In practice, this provision allows the trustee to avoid security

---

[6] 11 U.S.C. § 544 states:

> (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

>> (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

>> (2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

>> (3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

interests that are not perfected, rendering a high-priority secured creditor unsecured, and increasing the amount and value of property that can be distributed to creditors. "The trustee hypothetically extends credit to the debtor at the time of filing and, at that moment, obtains a judicial lien on *all* property in which the debtor has *any* interest that could be reached by a creditor. The advantage of this status derives not from the Bankruptcy Code but, rather, from the relevant state law defining creditor rights." *Musso v. Otashko*, 468 F.3d 99, 104 (2d Cir. 2006) (emphasis added).

Where goods are consigned to the debtor prepetition, they might be liquidated for the benefit of other creditors pursuant to the trustee's power under § 544(a). *See In re Tristar Automotive Group, Inc.*, 141 B.R. 41 (Bankr. S.D.N.Y. 1992) ("[A debtor-in-possession under § 1107] may assert the so-called strong-arm avoiding powers under 11 U.S.C. § 544(a) and set aside an unperfected security interest. … The fact that [the creditor] retained the title documents for the automobiles in question did not prevent the vehicles from becoming property of the estate within the meaning of 11 U.S.C. § 541."); *Valley Media*, 279 B.R. at 132 ("No knowledge of the pre-petition debtor regarding the consignments is imputed

---

(b) (1) Except as provided in paragraph (2) [concerning charitable contributions], the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502 (e) of this title. ***

to the Debtor in Possession. … [A] consignor will not prevail over a trustee exercising its powers pursuant to 11 U.S.C. § 544(a)."); *In re Morgansen's LTD*, 302 B.R. 784 (Bankr. E.D.N.Y. 2003) ("If a person takes goods to one who is considered a consignee (a 'buyer' for resale) and that buyer files for bankruptcy relief, the buyer/debtor's trustee will take the goods as property of the debtor's estate. Under section 544(a) of the Bankruptcy Code, these goods may be sold by debtor's trustee."). A chapter 11 debtor that remains in control of its bankruptcy case is called a debtor-in-possession, which may exercise a trustee's avoidance powers under § 544. *See* 11 U.S.C. §§ 1101, 1107.

In the matter at bar, the Court must determine whether to order the Trust to arbitration with Kraken pursuant to the Jersey Law Clause. The Court denies Kraken's motion. The bankruptcy court is the proper forum to determine whether the Botticelli is property of the estate, as one element of an action to avoid an unperfected security interest, which is a core proceeding. The Trust is not a party to the consignment agreement and is not bound by the Jersey Law Clause, because it asserts rights derived as a hypothetical judicial lien creditor, which stems from the Bankruptcy Code, and as assignee of the Bank. With respect to arbitration, a bankruptcy court may decline to enforce an arbitration clause when the matter to be determined is substantively core, and when the parties did not agree to arbitration.

Kraken has failed to establish cause for relief from the stay for the following reasons: 1. Arbitration of whether the Botticelli was property of the debtor or property of the estate would improperly sever an element of the § 544 action; and 2. Other creditors — the Trust as hypothetical judicial lien creditor and as assignee of the Bank —were not parties to the consignment agreement and thus are not bound by the Jersey Law Clause, either with respect to arbitration or the choice of Jersey law.

### *Bankruptcy courts may apply state law in resolving core matters.*

Kraken argues that the determination of whether the Botticelli is property of the estate is governed by issues of state law, rendering it a non-core proceeding. In support of this argument, Kraken cites *Interconnect Tel. Services, Inc.*, 59 B.R. 397 (S.D.N.Y. 1986), in which the district court granted the defendants' motion to withdraw the order of reference to the bankruptcy court. In *Interconnect*, the debtor commenced an adversary proceeding against former employees and the company they started, alleging causes of action under state law, independent of and antecedent of the bankruptcy case, including conspiring to defraud the debtor by creating a competitor, continuing to receive salaries and bonuses from the debtor, and misappropriating trade secrets. *Interconnect* is not binding on this court, and the Court declines to follow it for the proposition that the need for the bankruptcy court to apply state law renders a proceeding non-core. *Interconnect* is less

persuasive than *In re Valley Media*, discussed herein, and did not concern a trustee's avoidance powers under § 544. *Interconnect* concerned state-law claims independent of the bankruptcy, of the kind that the Supreme Court in *Marathon* found to elude the jurisdiction of the bankruptcy court. *Interconnect* did not concern a right the stems from the Bankruptcy Code, such as is at stake in the matter at bar. The Court declines to follow *Interconnect* for the proposition that it should not determine whether the Botticelli was property of the debtor or property of the estate.

The jurisdiction of the bankruptcy court depends on whether the issue to be decided arises in or under the Bankruptcy Code, such as whether a claim will be allowed, not whether state law is implicated. As previously noted, *Stern* did not eliminate the distinction between core and non-core matters; that case's holding only removed from the bankruptcy court's jurisdiction state-law counterclaims that cannot be fully resolved in the claims allowance process.

Kraken cites *Butner v. U.S.*, 440 U.S. 48 (1979) for the proposition that whether an asset is property of the estate is a matter of state law. In *Butner*, a case under the Bankruptcy Act of 1898, a junior mortgagee claimed a security interest in rents and profits. The Court considered whether a security interest in rents and profits should be determined under state law, which might not allow such an interest to arise automatically, or pursuant to a federal rule of equity that would

extend a security interest automatically. The Court concluded that state law should

control the question of whether the mortgagee had a security interest in the rents

and profits. The Court stated the rule:

> Property interests are created and defined by state law. Unless some
> federal interest requires a different result, there is no reason why such
> interests should be analyzed differently simply because an interested
> party is involved in a bankruptcy proceeding. Uniform treatment of
> property interests by both state and federal courts within a State serves
> to reduce uncertainty, to discourage forum shopping, and to prevent a
> party from receiving "a windfall merely by reason of the happenstance
> of bankruptcy."

*Id.* at 55. *See also In re Dreier LLP*, 429 B.R. 112, 125 (Bankr. S.D.N.Y. 2010)

(stating state law or other applicable non-bankruptcy law normally determines the

extent of the debtor's interest in property, absent an overriding federal policy;

bankruptcy law determines whether that interest is property of the estate).

*Butner* does not support Kraken's suggestion that the need to apply state law

— the New York Uniform Commercial Code — deprives the Court of jurisdiction.

*Butner* merely resolved a split among the circuits regarding whether state law

should govern security interests in rents and profits. As noted above, "[a]

determination that a proceeding is not a core proceeding shall not be made solely

on the basis that its resolution may be affected by State law." 28 U.S.C. §

157(b)(3). Allowance of claims and order of priorities of interests may be

fundamentally concerned with state law, and they are expressly denominated as

core proceedings, over which the Court has original jurisdiction. *See* 28 U.S.C. §

157(b)(2)(B), (K). In fact, in *In re Valley Media*, 279 B.R. 105, 125, 133 (Bankr. D. Del. 2002), a Delaware bankruptcy court construed past and present versions of the California Uniform Commercial Code, as well as the California law of corporations and federal patent law, to find that a debtor-in-possession could auction consigned goods and avoid the security interests of the consignors pursuant to Bankruptcy Code §§ 544(a) and 1107(a) ( "Under [U.C.C. §§ 9-102(a)(20) and 9-319(a)], the court is not concerned with the rights between the consignor and consignee, but rather solely with the rights of the third party creditors of the consignee").

### *Whether the Botticelli is property of the Debtor is an element of a lien avoidance action that is properly determined by the bankruptcy court.*

In support of its argument that a threshold determination must be made that the Botticelli was property of the Debtor, Kraken cites *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341 (2d Cir. 1992), in which the Second Circuit required the bankruptcy court to make such a determination in the context of a motion for turnover of assets alleged to be part of a foreign bankruptcy case. In *Koreag*, Mebco, a Swiss bank, was in bankruptcy liquidation pursuant to Swiss law; Koreag was appointed liquidator of Mebco. *Id.* at 345. Refco was a New York corporation that engaged in commodity and currency transactions around the world, and traded foreign currency with Mebco for U.S. dollars. *Id.* at 344. The parties had an agreement to wire the currencies and dollars to an account at the New York branch

of a Swiss Bank. *Id.* When Mebco went into liquidation, payments were not allowed to go out of that account. *Id.* at 345. Refco, unaware of the liquidation, continued wiring funds into the account. *Id.* Other funds in which Refco claimed an interest were ensnared in Mebco bank accounts. *Id.* Refco sued Mebco in district court to recover the funds, and Koreag petitioned the bankruptcy court for relief ancillary to a foreign proceeding pursuant to § 304.[7] *Id.* at 346.

The Second Circuit required the bankruptcy court to make a threshold determination of whether the property at issue was property of the estate of the entity in a foreign insolvency proceeding pursuant to § 304, before turnover of the funds could be ordered. *Id.* at 350. The appellate court noted that in a domestic bankruptcy, "although federal bankruptcy law determines the outer boundary of what may constitute property of the estate, state law determines the 'nature of a debtor's interest' in a given item." *Id.* at 349. The Second Circuit stated,

> Koreag, as liquidator, has asked a United States bankruptcy court to require the turnover of disputed assets to a foreign insolvency proceeding. The power of the court extends to 'property of [the] estate.' § 304(b)(2). Once a plausible challenge is presented as to whether particular property falls within the statutory definition, the bankruptcy court whose authority is invoked must determine the legitimacy of that invocation. The nature of this determination demands that it be made prior to the turnover of the property.

---

[7] 11 U.S.C. § 304 was repealed by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, and replaced by chapter 15 of the Bankruptcy Code, "Ancillary and Other Cross-Border Cases, 11 U.S.C. § 1501 *et seq.* Jurisprudence that was developed under 11 U.S.C. § 304 is preserved in the context of new § 1507.

*Id.* at 349.[8]

Read in its entirety, *Koreag* supports the bankruptcy court's retention of jurisdiction to decide whether the Botticelli is part of Debtor's estate when it determines the extent of the Trust's liens on the Botticelli. The courts in *Koreag* considered whether funds should be turned over to the Swiss liquidator, and the Second Circuit required the bankruptcy court to make a determination of whether the funds were property of the estate, as part of the turnover motion. *Id.* at 349, 350. Similarly, in the case at bar, the Court will have to determine whether the Debtor and the estate had an interest in the Botticelli, as part of determining the order of the priorities of the competing interests in the work of art, as well as

---

[8] Having found that the bankruptcy court was required to make a threshold determination of whether the funds were property of the estate, the *Koreag* court went on to consider whether New York or Swiss law should apply to that determination. The court stated the rule: "Federal courts sitting in diversity jurisdiction are required by *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 85 L. Ed. 1477 , 61 S. Ct. 1020 (1941), to apply the choice-of-law doctrines of the forum state. Many bankruptcy courts have read *Klaxon* as imposing the forum state's choice-of-law rules on bankruptcy adjudications where the underlying rights and obligations are defined by state law. In contrast, federal principles should guide our consideration of which jurisdiction's substantive law applies in cases arising out of federal law." *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 350 (2d Cir. 1992). The court found that the federal and New York choice-of-law standards were similar, requiring the court to apply the law of the jurisdiction having the greatest interest in the litigation. The court examined the interests of Switzerland and New York, and concluded that New York had a greater interest: "New York's concerns relate to the underlying property claims at stake, the corresponding contract rights of the parties, and the conduct giving rise to this particular property dispute. These relationships are ordinarily regulated under New York law, and New York is concerned with how this law operates as to a New York corporation with its principal place of business in New York. Switzerland's interests, on the other hand, focus less upon the ownership of particular property than upon the fair and organized administration of the debtor's estate, once defined." *Id.* at 351.

whether Kraken's claim may be allowed. *Koreag* does not support Kraken's argument that the question of whether the Botticelli is property of the estate can be severed from the larger question of the priority of the competing interests and decided in another forum. In fact, *Koreag* supports the opposite outcome — determination of whether the debtor had an interest in the work of art should be made by the bankruptcy court as a necessary element of an avoidance action created by the Bankruptcy Code. *Id.* at 350 ("[P]articular property must be determined to be 'of the estate' before it may be turned over pursuant to § 304(b)(2)."); *see also In re Halabi*, 184 F.3d 1335 (11th Cir. 1999) (affirming summary judgment for banks; trustee could not avoid assignment of properly perfected mortgage using § 544; debtor had no interest in that property and it was not property of the debtor); *In re Rector*, 14 B.R. 1008 (Bankr. D. Tenn. 1981) (denying summary judgment for trustee seeking to recover funds paid to debtor's lawyers under § 547(b); funds were paid by debtor's ex-husband and earmarked for payees by court order, and thus were not property of the debtor).

The Court holds that it has jurisdiction to determine the priority of interests in the Botticelli, a core matter pursuant to 28 U.S.C. §§ 157(b)(2)(B), (K) and (O). Bankruptcy courts may apply state law as part of the resolution of core proceedings. Determination of whether property was property of the debtor is more efficiently determined as one element of an action by the trustee to avoid an

unperfected security interest pursuant to 11 U.S.C. § 544(a). Judicial economy is better served by letting the bankruptcy court determine whether Debtor had a pre-petition interest in the Botticelli, as part of a single legal proceeding — the determination of whether the Trust may avoid any unperfected security interest of Kraken. Kraken's interest in the Botticelli will be determined irrespective of the stay, as part of the § 544(a) action and allowance of its claim, which are both core proceedings in the domain of the bankruptcy court.

### *The bankruptcy court may deny arbitration of a substantively core matter.*

"The Federal Arbitration Act ("FAA"), *see* 9 U.S.C. §§ 1 et seq., requires a federal court to enforce an arbitration agreement and stay litigation that contravenes it." *Kittay v. Landegger (In re Hagerstown Fiber Ltd. P'ship)*, 277 B.R. 181, 197 (Bankr. S.D.N.Y. 2002). "The FAA signifies a congressional declaration of a liberal federal policy favoring arbitration agreements, and any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* (citation omitted). "The policy favoring arbitration is so strong that an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement." *Id.* (citation omitted). "[By] its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration

agreement has been signed." *Genesco, Inc. v. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987).

Where a court is asked to stay proceedings pending arbitration in a case covered by the FAA, four determinations that must be made by the court: 1. whether the parties agreed to arbitrate; 2. the scope of that agreement; 3. if federal statutory claims are asserted; and 4. if some claims are arbitrable, whether to stay the balance of the proceedings pending arbitration. *Id.*; *see also Kittay*, 277 B.R. at 198. "In determining whether a particular claim falls within the scope of the parties' arbitration agreement, we focus on the factual allegations in the complaint rather than the legal causes of action asserted." *Genesco*, 815 F.2d at 846; *see also Maross Constr., Inc. v. Central New York Regional Transp. Authority*, 66 N.Y.2d 341, 345 (N.Y. 1985) ("Where the parties have expressly agreed to arbitrate their disputes, it remains to be determined whether the subject matter of the dispute is one that may be submitted to arbitration without violation of any law or public policy and, if so, whether it falls within the scope of the arbitration agreement.").

The FAA supports enforcement of arbitration clauses in contracts, while the Bankruptcy Code supports consolidation of reorganization and the attendant legal activities in a single forum, the bankruptcy court. "In the bankruptcy setting, congressional intent to permit a bankruptcy court to enjoin arbitration is sufficiently clear to override even international arbitration agreements." *In re*

*United States Lines*, 197 F.3d 631, 639 (2d Cir. 1999). The bankruptcy court's

equity powers under § 105(a), the broad effect of the automatic stay described in §

362(a), and the centralization of disputes and efficient reorganization are evidence

of a congressional mandate that requires the policy in favor of arbitration to yield

to the integrity of the reorganization process in the bankruptcy court in certain

circumstances. *See id.* at 639-41. A bankruptcy court turns to the distinction

between core and non-core proceedings when determining whether it should

exercise its discretion to enforce an arbitration clause, or require the matter to be

resolved in bankruptcy court.

> [Some bankruptcy] proceedings are core for substantive reasons; they
> are not based on the parties' pre-petition relationship, and involve
> rights created under the Bankruptcy Code. Such disputes will often
> fail the preliminary question of arbitrability because the parties did not
> agree to arbitrate them. Nevertheless, even if they are covered by the
> arbitration clause, it is more likely that arbitration will conflict with
> the policy of the Bankruptcy Code that created the right in dispute.

*Kittay v. Landegger (In re Hagerstown Fiber Ltd. P'ship)*, 277 B.R. 181, 202-03

(Bankr. S.D.N.Y. 2002) (denying arbitration of fraudulent conveyance litigation).

An early case discussing the apparent conflict between enforcement of

arbitration clauses and administration of bankruptcy cases in the single forum of

the bankruptcy court is *Hays and Co. v. Merrill Lynch*, 885 F.2d 1149 (3d Cir.

1989). In *Hays*, debtor entered an agreement with its brokerage firm that included a

requirement to arbitrate controversies arising out of the brokerage relationship. *Id.*

at 1150. Allegedly, Merrill Lynch invested the money in speculative securities contrary to debtor's directions, and commingled funds in personal and corporate accounts. *Id.* After the debtor filed for bankruptcy, the chapter 11 trustee commenced a lawsuit against Merrill Lynch, pleading claims under common law, as well as federal, Pennsylvania and New Jersey law, and under § 544 of the Bankruptcy Code. *Id.*  Merrill Lynch moved to compel arbitration, and the court denied the motion. *Id.* at 1151.

The Third Circuit held that the trustee-plaintiff stands in the shoes of the debtor and is bound by the arbitration clause to the same extent as would be the debtor, and that § 544(b) claims are not derivative of the debtor and are not arbitrable. *Id.* at 1153. The court included arbitration clauses as encompassed by the general rule that trustees are bound by pre-petition, non-executory contracts, noting the strong federal policy favoring arbitration and the Arbitration Act. *Id.* at 1153-54. The court found that the claims under § 544(b) were not arbitrable — the trustee's rights were created by the Bankruptcy Code, and were not derived from the debtor: "[T]here is no justification for binding creditors to an arbitration clause with respect to claims that are not derivative from one who was a party to it." *Id.* at 1155.[9]

---

[9] The appellate court in *Hays* concluded its discussion by deciding whether the bankruptcy court had discretion to decline to enforce the arbitration clause, and concluded that it did not. This portion of the *Hays* decision concerned a non-core proceeding.

In bankruptcy cases, the enforceability of arbitration clauses is governed by whether the matter to be arbitrated is substantively core. The Second Circuit discussed arbitration clauses in bankruptcy in *In re United States Lines, Inc.*, 197 F.3d 631 (2d Cir. 1999), in which a reorganization trust, successor to the debtors, sought a declaratory judgment regarding its rights under insurance contracts. In *United States Lines*, about 18,000 claims were filed regarding asbestos-related injuries, and more were expected. The insurance proceeds were likely to be the only source of recovery for these creditors.

The Second Circuit noted the Supreme Court's statement in *Northern Pipeline Construction Co. v. Marathon Pipe Line. Co.*, 458 U.S. 50 (1982) ("*Marathon*"), the decision that prompted Congress to create the distinction between core and non-core proceedings: "[T]he restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages." *United States Lines*, 197 F.3d at 636 (quoting *Marathon*). The Second Circuit noted that it has held that " 'core proceedings' should be given a broad interpretation that is close to or congruent with constitutional limits as set forth in *Marathon*, and that *Marathon* is to be construed narrowly." *United States Lines*, 197 F.3d at 637. The appellate court stated the rule, "[u]nder *Marathon*, whether a contract proceeding is core depends on (1)

whether the contract is antecedent to the reorganization petition; and (2) the degree

to which the proceeding is independent of the reorganization. The latter inquiry

hinges on the nature of the proceeding." Proceedings can be core by virtue of their

nature if either (1) the type of proceeding is unique to or uniquely affected by the

bankruptcy proceedings, or (2) the proceedings directly affect a core bankruptcy

function. *Id.* (citations omitted). "Core bankruptcy functions of particular import to

the instant proceedings include fixing the order of priority of creditor claims

against a debtor, placing the property of the bankrupt, wherever found, under the

control of the court, for equal distribution among the creditors, and administering

all property in the bankrupt's possession." *Id.* (citations omitted).

The *United States Lines* judges were in agreement that the contract and

breach under consideration presented a core proceeding.[10] Having established that

---

[10] The *United Lines* opinion was written by Judge Walker. Judge Walker determined that the
bankruptcy court had core jurisdiction over the proceeding for the declaratory judgment, due to
the impact the contracts would have on other core bankruptcy functions. He noted that the
insurance contracts could be the most important asset of the estate, and a "pay-first" provision in
the contracts necessitated declaratory relief to make sure the trust would be indemnified for
money it would have to pay the claimants. Judge Newman concurred in all aspects except for
Judge Walker's statement that whether a post-petition breach of a pre-petition contract was core
depended on the impact the contract had on core bankruptcy functions. Judge Newman proposed
a bright-line rule that all suits alleging post-petition breaches of pre-petition contracts should be
core. Similarly, Judge Calabresi concurred in all parts of Judge Walker's opinion, except for the
statement that whether a post-petition breach of a pre-petition contract is core depends on the
impact the contract has on core bankruptcy functions, and found that the narrow question of how
to determine whether a post-petition breach of a pre-petition contract was core was not before the
court. The three judges were in agreement that this particular contract and breach presented a
core proceeding.

the proceeding was core, the *United States Lines* court considered whether the bankruptcy court properly annulled the arbitration clause, and stated the standard of review: "Where the bankruptcy court has properly considered the conflicting policies in accordance with law, we acknowledge its exercise of discretion and show due deference to its determination that arbitration will seriously jeopardize a particular core bankruptcy proceeding." *Id.* at 641. The Second Circuit found that the bankruptcy court had properly exercised its discretion to refuse to send the core proceedings to arbitration: 1. the declaratory judgment proceedings were integral to the court's ability to preserve and equitably distribute the trust's assets; 2. the bankruptcy court was the preferable venue in which to handle mass tort actions against an insolvent debtor; and 3. the factual scenario was complex, involving multiple claims, policies and insurers.

Kraken relies on *MBNA America Bank, N.A. v. Hill*, 436 F.3d 104 (2d Cir. 2006), for the proposition that bankruptcy courts favor arbitration. In *Hill*, debtor attempted to bring a class action suit in the bankruptcy court as an adversary proceeding, alleging that MBNA had violated the stay by continuing to deduct monthly payments from her bank account. *See id.* at 106. In response to the complaint, MBNA moved to enforce an arbitration clause in the agreement between the parties, which stated that any claim or dispute arising from or relating in any way to the agreement or the account would be resolved by binding

arbitration. *Id.* The Second Circuit noted that bankruptcy courts generally do not have discretion to refuse to compel arbitration of "non-core" bankruptcy matters, or matters that are simply "related to" bankruptcy cases. *Id.* at 108. With respect to core proceedings, "the bankruptcy court will not have discretion to override an arbitration agreement unless it finds that the proceedings are based on provisions of the Bankruptcy Code that inherently conflict with the Arbitration Act or that arbitration of the claim would necessarily jeopardize the objectives of the Bankruptcy Code." *Id.* (citation omitted). "This determination requires a particularized inquiry into the nature of the claim and the facts of the specific bankruptcy. The objectives of the Bankruptcy Code relevant to this inquiry include the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders." *Id.* (citation omitted).

The Second Circuit reversed and remanded the lower courts' decisions to refuse arbitration, even though the matter was core. First, the Second Circuit stated that the debtor, an individual in a no-asset chapter 7 case, had received her discharge and the case was fully administered. Second, "as a purported class action, [debtor's] claims lack the direct connection to her own bankruptcy case that would weigh in favor of refusing to compel arbitration." *Id.* at 109. Third, the stay is not so closely related to an injunction that it could only be enforced by the

bankruptcy court.

In *Hill*, the Second Circuit distinguished the facts and legal questions under consideration from those presented by *United States Lines*. The *Hill* court noted that the question in *United States Lines* implicated core insurance claims that were integral to the bankruptcy court's ability to preserve and equitably distribute assets of the estate, where the debtor faced mass tort actions. The *Hill* court cited *Gandy v. Gandy (In re Gandy)*, 299 F.3d 489 (5th Cir. 2002), in which the circuit court affirmed that a complaint in which the debtor primarily sought to recover transfers pursuant to Bankruptcy Code §§ 544(b), 548 and 550 would not be sent to arbitration, where the claims represented nearly the entirety of the estate, the claims concerned the equitable distribution of the assets among creditors and one of the remedies sought was not available in arbitration; and *Phillips v. Congelton, LLC (In re White Mt. Mining Co., LLC.)*, 403 F.3d 164 (4th Cir. 2005) (affirming denial of arbitration of disputes between owners of debtor; arbitration would have made it difficult to attract funding, undermined creditor confidence, undermined confidence of parties doing business with the debtor, and imposed additional costs on the estate).

In the matter at bar, Kraken seeks relief from the stay to pursue arbitration in Jersey pursuant to a prepetition consignment agreement with the Debtor. Kraken's motion is denied. The Trust, asserting rights derived from the Bankruptcy Code

and the Bank, is not a party to the consignment agreement and is not bound by the Jersey Law Clause. The dispute between the Trust and Kraken is a substantively core matter, and it is not subject to arbitration.

The Court considers the *Marathon* factors discussed in *United States Lines* to determine whether the consignment agreement is core: 1. the consignment agreement that contains the Jersey Law Clause was entered by Debtor and Kraken on May 3, 2006, about a year and a half before the bankruptcy case was filed; and 2. the proceeding to determine the validity of the liens is totally dependent on the reorganization, implicating the powers of the Trust under § 544 that are created by the Bankruptcy Code and unique to the Bankruptcy Code. Determination of the Trust's interest in the Botticelli concerns whether a substantial claim will be allowed, which is unique to the bankruptcy proceedings; and represents a potentially significant source for creditor recovery. According to the agreement between Debtor and Kraken, the Botticelli was to be sold for $9.5 million, which suggests to the Court that the work of art is quite valuable. If the Trust's interest is superior to Kraken's, then liquidation of the painting may cause the creditors to receive a greater distribution than they would receive without the Botticelli.

The matter at bar bears striking similarities to the matter under consideration in *United States Lines*. In that case, the Second Circuit noted that it was confronted with core bankruptcy functions including fixing the order of priority of creditor

claims against a debtor, placing the property of the debtor, wherever found, under the control of the court, for equal distribution among the creditors, and administering all property in the bankrupt's possession. *United States Lines*, 197 F.3d at 637. These are exactly the same core bankruptcy functions presented by the question of who has the superior interest in the Botticelli. Competing interests are asserted by three parties, Kraken, the Trust as a judicial lien creditor under § 544, and the Trust as assignee of the Bank, and the priority of these interests must be determined. The Botticelli is in the control of the Court, and has been subject to the Court-ordered Art Protocol; and the interests in the Botticelli must be adjudicated so that it can be either liquidated for the benefit of creditors in the bankruptcy or returned to Kraken or other rightful owner.

With respect to the four-factor test federal courts apply when determining whether to enforce an arbitration clause, Kraken fails to satisfy the first prong: that the parties agreed to arbitrate. It seeks to enforce an arbitration clause and a choice of law clause against parties that were not parties to its agreement with the Debtor, regarding rights that are not contemplated by the agreement. The consignment agreement provides for consignment by Kraken to Debtor for one year; for $8.5 million of sale proceeds to Kraken; for insurance; for presentment of the painting to experts; for exhibition in a separate room; for Debtor to use best efforts to sell the painting; Kraken warrants ownership of the painting; asking price of $9.5

million; and for sale proceeds to be remitted to Kraken upon receipt or within thirty days. The arbitration clause provides, "[a]ny disputes **between the parties**, including any disputes regarding this agreement, will be referred to arbitration. . . ." (emphasis added). The consignment agreement makes no reference to bankruptcy.

The Trust is not a party to the consignment agreement. The Trust acquired its alleged right to avoid Kraken's unperfected security interest from Bankruptcy Code § 544(a) — a right that flows from the Bankruptcy Code, not the Debtor. If the Trust argues that it comes by its rights as assignee of the Bank, which was not a party to the consignment agreement, then the Trust cannot be said to be a party to the consignment agreement.

Kraken argues that whether the Botticelli was property of the Debtor at the time the case was commenced is a distinct, arbitrable issue, but, as noted above, it is really part of the prima facie case that the Trust must make if it attacks Kraken's claim using its powers under § 544(a). *See Koreag.* The determination of whether property was property of the Debtor cannot be severed from the other issues involved in a § 544 action and sent to arbitration. Rights under chapter 5 of the Bankruptcy Code, including lien avoidance under § 544, recovery of preferential transfers under § 547 and recovering fraudulent transfers under § 548, are not derived from the Debtor. Allowing part of a § 544 action to be resolved by

arbitration pursuant to a pre-petition arbitration agreement would improperly subject the trustee to an arbitration clause to which it was not a party, in contravention of established authority that § 544 rights are not derived from the Debtor. Whether the Botticelli was property of the Debtor may determine the priority of the Trust's lien against the Botticelli pursuant to § 544, and must be decided by the bankruptcy court. To bifurcate the § 544 claim in the manner demanded by Kraken would be to abandon the jurisprudence established by *Hays* and *United States Lines*. Arbitrating part of the § 544 claim in Jersey, then litigating the other part of the claim in bankruptcy court would lead to a multiplicity of proceedings, undermine judicial economy, and decentralize disputes, all of which militate against finding cause for relief from the stay. *See In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990).

Upon the foregoing, Kraken's dispute with the Liquidation Trust is unquestionably a core matter. The dispute at bar falls squarely within the rules stated by the Second Circuit in *United States Lines*. It appears that one of the questions to be arbitrated is the effect of Kraken's failure to file a U.C.C. financing statement with respect to the Botticelli, which is the question that will determine the priority of the Trust's interest in the work of art. This question is fundamentally concerned with whether the Trust may claim the superior lien on the work of art pursuant to § 544 or as a result of the assignment of the Bank's lien. The priority of

the liens will determine whether Kraken's claim will be allowed.

The Court considers the policies that support enforcement of arbitration clauses: Kraken is a foreign entity that wished to protect itself from unknown laws, and purposefully required the Jersey Law Clause. *See Affidavit of Ronald Fuhrer*, Docket No. 941. Enforcement of arbitration clauses may facilitate commerce and may reinforce the integrity of contracts. In New York City, a commercial hub and the location of Debtor's gallery, an arbitration clause might be negotiated by the parties as a necessary part of their business relationship. However, the present case presents a classic example of the compelling policy in support of a uniform Bankruptcy Code, to facilitate reorganization of debt and assets, allow repayment of creditors, and centralize disputes in a single forum.

At the time the bankruptcy case was commenced, Debtor's books and records had been impounded and art sales enjoined pursuant to orders issued by New York state courts. At least nineteen lawsuits were pending against the Debtor. *See* Docket No. 459, Statement of Financial Affairs. The Debtor and its principal eventually were charged with several crimes, including grand larceny and scheming to defraud investors. *Disclosure Statement*, at 13. Collectors unexpectedly found strangers asserting claims to their artwork, without their knowledge or permission. Commercial creditors cannot be paid from proceeds of sales of the artwork until the competing claims are resolved. Amid this legal chaos,

the only hope for fair creditor recovery lies in the efficient administration of estate assets in a single forum, the bankruptcy court. The very law that Kraken seeks to avoid is meant to protect the interests of parties that were unaware of the relationship between Debtor and Kraken, and who were not parties to the consignment agreement. Binding these third parties — the trustee in bankruptcy and a commercial lender — to arbitration would be grotesquely unfair, and would undermine state law and policies that require the perfection of security interests by filing public financing statements.

Kraken's dispute over priority of interests in the Botticelli is hardly an isolated prepetition lawsuit; rather, it is intertwined with the fundamental goals of this case: the distribution of a gallery crammed with art of unknown value, and payment of collectors and trade creditors who became mired in a fraud. The resolution of the competing claims to the body of artwork in the possession of the Debtor at the time the case was commenced is the primary purpose of this bankruptcy case. The Debtor has spent significant money on cataloguing and storing the artwork. The Court approved a special protocol designed to facilitate the resolution of the claims to the art, which was established by order. The Court approved a plan by order entered on January 20, 2010, which provides for the continuing resolution of the competing claims to the art. Sale of the works of art in which the Trust has the superior interest is the most significant source of creditor

recovery in this case.

### *Kraken has failed to persuade the Court that the consequence of its failure to file a financing statement may be governed by Jersey law.*

In addition to the foregoing conclusions, the Court holds that Kraken has failed to present a legal analysis of choice of law principles sufficient to persuade the Court that the Jersey Law Clause survives the limitation on contractual choice of law provisions set forth in N.Y. U.C.C. § 1-105(2).[11] Kraken has not established that it has a colorable right to enforce the Jersey Law Clause against the Trust, which is not a party to the consignment agreement, in a matter that concerns Kraken's failure to file a financing statement. "If the movant fails to make an initial showing of cause . . . the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection." *In re Sonnax Industries, Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990). Kraken argues that whether

---

[11] N.Y. U.C.C. § 1-105 states:

Territorial Application of the Act; Parties' Power to Choose Applicable Law

(1) Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement this Act applies to transactions bearing an appropriate relation to this state.

(2) Where one of the following provisions of this Act specifies the applicable law, that provision governs and a contrary agreement is effective only to the extent permitted by the law (including the conflict of laws rules) so specified:

*** Law governing perfection, the effect of perfection or non-perfection, and the priority of security interests and agricultural liens. Sections 9-301 through 9-307.

property is property of the estate is a question of state law, and state law,
specifically N.Y. U.C.C. § 1-105(1), states that choice of law provisions should be
upheld where the chosen law and forum bears a reasonable relation to the
transaction.[12]

Even assuming that it is the New York Uniform Commercial Code that
governs whether the choice-of-law aspect of the Arbitration Clause should be
enforced, Kraken fails to address U.C.C. § 1-105(2), which states, "Where [U.C.C.
sections 9-301 through 9-307, among others] specifies the applicable law, that
provision governs and a contrary agreement is effective only to the extent
permitted by the law (including the conflict of laws rules) so specified[.]" N.Y.
U.C.C. §§ 9-301 through 9-307 address the law governing perfection and priority
of security interests. Section 9-301 states that, with exceptions, while a debtor or
collateral is located in a jurisdiction, the local law of that jurisdiction governs
perfection, the effect of perfection or nonperfection, and the priority of a security

---

[12] "In most instances bankruptcy courts rely on the rule observed by federal district courts
hearing diversity cases and use the choice of law rules of the forum state." *In re Eagle
Enterprises, Inc.*, 223 B.R. 290, 292 (Bankr. E.D. Pa. 1998). New York applies an "interest
analysis" to choice of law problems. *Hong Kong and Shanghai Banking Corp., Ltd. v. HFH USA
Corp.*, 805 F. Supp. 133, 140 n.3 (W.D.N.Y. 1992). In *HSBC*, the court noted that New York law
would apply under the interest analysis. The goods were located in New York, the financing
statements were filed with New York, and application of New York law would further the goals
of New York's Article 9: predictability of transactions and the provision of notice to prospective
creditors. These factors showed the importance of the contacts that the transactions had with
New York.

interest in collateral.[13] By failing to address N.Y. U.C.C. § 105(2), which suggests that choice of law clauses yield to local law in the determination of questions regarding perfection, Kraken has failed to demonstrate to the Court that it is entitled to enforce the Jersey Law Clause.

The Court cannot overlook the apparent inconsistency between Kraken's argument that N.Y. U.C.C. § 1-105(2) is an irrelevant exception to the "reasonable relation" rule, and the plain text of N.Y. U.C.C. § 1-105(2) that suggests that a choice-of-law clause should not be enforced with respect to perfection. Parties to a contract are not allowed to opt out of the rules regarding perfection. The rules are meant to protect third parties that might extend credit, by providing notice of the secured party's interest in collateral in such a manner that other creditors can find it. *See In re Eagle Enterprises, Inc.*, 223 B.R. 290, 293 (Bankr. E.D. Pa. 1998) (holding that German choice of law clause did not apply to perfection of security interests, according to Pennsylvania law substantially similar to N.Y. U.C.C. § 1-

---

[13] N.Y. U.C.C. § 9-301 states:

> Law Governing Perfection and Priority of Security Interests

> Except as otherwise provided in Sections 9-303 through 9-306, the following rules determine the law governing perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral:

> (a) Except as otherwise provided in this section, while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral.

> (b) While collateral is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a possessory security interest in that collateral.***

105(2); "the [chapter 7] Trustee stands in the role of a third party as a representative of all creditors, and is specifically given the powers of a judicial lien creditor under 11 U.S.C. § 544. The Trustee, thus, is a third party whose rights cannot be governed by [the creditor's] contract with the Debtor."); *Hong Kong and Shanghai Banking Corp., Ltd. v. HFH USA Corp.*, 805 F. Supp. 133 (W.D.N.Y. 1992) (holding German law did not apply, according to previous version of N.Y. U.C.C. § 1-105; "[T]he parties' stipulation will not be regarded where it would operate to the detriment of strangers to the agreement, such as creditors or lienholders."); *Manufacturers Hanover Trust Co. v. Frymire*, 1991 WL 274972, at *7 (N.D. Ill. 1991) ("U.C.C. § 1-105(2) mentions five exceptions, all involving third party rights, where a choice of law clause in the contract will not prevail; but the Code does not limit the exceptions to those five examples. The general tenor of the Code indicates that third parties should not be bound by a choice of law clause."). In light of the plain reading of N.Y. U.C.C. § 1-105(2), Kraken has failed to present a colorable argument that it is entitled to enforce the choice-of-law provision of the Jersey Law Clause against the Trust, because the rights it intends to assert flow from the Bankruptcy Code and as assignee of the Bank's alleged lien. As such, it cannot be said, for purposes of determining whether Kraken's motion may be granted, that the Trust is a party to the consignment agreement and bound by the clause setting Jersey law as the applicable choice of law.

## <u>CONCLUSION</u>

Kraken's motion for relief from the stay is DENIED in all aspects. The Court exercises its discretion to deny the enforcement of the arbitration provision of the Jersey Law Clause. The determination of the Trust's interest in the Botticelli is a core proceeding that may implicate its powers under § 544 of the Bankruptcy Code. The Trust, allegedly having come by its rights by operation of the Bankruptcy Code and by assignment from the Bank, is not a party to the consignment agreement and did not agree to arbitrate the priority of its liens or the question of whether Debtor had an interest in the Botticelli at the time the bankruptcy case was commenced. Kraken failed to persuade the Court that the choice of law provision of the Jersey Law Clause is not pre-empted by N.Y. U.C.C. §§ 1-105(2) and 9-301 through 9-307. Given these deficiencies in its argument, Kraken has failed to establish cause for relief from the stay. Kraken's motion is denied.

Counsel to the Trust shall submit an order consistent with this decision.

Dated:      July 18, 2011
            Poughkeepsie, New York

                                        */s/ Cecelia G. Morris*
                                        The Hon. Cecelia. G. Morris
                                        United States Bankruptcy Judge